**United States District Court**
**Northern District of California**
**San Jose Division**

Betty Lou and Robert H. Heston,

     *Plaintiffs,*

       vs.

City of Salinas, et al

     *Defendants.*

Case No.: C-05-03658 RS

---

**Opinion Report**

of

**Mark W. Kroll, PhD, FACC**

December 1, 2006

*Prepared by:*

**Mark W. Kroll, PhD, FACC**
Mark Kroll & Associates, LLC
Box 23
Crystal Bay, MN 55323

27-Nov-06

*INTRODUCTORY STATEMENT* ................................................................. 3

*CASE SPECIFIC DOCUMENTS REVIEWED* ......................................... 3

*OPINION METHODOLOGY* .................................................................. 4

   **Scientific Method** .................................................................................. 4

   **Curriculum Vitae** ................................................................................ 4

   **Compensation** ...................................................................................... 4

   **Appendices** ........................................................................................... 5

*SUMMARY OF FACTS* ........................................................................... 6

   **Mr. Heston's Chronic Stimulant Usage and Criminal History** ............ 6

   **Mr. Heston's last day** ........................................................................... 7

   **Frontal vs. Back TASER Device Applications** ..................................... 9

   **Dr. Haddix Autopsy of Mr. Heston** ................................................... 10

     Dr. Haddix Autopsy Error 1: Added Agitation ................................... 11

     Dr. Haddix Autopsy Error 2. Multiple and Extremity Sites of Contact ........... 12

     Dr. Haddix Autopsy Error 3. Fibrillation ........................................... 13

     Dr. Haddix Autopsy Error 4. Pain ..................................................... 14

     Dr. Haddix Autopsy Error 5. Inverse Causation ................................ 15

   **Dr. Hain's Autopsy Report** ................................................................ 17

   **Dr. Karch's Autopsy Report** .............................................................. 17

   **Summary of the Autopsy Reports and Analysis** ................................ 18

*The Plaintiff's Complaint* ...................................................................... 18

*Incident Opinions* ................................................................................ 20

   **Excited Delirium** ............................................................................... 20

   **Electrocution** ...................................................................................... 22

   **Conclusions for the Tragic Death of Mr. Heston** .............................. 23

## INTRODUCTORY STATEMENT

Pursuant to Fed. R. Civ. P. 26(a)(2), I, Mark W. Kroll, PhD, FACC hereby submit my report that contains a complete statement of all opinions to be expressed and the bases and reasons for them; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; and the compensation to be paid for the study and testimony. I have not testified as an expert at trial or by deposition within the preceding four years.

## CASE SPECIFIC DOCUMENTS REVIEWED

1. Plaintiff's complaint
2. Answer of Salinas City, Salinas PD and various officers.
3. Answer of TASER International
4. Autopsy of Terri Haddix, MD
5. Forensic Pathology report of John Hain, MD
6. Forensic Pathology report of Steven Karch, MD
7. Brain Analysis report of Deborah Mash, PhD
8. EMS response records
9. Dispatch records
10. Police report of Chris Swinscoe
11. Police report of Masahiro Yoneda
12. Police report of Michael Cupak
13. Police report of Neil Herrier
14. Police report of Rodolfo Roman
15. Police report of Tim Simpson
16. Police report of Todd Swinscoe
17. Police report of Michael Rivera
18. Police report of Chris Stark
19. Police report of Kenneth Schwener
20. Police report of Henry Gomez
21. Investigative report of Dana Cornelison
22. Investigative report of Chris Lane
23. Police report of Michael Groves
24. Review of Monterey District Attorney

**OPINION METHODOLOGY**

The following opinions were developed using the disciplines of electrical engineering, biomedical engineering, cardiovascular physiology, scientific methods, mathematics, statistics, and physics.

**Scientific Method**

I have invested most of my adult life researching and developing electrical devices to diagnose and treat disease. My primary scientific specialty is the effect of shocks on the human body. I am proud that this investment has resulted in every ICD (Implantable Cardioverter Defibrillator) made anywhere in the world licensing some of my patented improvements.

Briefly, I research, lecture, and publish on electric shock and their effects on the human body. I have lectured throughout Europe and Asia as well as at the major universities and medical centers of the United States on this topic. With 217 issued United States patents and hundreds of pending and international patents, I currently hold the most patents on electrical medical devices of anyone in the world. I also currently hold the most cardiac device patents.

I am an author on about 150 abstracts, papers, book chapters, and invited presentations and the co-editor of the book, "Implantable-Cardioverter Defibrillator Therapy" published in 1996 by Kluwer of Boston.

I am prepared to speak about various scientific research methodologies that have been used to study the safety of the TASER Electronic Control Devices (ECDs or devices). These include mathematical analyses, computer models, animal studies, scientific analyses, and human studies.

**Curriculum Vitae**

Pursuant to Fed. R.Civ.P. 26(a)(2) my current Curriculum Vitae containing a list of my relevant formal education, training, experience, and publications authored  is attached as an Appendix and made an integral part hereof.

**Compensation**

My fees for the preparation of this report are $200 per hour. I have invested about 30 hours in this report and will thus invoice approximately $6,000. My fees for testimony are $350 per hour.

**Appendices**

This report includes the following appendices:

    A.  Pre-incident opinions

    B.  Educational exhibits

    C.  Curriculum vitae

Respectfully submitted,

**MARK W. KROLL, PHD, FACC**

**SUMMARY OF FACTS**

At the time of his tragic but not unforeseeable death, Mr. Robert Clark Heston, Jr. was a 40 year old chronic offender and illegal drug abuser with a lethal level of the illegal and powerful stimulant methamphetamine in his body.

Heston had a 20 year record of arrests for criminal and violent behavior including a 12 year arrest record for illegal drug activities. His violent behavior included injuring his own parents (knocking his mother down with a bloody nose) as well as three police officers as various times.

On January 23, 2005 Mr. Heston was released from Soledad State Prison. Three weeks later (February 19, 2005) he took his last dose of illegal stimulants and had his last violent encounter. Police were called after he began destroying his parent's home and battering his father. In spite of impressive professionalism — and the use of the latest technologies — the Salinas Police Department (SPD) and Emergency Medical Services (EMS) were unable to save Mr. Heston from his own poor choices and he died the next day.

## Mr. Heston's Chronic Stimulant Usage and Criminal History

It is helpful to study Mr. Heston's chronic stimulant use as this can do significant, and permanent damage to the heart and brain. Mr. Heston was using methamphetamine and cocaine at least as far back as 1993.[1] In 1994 his girlfriend called 911 as Mr. Heston was claiming to have rattlesnakes in a room and had been bit by one. That same year Mr. Heston attacked a California Highway Patrol officer with closed fists and was sentenced to twenty (20) days in jail. In 1996 he fought with SPD officer responding to a call of bizarre behavior at a motel. Mr. Heston was under the influence of drugs and extremely combative and received a 90 day incarceration sentence.

In 1999 Mr. Heston's father called police for help. Mr. Heston appeared very much under the influence of drugs, was sweating profusely, and exhibited unusual strength. Mr. injured three of the four law enforcement officers trying to restrain him and was sentenced to 120 days incarceration.

In 2000 Mr. Heston was again acting bizarrely and sweating profusely as a hotel and the police were called. Police were able to take him to a hospital where he was extremely combative and had to be restrained.

In 2001 Mr. Heston's brother in law, Mr. Kurt Kastner, called police to report that Mr. Heston was "high and drunk." Mr. Heston was arrested for being under the influence of a controlled substance and received 150 days in jail.

In 2002 Mr. Heston punched his mother in the face knocking her to the floor and then pushed his father to the floor, arriving officers noticed that Mr. Heston's mother's nose

---

[1] Interview with sister

had been bleeding and appeared very swollen and red but she refused to press criminal charges.

One month later the police were called to the Heston residence at 4:30 a.m. because Mr. Heston, Sr. reported that his son (Mr. Heston) was on drugs and a rampage. Mr. Heston was using a sledge hammer and piece of chain and attacking a parked car. Mr. Heston, Sr. reported that their son came home about once a week under the influence of some type of drug.

At least ten (10) law enforcement officers responded to the scene. Mr. Heston threw items all around, including over the rest of the house and was often throwing things at police officers. Mr. Heston threw glass bottles and jars, full cans of soda, a brick, a pair of pliers and various other heavy objects. Mr. Heston threw items continuously for 50 minutes. Officers were forced to use a police dog to take Mr. Heston into custody. An ambulance was called in order to have Mr. Heston's dog bites treated. Mr. Heston was so belligerent and violent at the hospital that he was strapped down to the gurney. The debris in the street both in front of and behind the Heston home was so extensive that a City of Salinas crew was required to clean it up. For this episode Mr. Heston received one year in the county jail.

In August of 2003 Mr. Heston was again abusing illegal stimulants and acting irrationally and destructive at a local motel. Mr. Heston was throwing items on a motel roof including the porcelain top of the toilet. The police were again called and they attempted to use TASER electronic control devices (ECDs or devices) on Mr. Heston but they were not effective. They used a police dog and batons and were able to again take Mr. Heston into custody. Because of his previous record Mr. Heston now received a two year sentence in the state prison.

## Mr. Heston's last day

On January 23, 2005 Mr. Heston was released from prison on parole. Three weeks later he ingested his last illegal substance of abuse and experienced his last excited episode..

At 1:34 p.m. SPD Officers Masahiro and Paradise responded to a 911 call from Mr. Heston's father who was concerned about Mr. Heston's bizarre behavior. One officer spoke with Mr. Heston who talked about something else in a complete non sequitor. Mr. Heston spoke in a similar fashion to his father. The officers spoke for twenty (20) minutes waiting for backup of. All of this time Mr. Heston was "extremely nervous and fidgety." Mr. Heston began to pull parts of the wall clock off of its housing. He began to disassemble his cell phone. The police told Mr. Heston, Sr. that they could not legally remove Mr. Heston from the home at that point. The police then departed.

Mr. Heston's best friend Satree later described Mr. Heston's behavior as "fidgety, and nervous, disoriented, and confused." Satree stated that he had never seen Mr. Heston like that before except for the last few days. Mr. Heston had previously told them that methamphetamine was his drug of choice. They could not understand why Mr. Heston would rip a picture off a wall.

The police were quickly called back after Mr. Heston began beating his own father in the front yard of his home. Mr. Heston was exhibiting significant strength and vandalism at that point. Mr. Heston threw picture frames that were approximately two-feet square all the way across the street at least 52 feet from the front door of the home. Mr. Heston distributed pieces of a broken grandfather clock around the yard. Impressively he threw the heavy brass counter weights from the grandfather clock, including throwing one at a police officer. These weights measured twelve (12) inches in length by three (3) inches in diameter. These then had a volume of 1391 milliliters. With the standard density of brass of 8500 kilograms per cubic meter this would give a mass of the 11.8 kg or 26.21 pounds. This should be compared to the weight of the shot that male Olympians use in the shot putt event which is only 16 pounds. The fact that Mr. Heston was able to throw a metallic cylinder almost twice the weight of an Olympic shot put – at a police officer – is impressive evidence of his drug induced strength. This certainly would represent an attack of potentially and foreseeably lethal force.

Nevertheless, the police officers showed great restraint and did not shoot Mr. Heston after this attack.

The left-window of the house was shattered and there was broken glass on the floor.  The large silver colored cover of a heater vent was also removed and thrown.

Tragically, possibly the best description of Mr. Heston's behavior is given by his own father. Mr. Heston, Sr. said that his son was saying "off the wall things" and talking about "little people inside of his head" and that the red painted porch was "covered in oil."  He stated that this was exactly the same behavior that was shown in the June 2002 incident. He described his son as having "a demon in him."

In this 2005 incident Mr. Heston knocked his father down twice. His father is a diabetic walking with a wooden cane after knee surgery.  Mr. Heston, Sr. told the police to "take him out of here."  Mr. Heston, Sr. noted that the first TASER device hit was not effective and that a later TASER device hit finally dropped his son to the ground.  Mr. Heston, Sr. saw no one do anything "inappropriate" trying to control his son.

The first police officers to appear at the callback were SPD Officers Dominici and Fairbanks.   Sergeant Dominici said that Mr. Heston was ranting and raving with unintelligible words. Mr. Heston pulled a light fixture from an outside wall. Mr. Heston threw something hard and hit Sergeant Dominici in the chest on his trauma plate. He groaned and was pushed back. He then hit Mr. Heston on his right side with the TASER ECD. Mr. Heston went rigid briefly but did not fall.

Officer Fairbanks then fired his TASER ECD hitting Mr. Heston on his left side. There was a visible reaction but it did not drop him.  Mr. Heston pulled some of the TASER probes out and turned to walk into the house.  He later reappeared at the front door and Officers Ruiz and Livingston were able to again discharge TASER devices as Mr. Heston turned to walk back to the house.

Officers Ruiz and Godwin hit Mr. Heston with TASER ECDs as well and they were finally able to drop him to the floor. Even then the officers were unable to handcuff Mr. Heston as he kept his hands firmly underneath his body. Officers pulled on both sides but still could not control Mr. Heston. Officer Godwin said he had never seen anyone fight through so many TASER cycles. He described Mr. Heston as having "super human strength" and had never seen anyone so resistant in his whole career.

Officer Goodwin discharged his TASER device into Mr. Heston's back. The officers were then finally able to handcuff him. Officer Fairbanks called EMS due to the serious bleeding from Mr. Heston. At this point Mr. Heston had not yet collapsed. Shortly after this Mr. Heston collapsed and Officer Roman, a former emergency medical technician (EMT), initiated two-man cardiopulmonary resuscitation (CPR) until EMS arrived.

AMR arrived within two (2) or three (3) minutes and found Mr. Heston in a cardiac rhythm of asystole. Eventually they were able to restore Mr. Heston's pulse with drugs and never used a defibrillation shock as Mr. Heston was not in fibrillation. They then transferred Mr. Heston to the hospital where he died the next day. An autopsy showed that Mr. Heston had a level of methamphetamine in his body higher than the median lethal dose.

## Frontal vs. Back TASER Device Applications

By differentiating front from the back to TASER device applications on Mr. Heston any role of the TASER devices causing or contributing to Mr. Heston's death can be unequivocally eliminated. This is not to say that there is a risk from using the TASER devices frontally. That has never been scientifically and medically demonstrated in over 600,000 human uses. However, even the most adversarial scientific critics of TASER devices clearly show that there is a zero risk from using these devices on a person's back.

The Nanthakumar porcine study[2] used fairly small swine (110 lbs), much below Mr. Heston's 219 lb weight, and were able to induce ventricular fibrillation (VF) in only one instance which was highlighted by some for the conclusion of the paper. The salient features of that one incidence of VF were: a chemical "trick," or anomaly, to increase the risk of fibrillation, electrodes across the heart and under the skin, and the use of the TASER X26 device. The paper concluded that there was no health risk of cardiac capture or an arrhythmia from electrodes away from the front of the chest. Also the researchers were unable to achieve any sort of cardiac effect with the Advanced TASER M26 device and concluded that the higher frequency of its output made it difficult to affect the heart.

Another adversarial porcine study — in which researchers were doing everything possible to electrocute smaller swine with a TASER device —required a modified probe nearly in direct contact with the heart with an open cut in the chest and conductive gel.[3]

---

[2] Nanthakumar, K., et al., Cardiac electrophysiological consequences of neuromuscular incapacitating device discharges. J Am Coll Cardiol, 2006. 48(4): p. 798-804.
[3] http://www.engr.wisc.edu/bme/faculty/webster_john/EB2006Final.pdf

This researcher, Prof John Webster, is a highly respected biomedical engineer who was honest enough to admit his bias in a newspaper interview when he stated that he had personally decided that the TASER devices were occasionally fatal and set out to find out why that was so.

In summarizing the most relevant features of theses adversarial studies it can be concluded that there is zero risk of a TASER device affecting the heart when the application is on the back or when the device is the TASER M26 instead of the TASER X26. In the Heston incident, the last TASER device application was applied to Mr. Heston's back and thus it goes beyond any scientific and/or medical possibility that the later TASER application to Mr. Heston's back had any effect on his heart. In addition the two adversarial researchers were able to induce ventricular fibrillation which is the easiest cardiac arrhythmia to induce and were never able to induce Mr. Heston's arrhythmia which was asystole.

This is highly relevant as the first TASER applications were to the front of Mr. Heston and clearly did not affect his heart. In fact, the TASER devices appeared to have had almost no effect on Mr. Heston's body as a whole. And importantly, Mr. Heston kept on walking, pulling out the probes, and fighting for minutes after the TASER devices applications to his front chest. This shows that Mr. Heston was clearly not electrocuted and clearly not harmed by the applications of the TASER devices.

## Dr. Haddix Autopsy of Mr. Heston

The Heston autopsy was performed by Dr. Terri Haddix. She did a rather complete job and is to be commended for taking the then novel step of having the brain analyzed by Dr. Deborah Mash, University of Miami, for the negative neurochemistry effects of chronic stimulant abuse.

In retrospectively analyzing Dr. Haddix' faulty conclusions the date of the autopsy must be considered. There were few scientific publications on the medical effects of the TASER devices on the date of Dr. Haddix' autopsy of Mr. Heston, 22 February 2005. The famous McDaniel paper had just appeared a few weeks before. A large number of papers on TASER devices have appeared in the nearly two years between her autopsy and today.

Nevertheless, some of Dr. Haddix' conclusions are simply wrong. Some of these can be excused because of the lack of medical knowledge but some present simple logical errors. Finally, one should recognize the tremendous pressure that a substitute medical examiner would likely be under with a law enforcement and TASER device involved in-custody death. The usual natural human desire is to not look foolish and the safest approach is to give a laundry list of causes and thus try to eliminate the possibility of leaving something out and being embarrassed with a newspaper reporter later on.

Dr. Haddix's conclusion was:[4]

---

[4] Haddix autopsy report of Heston p 12.

| CAUSE OF DEATH: | Multiple organ system failure |
|---|---|
| DUE TO: | Cardiopulmonary arrest |
| DUE TO: | Agitated state associated with methamphetamine intoxication and applications of TASER |

| CONTRIBUTORY CAUSE: | Cardiac dilatation and hypertrophy |
|---|---|

Dr. Haddix then added the following detailed diagnosis.

DIAGNOSES:
I. Agitated state associated with methamphetamine intoxication (see toxicology report)
II. Applications of TASER devices with multiple sites of contact on trunk and extremities
III. Cardiopulmonary arrest
   A. Diffuse hypoxic/ischemic encephalopathy; see neuropathology report
   B. Rhabdomyolysis (see also I and II)
   C. Renal and hepatic insufficiency
   D. Acute bronchopneumonia
IV. Mild four-chamber cardiac dilatation and hypertrophy; see cardiac pathology report

V. Cutaneous contusions and abrasions on arms and legs
VI. Cutaneous contusions, abrasions and incised wounds on both hands
VII. Medical therapeutic intervention including oral endotracheal intubation, orogastric tube, EKG pad, pulse oximetry probe, Foley catheter, indwelling vascular catheters, needle puncture marks and rectal tube

## Dr. Haddix Autopsy Error 1: Added Agitation

The causation element of "[a]gitated state associated with methamphetamine intoxication and applications of TASER [device]" is inconsistent with all witness accounts. Family members, friends, neighbors, and police officers all agree that Mr. Heston was already in a state of maximum agitation. There is no evidence that the TASER devices added any agitation to Mr. Heston.

## Dr. Haddix Autopsy Error 2. Multiple and Extremity Sites of Contact

The scientific evidence is now very clear – especially considering adversarial studies – that there is zero risk of cardiac complications from TASER device applications in which the probe(s) is(are) any distance away from the heart.

And, one does not have to rely on the latest studies to ascertain this. For example, it has been known for decades that the current (through the whole body) to cause a ventricular fibrillation is on the order of 300 milliamperes (mA) [or 0.3 amperes (A)]. Later in her report Dr. Haddix admits that she knew that the output current of the TASER M26 was about four (4) milliamperes [or 0.004 A]. Thus the logical conclusion is that any current through the whole body (and not focused right on the heart with a probe nearly touching the heart) would have to be nearly 100 times as strong as the TASER device output.

In fact, this 4 mA current is below that required to trip the ground fault circuit interrupter (GFI) safety outlets in everyone's bathroom.[5]  It was inappropriate for Dr. Haddix to suggest that a TASER device contact on extremities could have any deleterious effect leading to a cardiopulmonary arrest.

It has also been known for decades that electricity does not build up in the body like poison. If an electrical current does not electrocute someone in 2–5 seconds (s), it will not electrocute the person with a longer application. Thus, longer applications have no materially different effect on the heart.

It is well known that VF can be induced by current flowing through the body. The current that is required to cause VF is dependent on the length of time for which the current is applied, but it is well established that the induction threshold decreases for the first few seconds and does not decrease further.[6,7,8,9] In other words, if a person is not electrocuted by a certain level of electrical current after five (5) seconds, the person will not be electrocuted by a 60 second exposure either. If one ping-pong ball hit to the head does not kill you, 1,000 very probably cannot either.

As seen in the graph below the amount of current required for ventricular fibrillation does not decrease after the few seconds.

---

[5] http://www.national.com/ds/LM/LM1851.pdf#page=5
[6] Weirich J, Hohnloser S, Antoni H. Factors determining the susceptibility of the isolated guinea pig heart to ventricular fibrillation induced by sinusoidal alternating current at frequencies from 1 to 1000 Hz. *Basic Res Cardiol* 1983 Nov–Dec;78(6):604–16.
[7] Younossi K, Rudiger HJ, Haap K, Antoni H. [Experimental studies on the threshold for fibrillation produced by direct or sinusoidal alternating current in the isolated guinea-pig heart] *Basic Res Cardiol* 1973 Nov–Dec;68(6):551–68.
[8] Hohnloser S, Weirich J, Antoni H. Influence of direct current on the electrical activity of the heart and on its susceptibility to ventricular fibrillation. *Basic Res Cardiol* 1982 May–Jun;77(3):237–49.
[9] Roy OZ, Park GC, Scott JR. Intracardiac catheter fibrillation thresholds as a function of the duration of 60 Hz current and electrode area. *IEEE Trans Biomed Eng* 1977 Sep;24(5):430–5.



Since medical examiners often rely on the detection of poison to ascertain a cause of death, they frequently assume electricity also builds up like a poison. It does not. If two (2) seconds of current do not kill a person, it is highly unlikely that two (2) minutes of electrical current will do any differently.

It was inappropriate for Dr. Haddix to suggest that the number of TASER device applications or the duration of those applications had any of relevance to Mr. Heston's death, either causal or contributory. This lack of scientific rigor mandates finding Dr. Haddix' conclusions unreliable.

## Dr. Haddix Autopsy Error 3. Fibrillation

In her closing, Dr. Haddix makes perhaps her most astonishing error. She speculates and pontificates with a fairly long paragraph about the risks of the TASER inducing ventricular fibrillation.

hypoxic/ischemic encephalopathy. I believe the cardiopulmonary arrest is a consequence of the combined effects of the agitated state associated with methamphetamine intoxication and the TASER applications. It has been a question of some debate whether applications from TASER (or similar) devices have directly caused or contributed to the deaths of people upon whom they have been deployed. The low current (e.g. less than 4 mA) has been cited as being insufficient to produce a fatal cardiac dysrhythmia. However, even the publication "Human Effectiveness and Risk Characterization of the Electromuscular Incapacitation Device – A Limited Analysis of the

TASER" found on the TASER International website states: "Ventricular fibrillation (VF) is not expected to occur in an otherwise healthy population, although experimental data are too limited to evaluate probabilities for susceptible populations or for alternative patterns of exposure." The publication further states: "Available experimental-only data are too limited to adequately quantify possible risks of VF or seizures, particularly in susceptible populations." The report continues [bracketed phrases inserted by myself]: "This analysis [experimentally determined VF thresholds in pigs for differing TASER outputs plotted against body weight and extrapolated for use in assessing human dose-response] suggests that healthy adults and larger children would not be at significant risk of VF following exposure to the X26 TASER under normal operating conditions. However, due to assumptions made in selecting uncertainty factors and the absence of specific threshold information in young children, the elderly, individuals with underlying heart conditions, or individuals with concurrent drug use, it is not known whether there are highly sensitive individuals in these groups that could experience VF under normal use of an EMI [electromuscular incapacitation] device." In the current case, there are two factors (drug use and cardiac dilatation and hypertrophy) which, per this article, would place Mr. Heston into the group of highly sensitive individuals.

What is astonishing about this soliloquy is that no one has ever suggested that Mr. Heston was in ventricular fibrillation. The emergency medical technicians (EMTs) found Mr. Heston in asystole and were able to convert him with epinephrine and atropine and thus fibrillation was eliminated.

It is as if Dr. Haddix did an autopsy of someone that had died from lung cancer and then invested a long paragraph evaluating the risks of their diet causing bladder cancer. It is simply irrelevant. One would expect a medical examiner to know the difference between two (2) types of cancers and we would expect a medical examiner to know the difference between two types of lethal arrhythmias.

This is far from a technicality. It is nearly impossible to induce the cardiac rhythm of asystole with electricity. No one – even TASER's biggest critics – has ever suggested that a TASER device could induce asystole. Dr. Haddix should have known the difference. If she was not comfortable with cardiac arrhythmias she could have easily consulted a textbook or called a cardiac electrophysiologist.

### Dr. Haddix Autopsy Error 4. Pain

Dr. Haddix also goes on to speculate about the role of pain possibly contributing to Mr. Heston's death.

> …if, in fact, any other devices were successful in delivering a charge (prior to Mr. Heston landing on the floor) the associated pain would be expected to further exacerbate the ongoing high oxygen demands and increase autonomic output potentiating an arrhythmogenic state.

These speculations frankly make little sense. To translate this statement into a lay person's terms.

Okay, now we will forget about the final TASER device applications and just fo-

cus on those TASER device application when Mr. Heston was still standing.
Maybe those hurt. And, maybe that pain made Mr. Heston need more oxygen and
that made him more hyper. And we know that hyper people are more likely to
suffer cardiac arrhythmias.

There are several errors in this pain theory speculation. First, the evidence suggests that
Mr. Heston was not feeling any pain. The TASER device applications normally make
someone cry out in pain (or curse) and certainly usually encourage compliance with po-
lice commands. All accounts show that Mr. Heston had very little response to the TA-
SER device applications. Police officers stated that they had never seen anyone react so
minimally to the TASER device applications. Thus the evidence is to the contrary that
Mr. Heston felt any significant level of pain from the TASER device applications.

Secondly, it is illogical that Mr. Heston could have any increase to his oxygen demands
when the TASER devices had such a minimal impact. All accounts agree that Mr.
Heston was putting up a tremendous struggle and thus the evidence does not support the
speculation that the irritation of the TASER devices could significantly increase his oxy-
gen demands.

Surprisingly, "being hyper" only decreases the resistance to electrocution for a few min-
utes. After that the resistance to electrocution actually goes up significantly. To be spe-
cific, high epinephrine levels only increase the sensitivity of the heart to fibrillation from
electrical currents for a few minutes. After this time the heart is actually less susceptible
to electrocution.[10] This fact has been known for over 40 years. Again, consider there is
no evidence in this case that Mr. Heston was ever in VF.

### Dr. Haddix Autopsy Error 5. Inverse Causation

An additional error made by Dr. Haddix is so common that there are riddles based on it.
This is the error of the inverse causation. In fact, the best way to introduce this error is
with a riddle.

"Why do I always find something in the last place that I look?" After a brief reflection
the answer is obvious: once someone finds sometimes they stop looking. Therefore they
will always find that which is being sought in the last place they look. With the inverse
causation thinking one would be tempted to ascribe the discovery to the fact that the arti-
cle was hidden in the very last possible hiding place in the universe.

Here is one more example. Why does the sun rise after the roster stops crowing? Does the
sun, in fact, listen for a local rooster crowing to stop before it shows its shining face?
Obviously not. The causation is the exact inverse. The roster begins crowing with the
first hint of sunlight refracted through the atmosphere and then stops.

---

[10] Han J, Garciadejalon P, Moe GK. Adrenergic effects on ventricular vulnerability. *Circ Res*. 1964
Jun;14:516–24.

Inverse causation thinking is often common with the media and others with law enforce-ment involved in-custody deaths. With excited delirium a person will often have super-human strength and stamina until they stop breathing. This is when they have their very short "quiet period" and they then quickly progress to a cardiac rhythm of asystole or (PEA) pulseless electrical activity. During the quiet period the law enforcement officers are able to cease with restraint techniques and handcuff the person. However, the person was already programmed to progress to a lethal cardiac arrhythmia of asystole or PEA and they now have a lethal cardiac arrhythmia.

With the mistake of inverse causation it is often tempting to (wrongly) temporally blame the death on the last restraint technique or specifically the last few seconds of the restraint technique.

With this background let's look at the last sentence of the Dr. Haddix' autopsy report.

> Perhaps the most compelling argument for including the effects of the application of TASER in the cause of death is the tight (e.g. seconds) temporal relationship to the last application of the device and Mr. Heston's cardiopulmonary arrest.

This is a classic example of an inverse causation conclusion with an excited delirium death. Mr. Heston went into his quiet period; stopped struggling and the police officers were finally able to handcuff him. Mr. Heston was then noted to be in an arrest some time later.  Dr. Haddix states that the arrest was noted seconds after the last TASER applica-tions. That is not the impression that I get from reading the police officers' interviews. However, let us ignore that factual issue for a bit.

What is wrong with Dr. Haddix' conclusion here? There are two fundamental scientific problems with her conclusion. The first is that the last TASER device applications were only to the back and it has been well demonstrated that it is impossible for this to have any effect on the heart. If Dr. Haddix wanted to speculate or hypothesize a role for the TASER device she would have to consider the much earlier TASER hit given by officer Dominici to Mr. Heston's left side. However, this was minutes before Mr. Heston expired and thus the "tight temporal relationship" to Mr. Heston's cardiac arrest is lost.

Clearly the early frontal TASER device applications did not put Mr. Heston into a cardiac arrest or he would not have been able to continue fighting. To suggest that the TASER device hit to Mr. Heston's back could have caused his cardiac arrest is to engage in un-supported speculation which is contrary to known scientific fact.

A second problem with Dr. Haddix' speculation is that Mr. Heston's cardiac arrhythmia was not consistent with an electrical shock. An electrical shock can cause ventricular fib-rillation which would lead to immediate collapse. However, electrical shock cannot cause asystole which is what Mr. Heston had. This was later noted in Dr. Karch's comments.

## Dr. Hain's Autopsy Report

Dr. John Hain was asked to review Dr. Haddix' autopsy report regarding Mr. Heston.  Dr. Hain believed that Dr. Haddix was wrong in listing the TASER devices' applications as a primary cause of the death of Mr. Heston. De. Hain believed that the TASER devices applications should be listed as a contributing condition along with left ventricular hypertrophy and dilation, and the struggle with police.

CAUSE OF DEATH:        Multiple organ failure due to cardiac arrest due to
                       agitated state due to methamphetamine intoxication.

CONTRIBUTING
CONDITIONS:            Left ventricular hypertrophy and dilation.
                       Taser application and struggle with police.

While Dr. Hain's conclusions are certainly closer to scientific reality then those of Dr. Haddix, Dr. Hain still has failed to provide a linkage between the TASER devices applications and the causes of the death of Mr. Heston.  In other words, Dr. Hain does not provide any scientific connection, or causation, between the TASER devices applications and Mr. Heston's cardiac arrest. Studies have appeared in the last year suggesting that there really is no such connection or causation, and that TASER devices could not have contributed in this case.

## Dr. Karch's Autopsy Report

The famous pathologist and expert on drug deaths and excited delirium, Dr. Steven Karch was asked to review the autopsy reports of Dr. Haddix and Dr. Hain. Dr. Karch concluded with Dr. Hain that Dr. Haddix was in error listing the TASER device as a cause of death. Dr. Karch found that the cause of Mr. Heston's death was as follows:

CAUSE OF DEATH: Multiple Organ System Failure
        I. Due to: cardiopulmonary arrest
        II. Due to: chronic methamphetamine toxicity
              i. Excited Delirium
              ii. Left ventricular enlargement and fibrosis
CONTRIBUTORY CAUSES
        I. Rhabdomyolysis, secondary to multiple TASER application

Dr. Karch also pointed out that a TASER device could not have caused the rhythm of asystole which Mr. Heston had. Dr. Karch did offer a speculative suggestion of a way in which the TASER device could have contributed.

Dr. Karch correctly pointed out that there was no peer-reviewed scientific evidence either way on his speculative theory that multiple TASER device applications could have

caused rhabdomyolysis. Since the date of Dr. Karch's analysis a study has appeared that answers this question.[11] It looked at blood levels of myoglobin as a diagnostic for rhabdomyolysis. The researchers found no increase in the levels even with extremely heavy levels of electrical device discharges.

This research conclusions appeals to the common sense. It is hard to imagine that seconds or even a full minute of TASER devices' application contracting one set of muscles could have any impact compared to the full body exertion that an excited delirium subject is going through over a one hour or more episode.

## Summary of the Autopsy Reports and Analysis

It appears that Dr. Haddix did a thorough autopsy but had conclusions lacking in scientific rigor and logical strength. She erred when she listed the TASER device as a cause of death.

Dr. Hain reviewed everything and concluded that the TASER device usage could not be the cause of death but a contributing condition. He was unable to postulate how the TASER device could have contributed, other than by adding additional stress to the totality of the events.

Dr. Karch then reviewed everything and agreed with Dr. Hain that the TASER device usage was not a cause of death but speculated that it could be a possible contributing factor. Dr. Karch suggested rhabdomyolysis as a potential pathway by which TASER usage could have contributed to Mr. Heston's death. Since then the United States Air Force study was released which showed that there is no rhabdomyolysis even from extensive TASER device applications.

From this it can finally be concluded to a very high degree of medical and scientific certainty that the TASER devices had no causal or contributory role whatsoever in the unfortunate death of Mr. Heston.

## THE PLAINTIFF'S COMPLAINT

Plaintiff's complaint in this case makes several allegations none of which are remotely close to scientific facts.

In ¶ 41 it is alleged that [TASER's] product is unreasonably dangerous and defective for use on human beings because, among other reasons, it was sold without warnings as to the effect of multiple shocks, the danger of shocking people who are under the influence of drugs, and the effects of TASER shocks on respirations such that the weapon, when used in combination with chest compression techniques cause unnecessary deaths.

---

[11] Jauchem JR, Sherry CJ, Fines DA, Cook MC. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of Sus scrofa following repeated TASER exposures. Forensic Sci Int. 2006 Aug 10;161(1):20-30. Epub 2005 Nov 14.

This allegation is completely false in every regard and is the opposite of the truth. Electricity does not build up like poison and thus there is no need for warnings regarding multiple shocks. The studies of animals under the influence of drugs have shown that they actually are harder to electrocute. [12] Finally, human studies have shown that TASER device discharges actually increase and do not decrease respiration.

In ¶ 44 it is alleged that the TASER device somehow contributed to the death of Mr. Heston. Nothing could be further from the truth. The TASER device presented the best opportunity for the SPD to attempt save Mr. Heston from his violent death from his dangerous drug abuse.

In ¶ 45 it is alleged that the TASER device has some "extreme and unreasonable danger." This is completely false as study after study continues to show that the TASER device is the safest weapon that police departments have.

In ¶¶ 47 and 50 it is alleged that the TASER devices contain manufacturing and design defects. In my opinion, as someone that has spent his career in implantable pacemaker and the defibrillator technology, these TASER devices are designed and manufactured to similar standards. In fact, the TASER devices have more testing on them than almost any pacemaker. The allegation uses the term "ordnance" and the TASER products are not "ordnance."

---

[12] Lakkireddy DR, Wallick D, Ryschon K, Chung MK, Butany J, Martin D, Saliba W, Kowalewski W, Natale A, Tchou PJ. Effects of Cocaine Intoxication on the Threshold for Stun Gun Induction of Ventricular Fibrillation. J Am Coll Cardiol 2006;48:805–11.

## INCIDENT OPINIONS

Incident Opinions are those opinions that focus on the particular facts of the incident under review.  I reserve the right to amend or supplement these opinions if additional information is provided.

## Excited Delirium

Excited delirium with associated metabolic acidosis[13,14,15,16.17] is a usually fatal condition with the following common features:

1. Agitation
2. Incoherence
3. Hyperthermia
4. Paranoia or avoidance behavior
5. Extreme strength
6. Extreme stamina
7. Constant motion
8. Imperviousness to pain
9. Inappropriate behavior
10. History of chronic stimulant abuse or mental illness
11. Breaking of shiny objects such as glass and mirrors
12. Fatal cardiac rhythm of PEA (pulseless electrical activity) or asystole

Most simply explained, the person is mentally out of control and exceeds the normal physical limits of the human body until it "burns out." In greater detail, the person's metabolism goes way up, the respiratory system is unable to adequately compensate, the blood becomes acidic, the heart shuts down, and the subject is dead.

The following is a checklist for excited delirium with metabolic acidosis checklist for Mr. Heston:

1. *Agitation:* Numerous witnesses document this and it is stipulated in the complaint in ¶ 13.

---

[13] Pollanen MS, Chiasson DA, Cairns JT, Young JG. Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community. *CMAJ.* 1998 Jun 16;158(12)1603–7.
[14] Ross DL. Factors associated with excited delirium deaths in police custody. *Mod Pathol.* 1998 Nov; 11(11):1127–37. Review.
[15] Hick JL, SW Smith and MT Lynch. Metabolic acidosis in restraint-associated cardiac arrest: a case series. *Acad Emerg Med.* 1999;6:239–243.
[16] Karch SB, Stephens BG. Drug abusers who die during arrest or in custody. *J R Soc Med.* 1999 Mar;92(3):110–3. Review.
[17] Stratton SJ, Rogers C, Brickett K, Gruzinski G. Factors associated with sudden death of individuals requiring restraint for excited delirium. *Am J Emerg Med.* 2001 May;19(3):187–91.

2.  *Incoherence:* Numerous witnesses including family members and friends document this.

3.  *Hyperthermia:* Medical documentation shows Mr. Heston's temperature at or above 101 degrees..

4.  *Paranoia or avoidance behavior:* Mr. Heston's contemporaneous paranoia was well described by his own family and friends. It is also stipulated in the complaint in ¶ 13.

5.  *Extreme strength:* Mr. Heston was able to resist four trained law enforcement officers in their attempt to handcuff him. Officers described him as having "super-human" strength. One office said he had never seen anyone this powerful in his whole career.

6.  *Extreme stamina:* Mr. Heston was able to run around continuously while dismantling and throwing objects which is something exhausting for a normal person.

7.  *Constant motion:* Described as "extremely fidgety" and all accounts agree that he never stopped moving until he collapsed.

8.  *Imperviousness to pain:* Mr. Heston would show only minor effect from the TASER device discharges and then pull the probes out.

9.  *Inappropriate behavior:* Mr. Heston  was disassembling his cell phone. He was later pushing his own father down and then wondering who was pushing him down.

10. *History of chronic stimulant abuse or mental illness:* Mr. Heston's chronic drug usage is stipulated in the complaint in ¶ 12, well documented to in his arrest records, and testified to by friends and family.

11. *Breaking of shiny objects such as glass and mirrors:* Mr. Heston removed and threw the shiny heater vent cover, he destroyed his father's prized grandfather clock outside and hurled the shiny brass counterweights. He also broke a window with his fist and attacked a wall clock.

12. *Fatal cardiac rhythm of PEA (pulseless electrical activity) or asystole:* The paramedics found exactly this rhythm.

## Electrocution

Electrocution is the induction of a cardiac arrest by electrical shock. This is theoretically how a TASER ECD, such as the TASER M26, could have killed Mr. Heston.[18] It is an immediate death — on the order of seconds[19] — as electricity does not build up in the body like a poison.[20] There are five basic components to such an electrocution death:

1. There is an immediate loss of physical strength for continued resistance.
2. Collapse occurs within 5-15 seconds.
3. VF (ventricular fibrillation) rhythm results.
4. Pulse disappears immediately.
5. Immediate defibrillation is usually successful.

Here is the electrocution checklist for Mr. Heston:

1. *There is an immediate loss of physical strength for continued resistance:* After multiple frontal TASER M26 applications, Mr. Heston was able to resist four officers trying to handcuff him. Clearly he had not lost any physical strength.

2. *Collapse occurs within 5-15 seconds:* After the frontal TASER M26 applications were over, Mr. Heston was able to turn around and walk into the house while removing some of the TASER probes. Mr. Heston later ferociously resisted multiple law enforcement officers in a prolonged struggle. Mr. Heston's collapse occurred at least several minutes — not seconds — after the TASER M26 frontal applications.

3. *VF (ventricular fibrillation) rhythm results:* Paramedics on the scene found a rhythm of asystole instead.

4. *Pulse disappears immediately:* Mr. Heston clearly had a pulse during and after the TASER M26 frontal applications as he was fully conscious and fighting.

5. *Immediate defibrillation is usually successful:* Defibrillation was not indicated as he was not in fibrillation.

---

[18] Raymond E. Ideker, and Derek J. Dosdall. Can the Direct Cardiac Effects of the Electric Pulses Generated by the TASER X26 Cause Immediate or Delayed Sudden Cardiac Arrest in Normal Adults? American J of Forensic Medicine and Pathology
[19] Weirich J, Hohnloser S, Antoni H. Factors determining the susceptibility of the isolated guinea pig heart to ventricular fibrillation induced by sinusoidal alternating current at frequencies from 1 to 1000 Hz. Basic Res Cardiol 1983 Nov–Dec;78(6):604–16.
[20] http://www.forensicnetbase.com/books/561/0072_PDF_C16.pdf.

**Conclusions for the Tragic Death of Mr. Heston**

The facts surrounding Mr. Heston's death satisfy 13 of the 13 common signs of a death by excited delirium with metabolic acidosis. None of the five criteria for a death by electrocution are met. Whether Mr. Heston's excited delirium was triggered by his chronic methamphetamine abuse, or his lethal acute dosage is not salient. (Due to the timing with the acutely lethal dosage that was probably the immediate trigger.) Mr. Heston's death clearly had nothing to do with the use of an Electronic Control Device. In fact, the use of an ECD was probably the best option in order to have a chance to save Mr. Heston's life by quickly capturing him, getting him under control, and into the hands of medical professionals for medical treatment.

The above technical analysis can be simplified with nontechnical logic:
1. Electrocution is instantaneous.
2. Dead people cannot fight.
3. Mr. Heston violently resisted and fought after multiple TASER M26 applications.
4. Therefore Mr. Heston was not electrocuted by the TASER M26.


Based on my review of the documentation listed above, as well as my professional education, experience and background, it is my opinion, to a reasonable degree of medical and scientific probability (certainty), that the use of the TASER Electronic Control Device did not cause or contribute to Mr. Heston's death.  It is also my opinion, to a reasonable degree of medical probability (certainty), that Mr. Heston's death was caused by drug-induced excited delirium.

The Appendices to this report are hereby inserted within and hereby made integral parts of this report and analyses.


A. Pre-incident opinions

B. Educational exhibits

C. Curriculum vitae


Also, each graphic in this report or any of its references, as well as any documents referenced or cited, as well as any compilation of documents are to be considered exhibits to this report and will likely be utilized as exhibits at deposition and/or trial.

Appendix A

# Safety of TASER® Electronic Control Devices

---

**Pre-Incident Opinions**

**of**

**Mark W. Kroll, PhD, FACC**

November 27, 2006

*Prepared by:*

**Mark W. Kroll, PhD, FACC**
Mark Kroll & Associates, LLC
Box 23
Crystal Bay, MN 55323

**1. The TASER ECD PULSE CANNOT STOP THE HEART** ........................................ 4
Summary .......................................................................................................... 4
Safety Margin Calculations ............................................................................. 4
Safety Margin for a Single Pulse in the Vulnerable Zone ............................... 4
Green Model .................................................................................................... 5
Peleska Model ................................................................................................. 5
International Safety Standards ......................................................................... 5
Conclusion ....................................................................................................... 6

**2. Multiple Pulses from the TASER ECD Cannot Stop the Heart** ....................... 6
Knickerbocker Model ...................................................................................... 6
Beigelmeier Model .......................................................................................... 6
Dalziel Model .................................................................................................. 7
The GFI Safety Outlet for Guidance ............................................................... 8
Conclusion ....................................................................................................... 8

**3. Animal Results Show that the TASER ECD Cannot Harm the Heart** ............... 8

**4. Human Studies Show that the TASER ECD Does Not Affect the Heart** ........... 9

**5. How Can it Affect the Muscles Without Affecting the Heart?** ........................ 10

**6. The TASER ECD is Safer than Many Headache Remedies** ............................. 10

**7. Long TASER ECDs Applications Do Not Affect the Heart.** ............................. 11
Summary .......................................................................................................... 11

**8. The Naïve use of Low Frequency Power Line Safety Standards** ..................... 12

**9. Cocaine Does *NOT* Make the TASER ECD Dangerous** ................................ 14
Summary .......................................................................................................... 14
Discussion ....................................................................................................... 14
Other Stimulants ............................................................................................. 14

**10. The TASER ECD Cannot Cause Remote Electroporation** ............................. 15
Summary .......................................................................................................... 15
Discussion ....................................................................................................... 15

**11. The TASER ECD Cannot Cause Remote Burns** ........................................... 16

**12. Anti-Police Group Fund-Raising "Studies" are Pure Junk Science** ............. 17
Summary .......................................................................................................... 17
Causation vs. Correlation ............................................................................... 17

**13. Examining the Examiners** ......................................................................... 18

**14. The TASER ECD Cannot Cause Nerve Damage** .......................................... 21
Summary .......................................................................................................... 21
The Impossibility of Laceration ..................................................................... 21
The Impossibility of Electroporation Nerve Damage ..................................... 21
The Impossibility of Cauterization Damage ................................................... 22
Eye Injuries .................................................................................................... 22

**15. The TASER ECD Does Not Interfere with Breathing** .................................. 22

*Scientific and Other External References* ..................................................... *23*

**TABLE OF FIGURES**

Figure 1. Fibrillating currents as a function of body weight. ...................................7

Figure 2 The threshold in amperes for the capture of the A-α motor neurons as a function of the pulse duration. Note that narrow pulses require much more current...............................................................**Error! Bookmark not defined.**

Figure 3 The threshold in millijoules for the capture of the A-α motor neurons as a function of the pulse duration. Note that the most efficient capture obtains at the 100 μs pulse width of the TASER X26 pulse. . **Error! Bookmark not defined.**

Figure 4 Output waveform of X26 weapon in tissue. The output circuit attempts to deliver a constant charge per pulse. Thus the output current is largely load independent. ........................................................**Error! Bookmark not defined.**

Figure 5 M26 output waveform into a typical load. Due to the short duty cycle, the net average effective current is < 1 mA compared to the instantaneous peak current of 15 amperes or more. ............................**Error! Bookmark not defined.**

Figure 6 Voltage from the M26 and the proportional membrane response for possible electroporation. Due to the 10 μs time constant of electroporation, the effective peak voltage is less that half of the actual M26 peak voltage. ........**Error! Bookmark not defined.**

*Pre-Incident Opinions* are those professional opinions that focus on the medical safety of the TASER electronic control devices (ECDs or devices) prior to the instant matter. I reserve the right to amend these opinions based upon additional testimony and/or discovery documents.

## 1. The TASER ECD PULSE CANNOT STOP THE HEART

### Summary
The TASER ECD cannot stop the heart. While it has brief high currents, just like a strong static electricity shock, the pulses are significantly too short in duration to affect the heart. Since the pulses are each too weak to affect the heart a series of them will not affect it either.

The safety of the TASER devices has been verified in numerous human and animal studies. It is doubtful that any law enforcement use-of-force technique or tool has been tested so thoroughly for safety.

### Safety Margin Calculations
The best evidence for the cardiac safety of the device lies in the 210,000 voluntary training exposures and 340,000 suspect uses (total of 559,000 human uses) without any credible evidence of a resulting cardiac arrhythmia.

Nevertheless, we can quantify the safety margin of the TASER device outputs by comparing them to published scientific data on the electrical induction of VF (the main cause of cardiac arrest).

There are two primary ways to deliver an electrical shock to induce VF. The first is to deliver a single short shock (less than 1/20 second long) exactly during a particularly vulnerable point in the heartbeat cycle. The vulnerable spot is called the "T-wave."

The suggestion that the TASER device could induce VF (ventricular fibrillation) by shocking into the vulnerable period has been referred to as "Russian Roulette" or the "Lightning Lottery." For short duration pulses, such as those from the TASER ECDs, the critical parameter for cardiac stimulation is the net delivered charge.[i]

The second way to deliver a shock to induce VF is to deliver either continuous or nearly continuous current for a longer period of time. For this scenario the critical parameter is the average current. The following analysis will calculate the safety margin for both scenarios.

### Safety Margin for a Single Pulse in the Vulnerable Zone
The TASER M26 main phase delivered charge is about 85 microcoulombs (µC) and the TASER X26 delivers about 100 µC. It has been known for over a century

that the critical parameter of electrical stimulation by short pulses is the electrical charge.[ii] This has been more recently confirmed for cardiac stimulation with short duration pulses, such as those from the TASER ECDs.[i]

**Green Model**

Green investigated the VF induction threshold for canines stimulated along their long axis.[iii] He found that the lowest threshold occurred with a 5 millisecond (ms) quarter sine wave and was 2 amperes (A). Integrating, we find a minimum required charge of 6.5 millicoulombs (mC). On the basis of many studies, it is common practice to use a normalization factor of 2 to 1 to go from canine results to human as humans are so much larger than the small dogs typically used in these laboratory experiments.[iv] This suggests a human VF threshold of 13 mC. With the TASER X26 charge of 100 µC we can calculate the safety margin as:

$$SM = 13 \text{ mC} \div 100 \text{ µC}$$
$$= 130{:}1$$

For the TASER M26 the safety margin would then be even higher at:

$$SM = 13 \text{ mC} \div 85 \text{ µC}$$
$$= 153{:}1$$

**Peleska Model**

Peleska studied capacitor discharges into the T-wave and found a minimum required charge of 5 mC to induce VF.[v] This suggests a human threshold of 10 mC.

The safety margin is thus:  $100{:}1 = 10 \text{ mC} \div 100 \text{ µC}$  for the X26 and:

$$118{:}1 = 10 \text{ mC} \div 85 \text{ µC} \text{ for the TASER M26}$$

**International Safety Standards**

International safety standards (e.g. IEC 479) are primarily based on the 50-60 Hz wall outlet frequencies and the classical but misleading RMS current measurements. However, revisions to IEC-479 are being considered which would include more scientific measurements directly related to the risk of fibrillation such as the charge in microcoulombs.[vi] The proposal refers to 100 µC as "disagreeable" and 10,000 µC as "ventricular fibrillation likely." Note that this second number is 100 times greater than the TASER ECD charge. The updating of international standards is painfully slow as many countries input editing changes and the changes then require approvals around the globe. Nevertheless, it is encouraging that these standards are starting to move in the correct direction scientifically.

## Conclusion

No pulse from the TASER X26 or the M26 could ever induce VF by affecting the heart during the "sensitive" spot. The charge in the device pulses is too low by factors of at least 100:1. The "lightning lottery" and "Russian roulette" theories are simply not possible.

## 2. Multiple Pulses from the TASER ECD Cannot Stop the Heart

Since it is clear that no single pulse from a TASER ECD can induce VF, it is important to analyze the impact of the stream of 19 pulses per second (PPS). For the continuous current modeling, we need to calculate the "continuous" current level. With a charge of 100 µC delivered 19 times per second we have 1.9 mC per second delivered, which is an average current of 1.9 milliamperes (mA) for the TASER X26. The pulse rate for the TASER M26 varies from 15 to 20 PPS depending on the battery voltage. With the charge of 85 µC the average current varies from 1.3-1.7 mA. The more conservative 1.7 mA is so close to the typical 1.9 mA from the TASER X26 that we can simplify calculations by using a conservative 1.9 mA for both devices. (Counting both positive and negative phases of the M26 and X26 gives slightly higher numbers of 3.6 mA and 2.1 mA. In my opinion, the lower numbers are the most appropriate metric for indicating the ability of the pulses to affect the heart as the polarity changing phases merely offer cancellation effects.)

## Knickerbocker Model

Knickerbocker studied the VF threshold with 20 Hz (hertz or cycles-per-second) AC (alternating current).[vii] He found a threshold of 70 mA for canines in the long axis and a 2 second connection. This suggests a human threshold of 140 mA.

This gives a safety margin of 74:1 = 140 mA ÷ 1.9 mA for the X26 and M26.

## Beigelmeier Model

Beigelmeier's model holds that long-term AC (5 seconds or more) requires 1/20[th] of the current to fibrillate as does a single 20 millisecond (ms) pulse (which single pulse would have to be into the T-wave).[viii] We can predict the single pulse VF threshold from the Jones and Geddes study which found a ratio of 52:1 for a 10 ms pulse (the widest they investigated). This would give a single 10 ms pulse a VF threshold of 1.4 A = 52 • 27 mA.

Dividing this by Beigelmeier's ratio of 20 gives a predicted AC threshold of 70 mA. Doubling this for humans gives us a human threshold of 140 mA and a safety margin of:

> 74:1 for the TASER X26 and TASER M26

(which matches the results from the Knickerbocker model)

## Dalziel Model

Dalziel performed a meta-analysis of VF thresholds for mammals.[ix] This is shown in Figure 1. Conservatively, he included swine which are very easy to fibrillate due to subtle cardiac conduction system differences. The average current required to cause fibrillation is given by the formula:

I = 3.68W + 28.5 mA

Where W is the body weight in kilograms. For pounds the formula is:

I = 1.67W + 28.5 mA

For a typical difficult arrestee of 190 lbs (86 kg) the average current required to fibrillate would be:

I = 346 mA

which gives an average safety margin of 182. However, Dalziel recognized that sensitivities to electrical currents vary and he thus performed a statistical analysis. He plotted the lower limit of sensitivity as the middle line in the figure. Note that this middle line gives a fibrillating current of over 160 mA for our 190 lb resisting human subject. This gives a safety margin of:

$$84 = 160 \text{ mA} \div 1.9 \text{ mA}$$



**Figure 1. Fibrillating currents as a function of body weight.**

## The GFI Safety Outlet for Guidance

Finally, let consider the lessons from the ground-fault interrupter (GFI) outlets that are in everyone's bathroom, under current electrical codes in the United States. The TASER ECD level of current (1.9 mA) is so low that it will not trip the GFI safety outlet in your bathroom which requires between 4 and 6 milliamperes.[x]

The GFI specification is written in terms of root-mean square (RMS) current which will be discussed later. Nevertheless, the actual circuitry in the GFI outlets measure average current[1] which is also how TASER devices have to be rated. The GFI outlet designers recognize that RMS current measures the heating capability in a power source and not the fibrillating capability.

## Conclusion

We have analyzed the risk of the induction of VF from the TASER X26 and M26 ECD with the two scenarios known for cardiac risk.

For the risk of delivering a pulse into the vulnerable period of the cardiac cycle we find that the charge required is about 100–130 times that which the TASER X26 delivers. The TASER M26 safety margin was calculated at an even higher range of 118-153:1.

We also analyzed the risk for the delivery of "continuous" current. We found a safety margin of 140:1 by two different methodologies for the TASER X26 and TASER M26.

It appears that the TASER device output is incapable of inducing VF in adult human beings.

## 3. Animal Results Show that the TASER ECD Cannot Harm the Heart

TASER sponsored a study at the University of Missouri, Columbia, to determine the safety margin of the TASER X26 ECD. This institution has a well founded reputation for leading research in defibrillation going back decades. This study used pigs for the testing as pigs — pound for pound — are probably the easiest mammals to put into VF (ventricular fibrillation or cardiac arrest) by electricity.[xi] Also, the anesthetic used, isoflurane, is known to increase the risk of VF[xii,xiii] and thus this study was extremely conservative.

Even with the smallest pigs (only 60 pounds) the output of the TASER X26 had to be increased by a factor of 15 to ever cause VF. In fact, a 200-pound pig required over 30 times the X26 output to ever cause VF. This safety margin of 30:1 is far higher than that of many over-the-counter medications. For example,

---

[1] http://www.national.com/ds/LM/LM1851.pdf#page=5

acetaminophen (the active ingredient in many headache and pain medications) has a safety margin of only about 10:1 for the recommended dosage.[xiv,xv]

These ground breaking results were peer-reviewed and published in the leading journal Pacing and Clinical Electrophysiology (PACE).[xvi] This study was done with careful scientific procedures and set a new standard for use of force weapons research. No one has been able to make a credible criticism of the methodology or principles of this study. And — importantly — no other studies have contradicted the results. On the contrary, other completed studies now in the publication-review process strongly support those results. In fact, the data was validated by a multi-year, multi-million dollar study completed by the United Kingdom government in 2005 when they found an even higher safety margin.[xvii]

One researcher failed to induce VF in pigs and was finally forced to surgically open the skin, and move the fat and muscle insulating the heart. Then he poured a conductive gel (which conducted about 8 times better than the removed fat and the muscle against its grain) in until it directly contacted the heart. Only then was he able to induce VF by inserting a barb into the conductive gel within 5/8 inch of the heart.[xviii] This was a very useful result as it showed the great lengths that one had to go to in order to get VF from a TASER device. Unfortunately, this researcher perhaps went a bit too far by trying to analogize his extreme experiment to humans even though the thinnest humans have 1.2 inches between their skin and the heart which is filled with highly insulative muscle and fat.

## 4. Human Studies Show that the TASER ECD Does Not Affect the Heart

The following study was performed under the auspices of the University of Minnesota.[xix] Adult volunteers (n=66, age $40.3 \pm 6.8$ years, 65 male, 1 female) had typical cardiovascular histories: 6 hypertension, 6 hypercholesterolemia, 1 each of myocardial infarction and bypass grafting, heart failure, coronary disease, transient ischemic attack, and diabetes with 51 reporting no significant history. Each was shot in the back with standard TASER device barbs and received the full five-second application from the law enforcement model TASER X26. Each had blood drawn before, immediately after, and at 16 and 24 hours post-exposure. Troponin I, potassium, CK, lactate, and myoglobin were tested. A 12-lead ECG was recorded in 32 randomly chosen subjects at each venipuncture. A blinded cardiologist read all 128 ECGs in random order.[xx]

There were no significant changes in any of the serum markers. Thirty of the 32 ECG subgroup had normal ECGs for all four recordings. One subject had all four recordings interpreted as left ventricular hypertrophy and another had occasional sinus pauses in all four recordings. The TASER ECD did not affect cardiac or skeletal serum markers or cause serial ECG changes. In other words, no sign of any effect on the heart was found in any of the volunteers.

Another human study, through the University of California at San Diego, found no negative effects on the heart in the 49 volunteers exposed to the TASER devices.[xxi]

The world's expert on fibrillation is Raymond Ideker, MD, PhD who has over 300 indexed manuscripts on the topic and over 1000 total papers and abstracts. He analyzed the TASER X26 output and calculated that it should have a 28:1 safety margin for the typical adult human.[xxii]

## 5. How Can it Affect the Muscles Without Affecting the Heart?

The fact that the electrical pulses generated by the TASER X26 are too small and too short to stimulate the heart raises the question of why these same pulses are able to cause skeletal (external) muscle contraction. The electrical pulses stimulate the A-$\alpha$ motor nerves which in turn cause the skeletal muscle to contract.[xxiii] The time constant for stimulation of motor neurons from electrodes on the chest of dogs is approximately 0.24 ms, much shorter than the 3.6 ms for cardiac muscle.[xxiv] Other studies give time constants and chronaxies even shorter and nearer to 100 µs.

The second reason why the motor neurons are excited by the TASER pulse—while the heart muscle is not—is that the motor neurons are much closer to the electrodes than is the heart. This also explains why the muscles most affected are those nearest to the electrodes of the TASER device. The different electrical resistivities of the various body tissues, and the relative insulating effect of the air-filled lungs, also cause the electric field to be many times smaller in the heart than in the surface tissues near the electrodes. In fact, the amount of current that passes through the heart from electrical pulses delivered to the chest wall is only about 4–10% of the total current delivered through chest electrodes.[xxv,xxvi] Most of the current flows around the chest between the two electrodes in the intercostal muscles. Electrical current prefers to flow with the grain of a muscle vs. against the grain by a factor of 10:1. Also, the 4–10% value occurs when electrodes are optimally placed to affect the heart. When the electrodes are elsewhere on the body, as they are in the large majority of cases when the TASER device is used, the percent of applied current that traverses the heart is even less.

## 6. The TASER ECD is Safer than Many Headache Remedies

Acetaminophen (also sold as paracetamol in the United Kingdom) has caused fatalities in adults with dosages of 15 grams or 30 extra-strength acetaminophens.[xxvii,xxviii] One in 10 United States poisonings is acetaminophen alone. There are around 250 US deaths annually from acetaminophen. In the UK, it is even more popular and it accounts for every second poisoning.

What is the safety margin for acetaminophen? The bottle labeled safe dose for a single day is eight tablets. The safety margin for someone taking the daily dose in one sitting is thus only 4:1.[2]

To be generous, let us assume that people always followed the timing instructions, which recommend only two tablets every four hours. (People with bad headaches and other pains do not follow these limits and that is one reason there are so many acetaminophen poisonings.) After four hours the last two tablets are largely metabolized thus they are counted as — effectively — only one in the body. Now add in the two new tablets. The body now sees an effective ingestion of three tablets, or 1.5 grams. With a lower lethal limit of 15 g, there is now a safety margin of only 10:1.

According to the conservative University of Missouri pig study, the TASER ECD safety margin for a full-sized adult is 30 times, thus a TASER device is indeed far safer than acetaminophen.

How about body size effects? The threshold acetaminophen dose requiring treatment is 150 mg/kg of body weight. Assume a 110 pound young person. Such an individual's body weight is 50 kg, giving a threshold acetaminophen dose of 7.5 grams, or 15 tablets. The safety margin (for the three tablets in four hours) is 5:1. At this weight, a TASER device has a safety margin of 22:1 by the McDaniel study.

Regardless of body weight, the TASER device is around three to four times safer than acetaminophen. Note that this analysis does not include the risk that criminals struck by the TASER device may fall and hit their heads on a hard object, thus risking possible death from the secondary head trauma. This analysis deals only with death and not injury such as that from a barb hitting the eye or an increased risk of certain cancers associated with acetaminophen.


## 7. Long TASER ECDs Applications Do Not Affect the Heart.

### Summary
Electricity does not build up in the body like poison. If an electrical current does not electrocute someone in 2–5 seconds, it will not electrocute the person with a longer application. Thus, longer applications have no materially different effect on the heart.

It is well known that VF can be induced by current flowing through the body. The current that is required to cause VF is dependent on the length of time for which the current is applied, and it is well established that the induction threshold decreases for the first few seconds and does not decrease further.[xxix,xxx,xxxi,xxxii] In

---

[2] There are many different parameters to measure the relative safety of drugs. The calculations here are not the same as the classical "Therapeutic Index" or the "Normalized Safety Margin."

other words, if you are not electrocuted by a certain level of electrical current after five seconds, you will not be electrocuted by a 60 second exposure either. If one ping-pong ball hit to the head does not kill you, 1,000 probably cannot either.

A recent study in smaller pigs (110 lbs) looked at an "extreme scenario" by burying the TASER barbs under the skin and placing a barb over the most sensitive part of the heart. With 15 second durations they were able to record some temporary and harmless effect on the heart. However, they saw the same effect 96% of the time with only a 5 s application.[xxxiii]

## 8. The Naïve use of Low Frequency Power Line Safety Standards

The VF threshold (amount of current required to cause VF) depends on the frequency of the electrical current.[xxxiv,xxxv]  Due to the cardiac membrane time constant (the averaging effect of the cardiac cell walls) of approximately 3 ms the cells act as low-pass filters with a cutoff frequency of about 160 Hz = $(2\pi \cdot 3 \text{ ms})^{-1}$. Above this frequency, the heart's sensitivity to stimulation varies inversely with the frequency. Thus, the heart is extremely insensitive to stimulation by high frequencies. This fact is, of course, implicitly recognized by cardiologists every time they perform a cardiac radio frequency ablation with the typical 500 kHz generator. These generators deliver hundreds of times more power to the heart than does the TASER X26.

The primary international electrical safety standard is IEC 479-1. This standard was designed to promote electrical safety with utility power frequencies and its use with electrical weapon outputs is highly problematical. For example, IEC 479-1 has no correction for high frequencies and is not helpful in any way. This has led at least one self-proclaimed "expert" to calculate that the TASER M26 device will have a 50% fatality rate![xxxvi]

The proposed IEC 479-2 does have a correction for high frequencies but is based on an arbitrary frequency correction beginning at 1 kHz (when the correct value for cardiac safety would be 160 Hz). In spite of that unscientific pessimism, it correctly identifies the TASER M26 output as having cardiac safety. Ironically, IEC 479-2 is only a proposal and not even an official standard at this time.

Finally, none of the utility power safety standards give any guidance for the TASER X26 as the waveform is not sinusoidal.[3]

In general, the classical safety standards for the risk of electrically induced VF are largely based on continuous, sinusoidal current, of 50–60 Hz in frequency,

---

[3] However, revisions to IEC-479 are being considered which would include more scientific measurements directly related to the risk of fibrillation from narrow pulses such as the charge in microcoulombs.

and with the current calculated as RMS (root mean square). None of these four criteria are relevant for ECDs for the following four reasons:

1. The output pulse is a narrow burst and hence not continuous.

2. The waveform is either a damped sine wave (TASER M26) or even more complex (TASER X26).

3. The spectrum of the pulses is in the range of 10-100 kHz (M26) and thus orders of magnitude removed from the 50–60 Hz utility power frequencies.

4. The RMS calculation exaggerates the effect of short-duration high-current pulses due to the "squaring" of the current before averaging (mean calculation). On the contrary, the cardiac cells simply average the current and are not impressed by the short-duration high-current pulses. This is why electrophysiology stimulators and defibrillators are never rated in terms of their RMS output current or voltage. RMS measures the energy delivery in a current. This is useful for running motors and light bulbs and even heating tissue. But, the energy content has no connection to stimulation. The world's living authority on bioelectricity, Dr. Reilly, simply states "It should be clear from preceding discussions that the excitation or fibrillation capability of a stimulus is not predicted by it energy content.[xxxvii]

How can we then get any guidance from, say, the GFI specifications of 6 mA safe limits? The answer is to consider the specifications in light of our more modern understanding of electrical stimulation, which holds that the average current is the best measure. For line frequencies the difference is insignificant and thus the standards can be brought over directly in most cases.

$$I_{rms} = 0.707 = \sqrt{\frac{1}{\pi} \int_0^\pi \sin^2 t \ dt} \ = \ \frac{1}{\sqrt{2}}$$

While

$$I_{ave} = 0.637 = \frac{1}{\pi} \int_0^\pi \sin t \ dt \ = \ \frac{2}{\pi}$$

Note that the difference between the RMS and average values, for utility power, is only 11% which is insignificant for biological phenomena. That is why the RMS measurements have survived so long in standards – it does not really matter for low frequency sine waves![4] But, for more complex waveforms, one must use the

---

[4] Typically, the average current calculation requires one to treat all phases as if they were positive in sign. Otherwise, if one literally and blindly calculated the average current for a sine wave the result would be zero!

average current as that is much more closely linked to the delivered charge – which is what actually does the stimulation.[5]

| Current source | Average | RMS | Difference |
|---|---|---|---|
| Normal US wall outlet | 13.4 | 15 A | 11% |
| GFI safety limit | 5.4 mA | 6 mA | 11% |
| TASER M26 | 3.6 mA | 150 mA | 4167% |

## 9. Cocaine Does *NOT* Make the TASER ECD Dangerous

### Summary

Since cocaine is dangerous in so many ways, some uninformed individuals are tempted to assume that it must also be dangerous for electrocution. In fact, the opposite is true. Cocaine intoxication actually makes it *harder* to electrocute someone.

### Discussion

It is well documented that cocaine has strong effects on the heart such as dramatically raising the heart rate and blood pressure.[xxxviii] Cocaine usage also significantly increases the risk of a heart attack.[xxxix] Thus, the natural, although incorrect, assumption is that cocaine also makes it easier to electrocute someone. *I.e.*, electrically induce VF. What is surprising — even to some cardiologists — is that this natural assumption is wrong. Most scientific studies have shown that cocaine makes electrocution more difficult — not easier.[xl,xli,xlii]

Based on a careful review of the scientific literature, TASER has found that the presence of cocaine does not increase the already low risk of fibrillation. And, this conclusion was apparently sound as America's most famous Heart Hospital, the Cleveland Clinic, has recently soundly confirmed these findings.[xliii]

### Other Stimulants

With the methamphetamine epidemic there is concern that addicts using this and other illegal stimulants could be at increased risk for electrocution from the TASER devices. However, one small animal study found no TASER device induced

---

[5] Since the TASER M26 has an oscillating waveform the average current value will vary depending if one counts just the main phase (1.9 mA) or includes the smaller alternating phases (3.6 mA). I believe that the 1.9 mA value accurately reflects the safety of the M26 but the 3.6 mA also suggests extreme safety,

VF even in the presence of various similar stimulating agents.[xliv] And, it has long been known that a direct catecholamine (internal stimulants) challenge of epinephrine and norepinephrine appears to only lower the VF threshold for the first three to seven minutes (which is before the arrival of law enforcement to a call for strange or bizarre behavior), after which time the VF threshold actually goes up.[xlv] Thus, the person, ironically, is probably safer from electrocution than the responding law enforcement officers once they arrive on the scene.

Note that this field situation is far different from someone quickly ingesting a large dosage in front of police officers and then struggling with them. That could be dangerous with some stimulants for the first few minutes as was shown in an absolute worst case situation of low body weight, barb inserted under the skin, barb placed over the heart, and a strong pure stimulant (epinephrine — with no protective effects such as cocaine has) given intravenously.[xxxiii]

## 10. The TASER ECD Cannot Cause Remote Electroporation

### Summary
Experts are starting to admit the impossibility of the TASER device directly causing fibrillation (cardiac arrest). So, others have begun reaching to different types of electrical injuries such as "electroporation" and burns. Ironically, these require even more current than does the induction of cardiac arrest (electrocution). Thus, those who may now insupportably opine cardiac electroporation are incorrect — this is absolutely impossible.

### Discussion
Electric shocks can, indeed, cause myocardial (heart tissue) death[xlvi,xlvii] and myocardial cell death can cause ventricular arrhythmias minutes to hours after it occurs. [xlviii] However, the shocks must be very large to cause heart cell death. Shocks of 150 J (joules) or even higher used for defibrillation do not cause heart cell death.[xlix] A typical 150 J defibrillation shock delivers over 50 mC of electric charge, which is approximately 500 times the charge of a single TASER X26 pulse and over 50 times the total charge delivered by a five-second application. Thus, it is extremely unlikely that the TASER X26 causes myocardial necrosis. The TASER M26 delivers even less charge but more energy. It typically delivers about 0.5 joules per pulse and 50 J with a 5 s application.

Extremely large shocks can cause heart cell death by electroporation.[l] During electroporation, the shock electric field creates such a large change in the cell wall voltage that the wall breaks down and pores form in it that allow the free flow of ions.[li] If the electroporation is severe, the cell dies. Almost always, the cell's repair mechanisms can close the pores before the cell dies. During this time of repair, which can last for several minutes, the electrical activity of the cell is abnormal and arrhythmias can occur.[lii] However, the stimulus strength needed to cause even *mild* electroporation is approximately 50 times that needed to pace

the heart.[liii] The X26 delivers about ¼ the charge required for pacing and the TA-SER M26 even less so the TASER devices should have safety margins of about 200:1 or more for electroporation of the heart. Finite element models show that the safety margins protecting the heart from electroporation are enormous.[liv],[lv]

The simplest argument against electroporation is to notice that strong static shocks can have a peak current of 30 A according to international specification. This is twice the peak current of the M26 and nearly 10 times the peak current of the X26. There is no case in recorded history of someone suffering electropora-tion damage from a static shock.


## 11. The TASER ECD Cannot Cause Remote Burns

A second way in which an electric stimulus could cause heart cell death is by generating enough heat to "cook" some heart tissue. (Depending on the tempera-ture, this may be referred to as cauterization or ablation). The effect of high volt-age and high currents on the heart has been studied previously. Exposure to high voltage current from lightning strikes or power line electrocution has been shown to cause contraction band necrosis involving the atrial and ventricular myocardium, tunica media of the medium and large coronary arteries, and the sinus and AV nodes.[lvi,lvii,lviii,lix] These focal changes affecting the myocardium were extensive throughout the ventricles and atria. The vascular injury due to endothe-lial damage, smooth muscle contraction band necrosis, disseminated intravascu-lar coagulation, and hypertensive chemoreflex contribute to the acute and late thrombosis and vessel rupture, manifesting in myocardial infarction and intramu-ral hemorrhages.[ix] Hearts were described to be normal in outside appearance, except for a few petechiae.

Ablation requires the tissue to be raised to about 55° C. The TASER X26 pulse has 70 mJ of energy and delivers 19 pulses per second for five seconds. There are 95 pulses, which thus together deliver 7 joules of energy. One joule of energy generates 0.24 calories of heat. Therefore, 2.3 calories are delivered which will raise the temperature of one cubic centimeter of water by 1° Celsius. Thus, the idea of the TASER devices causing any ablation beyond a few mm from the tiny barb is fanciful.

The TASER X26 heating would raise 1 cc of water if there was no loss of heat to other tissues during the five-second application. However, due to heat loss, the actual temperature increase would be far less. The body generates about 100 W or 100 J/s at rest. Thus over a 5 second application the X26 is directly adding 5/500 or 1% to the body's intrinsic heating. With an exercising or struggling indi-vidual the percentage increase is far less.

Assuming no cooling at all, a 5 second X26 application injects 2.3 calories of heat into the body. With a 180 pound subject, the average temperature increase would be:

$$0.000028° \text{ C} = 2.3 \text{ cal} / 180 \text{ lbs} / 454 \text{ g per lb}$$

Therefore the average body temperature increase would be 28 *millionths* of a degree Celsius!

## 12. Anti-Police Group Fund-Raising "Studies" are Pure Junk Science.

### Summary

Why do some people succumb to sudden unexpected and unforeseeable death while encountering law enforcement officers? We all want answers and we all want to blame something. Often, some people seek to blame a single cause temporal to the person's death, while most often the causation of death is actually multi-factorial and is usually chronic rather than acute. Resisting arrest and consuming illegal drugs, especially over a long period of time, is dangerous and often leads to "excited delirium"-type deaths, which is the most likely explanation for this sad death.

The fact that the TASER device was used in attempts to control someone to save their life is not why they died.

### Causation vs. Correlation

Why does the sun come up after the rooster crows? If you think that the rooster's crow caused the sun to come up you have committed the *post hoc ergo propter hoc* logical fallacy. The statement "*post hoc ergo propter hoc*" is Latin for "after this therefore because of this." You put your coat on before you go out on a winter day. Do you think your coat caused the air to turn cold? That is why some reporters lacking both scientific training and an understanding of statistics may see causations where there is none.[lxi,lxii,lxiii]

About 20,000 Americans die annually of drug-related causes according to the Center for Disease Control.[lxiv] A cocaine overdose death is not a peaceful sleepy death like one from heroin – especially if the individual is a chronic abuser. It is violent, disturbing, and with bizarre behavior.[lxv] It is also ugly, sad and tragic. The methamphetamine epidemic is also causing a rapidly increasing number of stimulant deaths which may top those of cocaine. The end-stage of chronic cocaine or methamphetamine usage is a fairly consistent sequence of events typically referred to as "excited delirium."[lxvi,lxvii,lxviii] These same symptoms can also be seen in violent struggle deaths triggered by a psychiatric episode.[lxix,lxx] This has been recognized as far back as before the American Civil War.[lxxi]

A decade ago, these in-custody-deaths were blamed on pepper spray. "*Pepper Spray: A Magic Bullet under Scrutiny.*"[lxxii] In that report, the American Civil Liberties Union (ACLU) of Southern California documented seven fatalities after the use of pepper spray in a nine-month period. Now the TASER devices are being seen as a simple, "obvious" scapegoat for these tragic deaths.

If a person with normal mental function has excessive exertion, that individual's brain will recognize the signals that the blood is getting acidic and will force the body to slow down. If someone's mental functioning is such that this feedback signal is ignored, the person may struggle until they die.[lxxiii] Thus, excited delirium can kill by making the blood so acidic that nothing can function.[lxxiv,lxxv] The typical features of excited delirium are agitation, incoherence, hyperthermia, paranoia, displays of public nudity, violent aggression, attraction to glass and lights, constant motion, and feats of incredible strength right up to death.[lxxvi] The main causes are chronic, illicit stimulant abuse, presence of certain mental health conditions, and also use of certain mental health medications.[lxxvii,lxxviii] Sadly, some cases are also due to severe mental illness and the refusal to take prescribed medications.

When someone is dying this horrible death described as excited delirium, they usually exhibit bizarre, unusual, and violent resistive behavior which often attracts attention. Law enforcement personnel are then called and they have to deal with this syndrome for which no good or accepted protocols or treatment have been agreed upon.[lxxix]

Studies of excited delirium deaths show that the majority of the cases have no TASER device involvement.[lxxx] Citizen Down, another law enforcement "watchdog" group, estimates that 1,000 American citizens die in law enforcement custody each year. About 50% of the U.S. law enforcement agencies have at least some TASER devices. If the TASER device-carrying officers were to be always called to deal with these violent cases then one would estimate 500 "TASER-related" deaths per year. Consider a much more conservative estimate and take just the 12% of officers, across the country, who carry TASER devices on their belts. That would give a very conservative estimate of 120 "TASER-related" deaths per year. The clear and inescapable conclusion is that the TASER devices are being blamed for less than their theoretical share of "related" deaths and thus may well be reducing the incidence of in-custody-deaths.

In fact, every study by law enforcement agencies adopting TASER devices has shown that the arrest-related death and injury rate goes down — not up![lxxxi]

## 13. Examining the Examiners

Why have a few medical examiners indicated that TASER devices were a cause of death, a contributing factor in a death, or could not be ruled out as a cause of death? Even if every death in which the TASER device is even mentioned —was assumed to actually be the fault of the TASER device — then it would appear to

be an amazingly safe weapon. Around 27 deaths out of about 550,000 estimated uses indicates that the theoretical death rate is about 1 in 20,000. But, even those few cases exaggerate the role of the TASER devices in any deaths.

Medical examiners cannot detect electricity in the body after a shock like they can detect drugs or bullets. So, they sometimes take a politically safe approach and make the meaningless statement that, "The role of the TASER was undetermined," or "… could not be ruled out." This can be an honest admission by a medical examiner (ME) of knowing nothing about electricity. They are trained to detect poisons and physical injury and disease.

Also, in many such death cases the ME does not perform the investigation or the tests that could actually assist in proving causality of death. The examiners often do not examine the striatal dopamine transporter levels in the brain,[lxxxii] nor do they perform hair analysis for indications of chronic drug abuse. Nor do many of the examiners perform psychological autopsies to gain additional information that could lead them to other possible contributors or causations of death. This may be for budgetary reasons or time constraints. Also, there is no great societal pressure to expend large amounts of time and money precisely investigating the death of a drug addict or street criminal.

A death from excited delirium, in the chronic drug abuser, will often occur at a point when the drug itself has been metabolized (processed) and thus is not detectable in the blood.[lxxxiii] Or, it is detectable at a fairly low level not fatal for an acute usage. The tests to determine chronic drug usage are tricky, expensive, and time consuming. At a minimum they require a quick freezing of the brain so that it can be analyzed for the modifications from long-term drug use. This is generally not done.

Very rarely do the medical examiners affirmatively list the TASER device as a contributing factor. In those rare cases, TASER has presented the autopsy and law enforcement records to cardiac electrophysiologists, experts in excited delirium, and other specialists. In every case analyzed to date, the medical experts have concluded that the medical examiners erred in their conclusions. The most common mistakes made by the examiners were: (1) failure to appreciate the timing of electrocution, and (2) failure to adequately test for excited delirium. Since electrocution is instantaneous (seconds), cases in which death occurred minutes or hours after the TASER application are easy to eliminate by someone understanding fibrillation.

I performed a press search for the years 2001-2005 for cases of an SICD (Sudden in custody death) with a temporal TASER ECD association and obtained the autopsy reports. Working with other experts, we counted the number of errors found in the medical examiner reports.[lxxxiv]

As discussed above, sudden death from electrical discharge is caused by the induction of ventricular fibrillation (VF) and generally follows this sequence: (1)

pulse disappears immediately, (2) there is loss of physical strength for continued resistance, (3) collapse occurs within 5-20 seconds, (4) VF rhythm occurs, and (5) immediate defibrillation is usually successful. Any material failure to appreciate the above facts was scored as an error.

Other errors were counted if the medical examiner report reflected hypotheses not supported by known literature. These included: blaming the ECD for cardiac physical changes, inclusion of a publicity sensitive safe comment (e.g. "we were unable to eliminate the role" of the ECD), assuming prolonged ECD applications are more dangerous than other restraint techniques, claiming that ECDs impair breathing, presumption of a lethal synergy between stimulant drugs and the ECD, use of the ECD in the "drive stun" mode only since this involves current passing between the two very close electrodes and does not create any major body mass involvement. Finally, the use of the metaphorical "last straw" was scored as an error.

We found 27 cases where the autopsy report listed the ECD as a contributory or as an "unknown" factor. As expected, the rate of such reports appears to be growing at 2.6 per year ($r^2$=.74, p = .06) due to increased adoption of the TASER ECDs.  Autopsy reports were reviewed for these cases and errors were tabulated.  The decedents were all male with mean age 35.6 ± 10.7 years (median = 32) which is consistent with recently reported SICD data.[6] We found a mean of 3.1 ± 1.2 scored errors per report with a range of 1-6. This rate was very stable across the study period. A sobering finding was the rate at which "last straw" was mentioned as a linkage in lieu of a scientific mechanism. Scored errors are listed in the following table:

| Probable Error in Citing the ECD | N |
|---|---|
| Time to collapse  ≥ 1 minute | 21 |
| Continued resistance after ECD application | 14 |
| Rhythm other than VF | 11 |
| Publicity sensitive comments | 9 |
| Failure of immediate defibrillation | 7 |
| Drive stun mode | 6 |
| Assumed drug-ECD electrocution synergy | 6 |
| Discharge duration or parity | 5 |
| "Last straw" metaphor as a mechanism | 4 |
| Cardiac damage ascribed to ECD | 3 |
| Assumed ventilation impairment | 2 |

---

[6] Ho JD, Reardon RF, and WG Heegaard. Deaths in police custody: an 8 month surveillance study. Annals Emerg Med, 2005;46 (suppl):S94.

## 14. The TASER ECD Cannot Cause Nerve Damage

### Summary

Major organ nerve damage can be caused by three possible mechanisms: laceration, cauterization, and electroporation. None are even remotely possible with TASER devices.

### The Impossibility of Laceration

Even if the barbs can penetrate the skin, they go only 9 mm deep and are thus nowhere near the important nerves controlling the organs.

### The Impossibility of Electroporation Nerve Damage

The TASER M26 phases are too short for efficient electroporation. (The TASER X26 has too low of a current.)

Electroporation is the injury to the cell wall due to a very high electrical field.[lxxxv] The "field" is the change in voltage per cm of distance. If you grab the electrodes on a 12 V car battery (one in each hand) you will feel nothing. However, if you put a 9 V battery against your tongue you will feel an electrical stimulation. Why does a lower voltage stimulate when the higher one does not? The difference is in the field. The distance between your hands is about 200 cm so the field is only 12 V/200 cm = 0.06 V/cm. However the 9 V battery terminals are only 1 cm apart so the average field was 9 V/cm. So the little battery gave 150 times the electrical field. (Another issue is the salty saliva which is a good conductor. But even if one grabbed the car battery with hands wringing wet with saltwater there would still be no sensation.)

The field required for electroporation is about 35–50 V/cm. But, almost all electroporation is temporary as cells have amazing abilities for self healing after electric shock. For permanent injury, the fields must be much stronger by a factor of at least ten to 1. The field required for permanent injury appear to be about 700 V/cm[lxxxvi] to 800 V/cm.[lxxxvii]

The time constant for electroporation membrane charging is typically about 60 µs.[lxxxviii] Thus, the short 10 µs phases of the M26 are unlikely to accomplish much electroporation. In fact, **Error! Reference source not found.** shows the effect of this 60 µs time constant is to reduce the 5,000 volt peaks to, effectively, 500 volts. The 60 µs time constant tends to smooth out the TASER M26 phases. This is why medical research electroporation is typically done with 100 µs long pulses.

Using the peak effective electroporation voltage of 500 volts delivered from a TASER M26 into a subject, the resulting electrical fields were modeled. The 10 mm barb was modeled as 10 superimposed 1 mm spheres. The abdominal barb was assumed to be in the fat, which is worse case, and has a 2000 Ω cm conductivity. The leg barb was assumed to be half in fat and the deepest half to be in muscle.

Regions of possible electroporation were limited to about 1 mm from the barbs. Any regions of permanent electroporation were so small (a few layers of cells) that they would have been, at most, a thin coating on the barbs.

Any claims of nerve damage are completely unscientific .The easiest way to understand this is to compare the TASER device output to the output of an ECT device. An ECT (electroconvulsive therapy) device is used to deliver a shock to the brain to reset it as a therapy for severe refractory depression.[lxxxix] The popular Somatics® ME 2316[xc] delivers 20.3 joules per second of energy with 1 ms pulses for a 30–60 second application. This gives a total of up to 1218 joules of energy—directly to the head! This is 25 times more energy than delivered by the TASER M-26. The brain is nothing but nerves yet nerve damage is not found. In fact, therapeutic benefit is found even for epilepsy.[xci]

### The Impossibility of Cauterization Damage

Even if the barbs do penetrate the skin cauterization is impossible as the TASER M26 device only delivers 50 joules of energy over the full five second application. That is not enough to even raise the temperature of a teaspoon of water by more than a few degrees—much less burn tissue.

### Eye Injuries

Strong evidence of the safety of the TASER X26 involves a case report of a subject taking a barb in his eye.[xcii] Even though there was obviously an acute mechanical injury, the electrical pulses did not damage to the eye or the connecting nerves. The individual recovered his vision except for a pinhole from the barb location.

### 15. The TASER ECD Does Not Interfere with Breathing

One animal study suggested that an X26 discharge might interfere with breathing.[xciii] This result had several caveats: (1) pigs were used on their backs which is a highly unnatural position for them, (2) the anesthetic tiletamine-zolazepam (TZ) has the side effect of depressing breathing,[xciv] and (3) the report was just an anecdotal observation as the study was not designed to look for breathing effects and the pigs were not instrumented for breathing.

A human study was recently performed under the auspices of the University of Minnesota. Volunteers were instrumented with a breathing monitoring device which showed that the TASER X26 did not interfere with breathing.