1  JOHN BURTON, State Bar No. 86029
   THE LAW OFFICES OF JOHN BURTON
2  414 South Marengo Avenue
   Pasadena, California  91101
3
   Telephone:   (626) 449-8300
4  Facsimile:   (626) 449-4417
   E-Mail:       jb@johnburtonlaw.com
5
   PETER M. WILLIAMSON, State Bar No. 97309
6  WILLIAMSON & KRAUSS
   18801 Ventura Boulevard., Suite 206
7  Tarzana, California  91356
8  Telephone:   (818) 344-4000
   Facsimile:   (818) 344-4899
9  E-Mail:       pmw@williamson-krauss.com
10 Attorneys for Plaintiffs Betty Lou Heston, individually,
   and Robert H. Heston, individually and
11 as the personal representatives of Robert C. Heston, deceased

12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15 BETTY LOU HESTON, individually,        Case No. C 05-03658 JW
   and ROBERT H. HESTON,
16 individually and as the personal
   representatives of ROBERT C.           PLAINTIFFS' MEMORANDUM OF
17 HESTON, deceased,                      LAW IN OPPOSITION TO
                                          DEFENDANTS' MOTION FOR
18              Plaintiffs,               SUMMARY JUDGMENT OR IN
                                          THE ALTERNATIVE SUMMARY
19        v.                              ADJUDICATION; DECLARATION
                                          OF PETER M. WILLIAMSON IN
20 CITY OF SALINAS and SALINAS            SUPPORT THEREOF
   POLICE DEPARTMENT, SALINAS
21 POLICE CHIEF DANIEL ORTEGA,
   SALINAS POLICE OFFICERS
22 MICHAEL DOMINICI, CRAIG               DATE:     April 23, 2007
   FAIRBANKS, JAMES GOODWIN,             TIME:     9:00 A.M.
23 LEK LIVINGSTON, VALENTIN              ROOM:     Courtroom "8", 4th Floor
   PAREDEZ, JUAN RUIZ and TIM            JUDGE:    Hon. James Ware
24 SIMPSON, TASER INTER-
   NATIONAL, INC.,  and DOES 1 to
25 10,
26              Defendants.
27
28

# TABLE OF CONTENTS

|  | Page |
|---|---|
| TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1, 2 |
| TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3, 4 |
| MEMORANDUM OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |

1.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

2.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    A.   The Taser Weapon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    B.   The First 911 Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

    C.   The First Taser Sequence . . . . . . . . . . . . . . . . . . . . . . . . .   8

    D.   The Second Taser Sequence . . . . . . . . . . . . . . . . . . . . . . .   9

3.   THE COURT IS REQUIRED TO VIEW THE FACTS
    IN A LIGHT MOST FAVORABLE TO PLAINTIFFS . . . . . . . .   13

4.   THE TWO-STEP ANALYSIS OF **SAUCIER V. KATZ** . . . . . . .   14

    A.   A Jury Could Conclude that Each Taser Shock
        Administered to Heston **After** the Tasers Knocked
        Him to the Floor was Excessive and Objectively
        Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

    B.   The **Graham v. Connor** Objective Reasonableness
        Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

        (1)   Severity of Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

        (2)   Immediate Threat Posed to the Officers
             or Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

        (3)   Active Resistance to Arrest . . . . . . . . . . . . . . . . . . . . .   20

        (4)   Attempts to Evade Arrest . . . . . . . . . . . . . . . . . . . . . . .   20

        (5)   Lesser Intrusive Alternatives to Use of Force . . . . . . . .   21

        (6)   Mental Status of Suspect . . . . . . . . . . . . . . . . . . . . . . .   21

    C.   The Law Was Clearly Established that Repeated,
        Pointless, Painful Electric Shocks Administered to
        Heston Amounted to Excessive Force . . . . . . . . . . . . . . . . .   23

1

## TABLE OF CONTENTS (conti.)

Page

2

3      5.      TRIABLE ISSUES OF FACT EXIST WHICH
               SUPPORT PLAINTIFFS' MONELL CLAIM . . . . . . . . . . . . . .      25

4      6.      THERE ARE NO APPLICABLE STATE IMMUNITIES . . . . .      27

5      7.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      28

6      Declaration of Peter M. Williamson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      29

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

3  <u>FEDERAL CASES</u>                                                      <u>Page</u>

4  <u>Boyd v. Benton County</u>
        374 F. 3d 773, 781 (9th Cir. 2004). . . . . . . . . . . . .        23
5
   <u>Chew v. Gates</u>
6        27 F. 3d 1432 (9th Cir. 1994) . . . . . . . . . . . . . . . .      21

7  <u>Cleveland v. Policy Management Systems Corp.</u>
        526 U.S. 795, 806 (1999) . . . . . . . . . . . . . . . . . .        13
8
   <u>Davis v. Mason County</u>
9        927 F.2d 1473, 1484-85 (9th Cir.1991) . . . . . . . . . .         16

10 <u>Deorle v. Rutherford</u>
        272 F. 3d 1272 (9th Cir. 2001) . . . . . . . . . . . . . . .        22, 23
11
   <u>Drummond v. City of Anaheim</u>
12       343 F. 3d 1052 (9th Cir. 2003) . . . . . . . . . . . . . . .       20, 24, 25, 26

13 <u>Graham v. Connor</u>
        490 U.S. 386, 109 S. Ct. 1865 (1989) . . . . . . . . . .          15, 19, 21, 22
14
   <u>Gutierrez v. City of San Antonio</u>
15       139 F.3d 441 (5th Cir.1998) . . . . . . . . . . . . . . . . .      25

16 <u>Harlow v. Fitzgerald</u>
        (1982) 457 U.S. 800, 102 S. Ct. 2727 . . . . . . . . . .          23
17
   <u>Hope v. Pelzer</u>
18       536 U.S. 730, 122 S. Ct. 2508 (2002) . . . . . . . . . .          24

19 <u>Kennedy v. City of Ridgefield</u>
        439 F.3d 1055, 1066 (9th Cir. 2006) . . . . . . . . . . .          25
20
   <u>LaLonde v. County of Riverside</u>
21       204 F.3d 947 (9th Cir. 2000) . . . . . . . . . . . . . . . .       25

22 <u>Larez v. City of Los Angeles</u>
        946 F.2d 630, 635 (9th Cir.1991) . . . . . . . . . . . . .         16, 25
23
   <u>Liston v. County of Riverside</u>
24       120 F. 3d 965 (9th Cir. 1997) . . . . . . . . . . . . . . . .      20

25 <u>Meade v. Grubbs</u>
        841 F.2d 1512, 1528 (10th Cir. 1988) . . . . . . . . . .          25
26
   <u>Mendoza v. Block</u>
27       27 F. 3d 1357 (9th Cir. 1994) . . . . . . . . . . . . . . . .      25

28

1

<u>TABLE OF AUTHORITIES (conti.)</u>

2

3   <u>FEDERAL CASES</u>                                                          <u>Page</u>

4   <u>Monell v. New York Dept. of Social Services</u>
         436 U.S. 658, 98 S. Ct. 2018 (1978) . . . . . . . . . . . . . .          28

5
    <u>Saucier v. Katz</u>
6        533 U.S. 194, 121 S. Ct. 2151 (2001) . . . . . . . . . . . .          14,15, 23

7   <u>Scott v. Henrich</u>
         39 F.3d 912, 916 (9th Cir.1994) . . . . . . . . . . . . . . .            25

8
    <u>Smith v. City of Hemet</u>
9        394 F.3d 689 (9th Cir. 2005) . . . . . . . . . . . . . . . . .       15, 16, 21

10  <u>Ting v. United States</u>
         927 F.2d 1504 (9th Cir. 1991) . . . . . . . . . . . . . . . . .         19

11
    <u>Ward v. City of San Jose</u>
12       967 F.2d 280, 284 (9th Cir. 1992) . . . . . . . . . . . . . . .          15

13

14  <u>STATE CASES</u>

15  <u>Edson v. City of Anaheim</u>
         63 Cal. App. 4th 1269 (1998). . . . . . . . . . . . . . . . . .        27, 28

16
    <u>Johnson v. State of California</u>
17       69 Cal.2d 782 (1968) . . . . . . . . . . . . . . . . . . . . . . .        27

18  <u>Lopez v. Southern California Rapid Transit District</u>
         40 Cal.3d 780 (1985) . . . . . . . . . . . . . . . . . . . . . . .        28

19
    <u>Scruggs v. Haynes</u>
20       252 Cal. App.2d 256 (1967). . . . . . . . . . . . . . . . . .          27, 28

21  <u>Susan A. v. County of Sonoma</u>
         2 Cal. App.4th 88 (1991) . . . . . . . . . . . . . . . . . . . . .        27

22

23  <u>FEDERAL STATUTES</u>

24  42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . .         5, 27

25  <u>STATE STATUTES</u>

26  Cal. Govt. Code § 820.2 . . . . . . . . . . . . . . . . . . . . . . . . .        27

27  Cal. Govt. Code § 820.4 . . . . . . . . . . . . . . . . . . . . . . . . .        27

28

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT/ADJUDICATION
N.D. Cal. Case No. C 05-03658 JW

MEMORANDUM OF LAW

1.    INTRODUCTION

Plaintiffs Betty Lou Heston and Robert H. Heston bring this wrongful death action after Salinas Police Department officers repeatedly shocked their son, Robert C. Heston, with multiple Taser stun guns until he experienced cardiac arrest resulting in his death the following day when he was disconnected from life support.

Plaintiffs called 911 for assistance with their 40-year-old son who had a troubled history of substance abuse. He appeared to be under the influence of methamphetamine and was highly agitated, damaging household items and throwing them out of the house. The responding City of Salinas police officers shocked Heston repeatedly with multiple Taser weapons. During the last five-second shock, the twenty-fifth within a period of seventy-four seconds, they noticed he was in cardiac arrest.  Although he was revived after ten minutes or more of down time, Heston suffered irreversible brain damage and did not survive. The medical examiner for the Monterey County Sheriff-Coroner, Dr. Terri Haddix, determined the Taser applications to be a cause of death.

The Salinas defendants have filed this Rule 56 motion challenging the claims against them in the First-Amended Complaint causes of action for wrongful death, survival and deprivation of familial relations under 42 U.S.C. § 1983, and common-law torts of assault, battery, and negligence. The products liability claims against defendant Taser International, Inc., are not at issue in this motion.

Defendants make the following contentions (claims conceded by the plaintiffs in their Notice of Non-Opposition are not listed here):  (1) the officers did not commit any constitutional violations; (2) even if constitutional violations were committed, the officers are entitled to qualified immunity; (3) the Chief of Police and the City of Salinas were not deliberately indifferent to the training or supervision of the City's officers; and (4) since the officers did not use excessive  force, they are immune on state claims of assault, battery and negligence.

1    Defendants ignore the maxim that the evidence must be viewed in the light most

2  favorable to the party opposing the motion. Plaintiffs' evidence demonstrates that the

3  defendant officers shocked Heston repeatedly after he was knocked to the floor, and that

4  those painful and ultimately lethal shocks served no legitimate law enforcement purpose –

5  they constituted excessive force. There is more than adequate evidence to support a jury

6  verdict here that the excessive force occurred because of the City's deliberate indifference

7  to the training and supervision of officers in its Taser program.  None seemed to know how

8  to use this powerful new device properly.  The Court need go no further than to deny the

9  motion in its entirety.

10    For the following reasons, defendants' Motion for Summary Judgment, or in the

11  alternative, Summary Adjudication, should be denied because triable issues of fact exist

12  which, ultimately, must be resolved by a jury.

13  2.    STATEMENT OF FACTS

14    A.    The Taser Weapon

15    The basics of the Taser electric control weapon is explained in the Declaration of

16  plaintiffs' expert witness, Ernest Burwell:

17        The M-26 is shaped like a pistol. A cartridge attaches to the end of the

18    "barrel." When the trigger is pulled, the cartridge doors fly open and two

19    barbed probes attached to wires are fired with compressed nitrogen. The usual

20    wire length is 21 feet, making the effective range about 18 feet. The darts

21    pierce the skin or clothes of the target, creating a circuit through which

22    electrical current passes for a pre-set interval of five seconds.  The current is

23    high voltage, 50,000 Volts, but low amperage, 3.6 mAmps, a total of 1.76

24    Jules, making the current effective in jumping through two inches of clothing,

25    but relatively safe from causing electrocution. After the Taser is fired initially,

26    the trigger can be pulled for additional five-second shocks. (There is a shut-off

27    mechanism, but that was not used in this incident.)  The trigger can also be

28    held down to administer a prolonged shock, lasting until the trigger is

released.  The current is designed to "pulse" at a rate of 15 to 20 times per second.  According to Taser's promotional materials, the current is designed to "temporarily override the nervous system [and take] over muscular control." People who have experienced the effect of a Taser typically liken it to a debilitating, full-body seizure, complete with mental disorientation and loss of control over bodily functions. When effective, the current causes the skeletal muscles to contract, inducing the condition known medically as "tetany." It is generally not possible to comply with instructions while being shocked, and it can be difficult to put someone's arms in handcuffing position while the current is active.

(Burwell Declaration at ¶¶ 8 & 9)

Mr. Burwell explains that the "Taser is designed to knock down a subject and incapacitate him briefly to create a 'window of opportunity' for officers to move in and safely apply handcuffs  Once Heston went down in the living room, he should have been handcuffed immediately."  (**Id.** at ¶ 4:21-27)

Each Taser M-26 has a "Dataport" – a computer chip installed which records the time of each trigger pull.  Prolonged shocks are measured as a series of pulls at five-second intervals.  Taser promotes the Dataport as a feature to make officers accountable and subject to meaningful supervision for their Taser usage.   Using software sold by Taser International, Inc., all recorded information from the Dataport can be downloaded to a Windows-based computer.  (Burwell Declaration at ¶ 10)

B.     The First 911 Call

The 40-year-old decedent, Robert C. Heston (hereinafter "Heston"), had a history of substance abuse, mostly involving methamphetamine and alcohol, and a series of arrests related to drug offenses and run-ins with the police.  Three weeks before the incident, he was released from prison after serving a year-and-a-half sentence. He was living with his parents, Robert H. Heston (referred to herein as "Mr. Heston") and Betty Lou Heston, at 139 Rodeo Avenue, Salinas, California, and was employed by his father's concrete business.

1    Heston apparently was doing well until Saturday, February 19, 2005, when he

2   appeared at the family home in the early afternoon acting strangely. His parents correctly

3   assumed he was experiencing a drug relapse and asked him to leave. Mr. Heston called 911

4   and several police officers from the Salinas Police Department responded.  In addition to

5   Mr. Heston, there were two other civilians trying to help out, Heston's brother-in-law, Kurt

6   Kastner, and a friend, Clifford Satree.

7        The supervisor and decision-maker at the scene was Sgt. Michael Dominici.

8   (Dominici Depo at 58:19-25; 59:1-25) Other Salinas personnel present included Sgt. Juan

9   Ruiz and Officers James Godwin, Craig Fairbanks, Suthichai "Lek" Livingston and

10  Valentin Paredez.   The officers observed Heston acting strangely and believed he may have

11  been under the influence of drugs or having other "mental issues." (**Id**. at 55:5-20; Godwin

12  Depo at 25:20-24)   They were advised by Mr. Heston that his son was on parole.  Mr.

13  Heston requested that his son be removed from the home. Despite this plea, Sgt. Dominici

14  directed the other officers to leave without taking any action. (Fairbanks Depo at 46:12-16;

15  Godwin Depo at 26:10-22)

16       C.    The First Taser Sequence

17       A few minutes later, Mr. Heston called 911 again and reported that his son had

18  become more agitated.  He requested that the police return immediately.   Heston had

19  apparently knocked his father down and was destroying items in the house and then

20  throwing them out the front door.  In describing the actions of his son at this point in time,

21  Mr. Heston thought that his son "was trying to help me up.  I didn't think he had any

22  harm, you know, to hurt me."  (Heston Depo at 98:7-16)

23       Clifford Satree also called 911.  The recording of his call is particularly valuable

24  evidence because he gave a detailed  "play-by-play" description of the events leading up to

25  the point where Heston was handcuffed.  This recording helps establish the precise timing

26  of certain events, particularly when correlated with the officers' radio traffic (CAD

27  printouts) and the Dataport data.

28

1  Sgt. Dominici and Officer Fairbanks arrived first. (Dominici Depo at 63:17-22)
2  Dominici called for backup. Heston was observed throwing objects out the front door and
3  window. (Id. at 64:7-8; Fairbanks depo at 48:24-25, 49:1-10) As Dominici and Fairbanks
4  approached the house, Heston threw a rod or stick of some sort that bounced harmlessly
5  off Dominici's bullet-proof vest. When Heston appeared at the door again, Dominici fired
6  his M-26 Taser. Fairbanks fired his seconds later. (Id. at 78:3-17)

7  According to Dominici's DataPort,[1] his firing occurred at 14:24:27. There is a
8  corresponding CAD entry reading "MALE TASED," probably based on Satree's telephone
9  call, at 14:24:32. Neither Taser had the desired effect of knocking down Heston. One of
10  Dominici's probes hit the doorjamb instead of the target. (Id. at 80:1-9) Fairbanks
11  believed he may have been too far away so that when the Taser darts hit Heston, they
12  backed him up causing the wires to break. (Fairbanks Depo at 54:14-19.)

13  Although the tactics employed by Sgt. Dominici and Officer Fairbanks may have
14  been flawed (firing from too far away and not waiting for an apprehension team to be in
15  place before firing their Tasers), plaintiffs claim no constitutional violations as a result of
16  their conduct during this first Taser sequence. Rather, plaintiffs' excessive force claims
17  focus on the second Taser sequence when Heston was subjected to multiple and prolonged
18  taser shocks for between 50 and 69 seconds **after** he was knocked down to the floor.

19  D.   The Second Taser Sequence

20  Right after the first Taser sequence, Sgt. Ruiz and several additional personnel
21  arrived, including Officers Livingston, Godwin, Paredez and, slightly later, Timothy
22  Simpson, who applied the handcuffs to Heston.

23  According to the Dataport data, (again adjusted pursuant to Sgt. Groves' test firing)
24  Sgt. Ruiz fired his Taser at 14:25:31. That matches the time established by the Satree call.

---

26  [1] This time was corrected in conformity with a test firing performed by Sgt. Groves of the Salinas
27  Police Department on March 15, 2005. The Tasers involved in this incident were not calibrated properly
so as to ensure the accuracy of the date/time stamp for each Taser discharge (see: Declaration of Ernest
28  Burwell attached hereto as Exhibit "1"). As a result, the dataport data does not reflect the actual time of
each discharge, but the relative time and number of discharges are recorded.

Livingston fired simultaneously with Ruiz. (Livingston Depo at 55:12-17) Heston moved back into the house, and the officers followed him to keep the probes in place and the wires intact. Ruiz pulled the trigger of his Taser six times over the course of the next 48-seconds. Livingston pulled the trigger of his Taser approximately thirteen times over the next 74-seconds, including several prolonged shocks. Officer Godwin fired 19 seconds after Livingston, according to the dataport information. Godwin pulled the trigger of his Taser four times over the course of the next 28-seconds, switched cartridges, and fired again.[2]

Based on the foregoing, it is obvious that Heston was tased virtually continuously for one minute and fourteen seconds, much of the time by two and even three tasers, including the **entire** time he was on the floor, prone, with his arms curled underneath him because of the Taser current. Based on the Dataport, there could not possibly be significant gaps in time – certainly nothing greater than a second or two – when Heston was not being shocked. It is in fact, more than likely, that he was tased without any breaks at all.[3]

The police officers' testimony conflicts on how long Heston stayed on his feet after he was tased by Ruiz and Livingston and moved back into the house. Fairbanks and Paredez testified that they followed immediately behind the tasering officers into the house, and saw Heston lying prone, a period no more than five seconds. (Fairbanks Depo at 67:6-9; Paredez Depo at 57:3-13). Other officers testified that Heston remained standing inside the house, until Officer Godwin tased him as well, which the Dataport suggests may have happened as long as 19 seconds after the Ruiz-Livingston firings.

---

[2] For a more detailed explanation of the sequence of the second Taser deployment, see the Table attached hereto as Exhibit "2". It should be noted that times have been adjusted based on the testimony of the defendants and other witnesses because the date/time stamp was not correctly calibrated by the Salinas Police Department.

[3] Defendants argue that breaks in the second Taser sequence occurred because the defendant officers "believed" that their Tasers were not functioning properly. However, this claim was flatly rejected by Dr. Adam Aleksander, Ph.D., an expert witness who was specifically retained to test the Tasers used during this incident to determine whether they were functioning properly at the time. Dr. Aleksander tested each unit and concluded that (1) "no deficiencies or operational anomalies were observed", and (2) "the units are functional in all respects, and perform within the specified parameters."

1   Regardless, several officers describe Heston falling down, hitting his head on a table

2   and winding up in a prone position on the floor, rigid, with his arms curled underneath

3   him. The position which Heston ended up in is common among individuals who have

4   been incapacitated by a Taser and fall involuntarily to the ground.

5   Heston was lying on the floor with at least three to five pairs of Taser wires stuck in

6   him, and was still being shocked over and over. During this period of time, Officer Paredez

7   received a shock from one or more of the Tasers.  He was unsure whether the had touched

8   an exposed wire or had placed his hands between two wires during the discharge.  (Paredez

9   Depo at 63:16-25; 64:1-25;65:1-3)   With two or three Tasers clicking away, according to

10   Dominici, "I was yelling at him, and others were yelling at him."(Dominici Depo. at 98:

11   22-24) Officers Fairbanks and Paredez were trying to pull Heston's arms out.   Ruiz,

12   Livingston and Godwin kept discharging their Tasers because, according to them, Heston

13   would not put his arms behind his back so he could be hand-cuffed. (Ruiz Depo. at 56:5-

14   13; Livingston Depo. at 71:1-14; Godwin Depo. at 37:11-25 - 38:1-25 - 39:1)

15   The officers knew, however, based on their own experience being tased during their

16   Taser training, that Taser shocks cause muscle rigidity (referred to medically as "tetany")

17   which made it impossible for Heston to comply with the commands to release his arms.

18   For example, Godwin described the physical effects he experienced while being tased as

19   follows:

20   Q.   And what would you say -- what'd it feel like?

21   A.  It was -- I can't even describe.  **I felt frozen**.  It seemed painful at the time.  And

22   my balance – I wasn't able to maintain my balance.  Whatever balance I  had when the

23   probes hit me was what I maintained.  And I eventually almost fell over a few seconds into

24   the cycle.

25   Q.   Do you know if the muscles in your legs contracted so that your leg became

26   unusable?

27   A.   I don't know.  **I remember being pretty stiff**.  I don't know quite what caused

28   it.

1      Q.  Do you know what your arms did?

2      A.  **I want to say my whole body just tensed.**

3  (Godwin Depo at 14:13-21 - 15:3-8) (emphases added)

4      Similarly, Livingston described the physical effects he experienced while being tased:

5      Q.  And can you describe the experience of being Tased?

6      A.  **Upon being Tased, my muscles contracted, and I kind of was unable to move.**

7      Q.  Did you become rigid?

8      A.  Yes.

9      Q.  Was it painful?

10      A.  Yes.

11  (Livingston Depo at 16:6-13) (emphasis added)

12      Fairbanks admitted in his deposition testimony that it would not even have been

13  possible for the officers to put Heston's hands behind his back while he was being tased:

14      Q.  **If he were being Tased at the time, would it have been possible for him [Heston]**

15  **to comply with that command?**

16      A.  If he was being Tased at the time?

17      Q.  Right.

18      A.  Would he be able to show his hands?

19      Q.  Right.

20      A.  **No.**

21      Q.  **If he was being Tased at the time, would it be possible for you to have taken his**

22  **right arm out and put it behind him in a handcuffing position, or would he have been too**

23  **rigid?**

24      A.  **Too rigid.**

25  (Fairbanks Depo at 70:9-20) (emphases added)

26      The numerous officers at the scene continued to shout verbal commands at Heston

27  although their own training suggested that "... focused, intoxicated, excited delirium

28  individuals, etc. might not comply with verbal commands following the TASER cycle."

1   (See; Taser Training Manual, Ver. 13, "Controlling/Cuffing Under Power", attached

2   hereto as Exhibit "12".

3        As Godwin's final cycle came to an end – about the same time as Livingston finally

4   stopped firing – Heston went limp and unresponsive, and his head turned blue. As Ruiz

5   described it, "during the cycle of -- the last cycle by Officer Godwin, Mr. Heston, right

6   towards the end of the cycle or immediately after the cycle -- I'm not sure -- Mr. Heston

7   went what I describe as limp..." (Ruiz Depo at 69:20-24) ".... right towards the end of the

8   cycle or immediately after the cycle ended that they were able to cuff him, and I noticed

9   that he started going blue.  His head started getting dark." (**Id**. at 70:21-24)

10       Officer Simpson, who entered the house after Heston was on the floor, closed the

11  handcuffs on Heston's wrists.  (Simpson Depo at 35:18-25 - 36:1)  Fairbanks then called

12  for an ambulance.   According to the CAD, that time was 14:26:47.

13       The officers checked Heston and saw he had no vital signs. They began CPR.

14  Paramedics arrived and after ten or more minutes of down time, Heston was revived.  He

15  died when disconnected from life support the next day, however, because of extensive

16  damage to his brain tissue.  The Monterey County Medical Examiner, Terri Haddix, M.D.,

17  who performed an autopsy on Mr. Heston, attributed his death to cardiac arrest due to

18  Heston's "agitated state associated with methamphetamine intoxication **and applications**

19  **of TASER.**" (Haddix Depo at 119:19-25; 120:1-9) (emphasis added)

20  3.   <u>THE COURT IS REQUIRED TO VIEW THE FACTS IN A LIGHT</u>

21       <u>MOST FAVORABLE TO PLAINTIFFS</u>

22       Defendants consistently present the facts in the light most favorable to them. For the

23  purposes of this motion, however, the Court must view the evidence in a light most

24  favorable to the plaintiffs, and defendants cannot use declarations to alter testimony

25  previously given in their depositions.  **Cleveland v. Policy Management Systems Corp.**,526

26  U.S. 795, 806  (1999)

27       One noteworthy change in testimony concerns the question of whether there were

28  time gaps while defendants were shocking Heston during the second Taser sequence.

Defendants contend that such gaps did exist and Heston could have willingly released his arms from underneath him during the brief moments he was not being tased. Fairbanks' declaration includes the following statement: "At the point that Godwin was going to deploy [the final shock] I did not hear any cycling and did not see probes or wires attached to Heston." (Fairbanks Declaration at ¶ 31:7-8, attached to Defendants' Motion)  At deposition, however, Fairbanks testified differently:

Q.  Can you say, positively, one way or another, if we take, again, that time frame from when you first saw him on the floor until when Officer Godwin shot him, whether there was any period of time when he definitely was not being Tased?

A.  **No.**

(Fairbanks Depo at 78:18-23) (emphasis added)

The best evidence of whether or not gaps existed during the second Taser sequence can be found in the data obtained from the Dataports.  (See the Table attached hereto as Exhibit "2")  This data clearly establishes that little or no gaps existed during a 74-second continuous tasing by Ruiz, Livingston and Godwin (50 to 69 seconds of which occurred **after** the Taser shocks knocked Heston to the floor). Even if gaps of a second or two did exist, the training materials of Taser International, Inc., indicate that a "common effect" of a taser discharge is that the subject "may freeze in place with legs locked" and "may feel dazed for several seconds/minutes."[4]   Consequently, while in the midst of receiving multiple Taser shocks, Heston would have had **no** ability to comply with the officers commands to release his arms from under his body.[5]

4.    THE TWO-STEP ANALYSIS OF **SAUCIER V. KATZ**

Resolving claims of qualified immunity requires the two-step analysis outlined in **Saucier v. Katz**, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001).  First, a "court

---

[4]  See; Taser Training Manual, Ver. 13, "Common Effects of EMD Taser", attached hereto as Exhibit "13"

[5]  Parenthetically, it should be noted that Heston had already proven un-responsive to the officers' commands whether it was due to mental illness or a drug-induced stated.   It is, therefore, difficult to understand how the defendants could have believed that he would have suddenly become responsive in the midst of being subjected to multiple taser shocks.

1   is required to rule upon the qualified immunity issue must consider . . . this threshold

2   question: Taken in the light most favorable to the party asserting the injury, do the facts

3   alleged show the officer's conduct violated a constitutional right?" **Id**. at 201. This hurdle

4   is quite low for plaintiffs opposing summary judgment in excessive force cases.

5      Because [the excessive force inquiry] nearly always requires a jury to sift

6      through disputed factual contentions, and to draw inferences therefrom, we

7      have held on many occasions that summary judgment or judgment as a

8      matter of law in excessive force cases should be granted sparingly. [Citations

9      omitted]; **see also Liston v. County of Riverside**, 120 F.3d 965, 976 n.10 (9th

10     Cir. 1997) (as amended) (We have held repeatedly that the reasonableness of

11     force used is ordinarily a question of fact for the jury. This is because such

12     cases almost always turn on a jury's credibility determinations.)

13  **Smith v. City of Hemet**, 394 F.3d 689, 700-01 (9th Cir. ), **cert. denied**, 125 S. Ct. 2938,

14  162 L. Ed.2d 866 (2005) (citing **Graham v. Connor**, 490 U.S. 386, 395, 104 L. Ed. 2d

15  443, 109 S. Ct. 1865 (1989); Ward v. City of San Jose, 967 F.2d 280, 284 (9th Cir. 1992)

16    As explained in the following section, plaintiffs' expert declarations establish a triable

17  issue of fact as to whether **all** the shocks administered by Sgt. Ruiz and Officers Livingston

18  and Godwin **while Heston was on the floor** were excessive, and whether Sgt. Dominici

19  failed to exercise the command leadership to prevent them.

20     A. A Jury Could Conclude that Each Taser Shock

21       Administered to Heston **After** the Tasers Knocked Him to

22       the Floor was Excessive and Objectively Unreasonable.

23    When viewed in a light most favorable to plaintiffs, the facts of this case clearly

24  establish that Heston was repeatedly subjected to Taser shocks **after** falling to the floor.  A

25  jury could conclude that each of these shocks amounted to excessive force.

26    After reviewing the available evidence in this case, plaintiffs' Taser Expert, Ernest

27  Burwell, offers the following opinion regarding the repeated tasking of Heston **after** he was

28  on the floor:

1   Every shock Sgt. Ruiz, Officer Livingston and Officer Godwin administered

2   **after** Heston went down, over this span of 50-68 seconds with two or three

3   devices activated at the same time, was force administered for no valid law

4   enforcement purpose whatsoever.  As previously mentioned, once a person

5   has fallen down from the Taser there is no legitimate reason to administer

6   further shocks. The device is designed for incapacitation, not pain

7   compliance.   The officers should have used the much less restrictive

8   alternative – used by officers over the years – of manually placing Heston in

9   handcuffs.

10   (Burwell Declaration at ¶26)

11        In **Smith v. Hemet**, supra, a case decided **en banc** by the Ninth Circuit, plaintiff

12   introduced expert testimony of a police practices expert to prove excessive force.  The court

13   held that "A rational jury could rely upon such evidence in assessing whether the officers'

14   use of force was unreasonable."  (394 F.3d 689, 703 (9th Cir. 2005))   In fact, the Ninth

15   Circuit has long held admissible the testimony of such experts on the question of whether

16   police officers violated law enforcement standards in a given situation.[6]

17        The undisputed facts in this case establish that Heston was subjected to multiple

18   taser shocks  by Ruiz, Livingston and Godwin for as many as 69-seconds **after** he was on

19   the floor surrounded by as many as 7 officers.  Heston could not escape.  He was unarmed

20   and posed no threat to anyone.  Subjecting him to repeated and prolonged taser shocks

21   under such conditions amounted to torture.

22        As Officer Livingston explained,

23        Q.   Now, while Mr. Heston was on the floor on his stomach, did you cycle the

24   Taser again --

25        A.   Yes.

26   _____

27        [6] See; **Larez v. City of Los Angeles**, 946 F.2d 630, 635 (9th Cir.1991) (as amended) (finding that
     testimony of "an expert on proper police procedures and policies" was relevant and admissible); **Davis v.**
28   **Mason County**, 927 F.2d 1473, 1484-85 (9th Cir.1991) (as amended) (testimony of plaintiffs' police
     practices expert that officers violated law enforcement standards properly received)

Q.  -- deliberately?   All right.  Why did you do that?

A.  **Because he still was not complying with commands.**

Q.   Well, were there officers in a hands-on position?

A.  Yes.

Q.  Why didn't you just stop firing the Taser and let the officers remove his hands?

A.  **They were trying to remove his hands, and he wasn't complying.  That's why I cycled it again.**

(Livingston Depo at 71:1-14) (emphases added)

Officer Paredez, in his deposition testimony, confirmed the use of the Taser as a pain compliance device:

Q.  So **why would you cycle the Taser to get the person to put their hands behind their back**?

A.   They're not being cooperative.  They're not being compliant with the verbal commands.

Q.  So are you then using the Taser through the probes as a pain-compliance device?

MS. BLITCH:  Objection; calls for speculation.

THE WITNESS:  **Yeah, depending on the situation.**

(Paredez Depo at 28:17-24) (emphases added)

Using the Taser as a pain compliance device, however is contrary to the training. The training materials provided with the M-26 state: "ONLY USE TO STOP A THREAT. NEVER USE FOR PHYSICAL COERCION."  (See; Taser Training Manual, Ver. 8, "The Decision to Deploy" which is attached hereto as Exhibit "14")

The repeated and prolonged Taser discharges[7] inflicted by Ruiz, Livingston and Godwin after Heston collapsed to the floor, were excessive, unnecessary, counter-productive to their ultimate goal of handcuffing Heston and were contrary to the specific warnings

---

[7]   It is important to note that recent (2006) research studies conducted regarding the effects of prolonged Taser discharges on the human body define "prolonged" as discharges of 15-second duration, far less than the 74-second discharge experienced by Heston, Jr., prior to his death.  See: "Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults" by Jeffrey D. Ho, MD, et al.  (2006)

given to them by Taser International, Inc., as part of their training.

Furthermore, Sgt. Dominici is liable for the use of excessive force by his subordinates. Although he did not fire his own Taser during the second Taser sequence, he acted in supervisory capacity as the senior officer at the scene. Plaintiffs' Police Practices Experts, Ernest Burwell and Roger Clark both offer their opinions regarding the responsibility of a supervising officer. Mr. Burwell opines as follows:

> As a line officer, Sergeant Dominici failed to supervise this incident, allowing too many Taser applications to be administered to Heston, which resulted in the use of excessive force. A supervisor must have control of his officers during incidents, and the officers must follow his orders. In the event this is not done, officers, suspects, and citizens are at risk of injury.

(Burwell Declaration at ¶ 18)

Mr. Clark opines as follows:

> As stated above, my opinion is that the lack of proper command and control by Sergeant Dominici was a key aspect of this tragedy. Sergeant Dominici failed to instruct or deploy his personnel in any meaningful way – and clearly did not take command of the situation as required during an incident of this type. The record is clear that there were multiple officers at the scene and the situation was fluid, i.e. Mr. Heston was agitated and moving through the living room throwing objects and damaging property. Proper police procedure requires that when a multi-unit field response occurs, someone must become the lead officer, or officer in charge. This is always a ranking officer – usually a Sergeant when one is available. This was clearly Dominici's role during this incident.

(Clark Declaration at ¶ 28)

Sgt. Dominici's failure to intercede, as the supervising officer, to prevent injury to Heston, knowing that Heston was being repeatedly shocked without any legitimate lawful

1   purpose, is actionable.[8]

2   B.      The **Graham v. Connor** Objective Reasonableness Standard

3   Claims of excessive force are analyzed under the objective reasonableness standard

4   of the Fourth Amendment as set forth in **Graham v. Connor** 490 U.S. 386, 109 S. Ct.

5   1865, 104 L. Ed.2d 443 (1989) .  Defendants' motion turns not on whether the use of the

6   Tasers by the defendants caused or contributed to Heston's death – the inquiry is whether

7   any of the uses of force was excessive and, therefore, objectively unreasonable.

8   "Determining whether the force used to effect a particular seizure is reasonable under

9   the Fourth Amendment requires a careful balancing of the nature and quality of the

10  intrusion "on the individual's Fourth Amendment interests against the countervailing

11  governmental interests at stake."  **Id.** at 396   This balancing test entails consideration of

12  the totality of the facts and circumstances in the particular case.  The reasonableness of the

13  officer's conduct is to be evaluated with "careful attention to the facts and circumstances

14  of each particular case, including the severity of the crime at issue, whether the suspect

15  poses an immediate threat to the safety of the officer and whether he is actively resisting

16  arrest or attempting to evade arrest by flight."  **Id.** at 396

17  Plaintiffs do not challenge the reasonableness of any force used prior to the time the

18  Tasers had their desired effect and knocked Heston to the floor.  Only the subsequent

19  multiple and prolonged shocks must be evaluated in terms of the **Graham** factors.

20  (1)     The Severity of the Crime

21  Heston appeared to the officers present to be mentally disturbed, delusional and

22  possibly under the influence of drugs.  After the Tasers had the desired effect of knocking

23  Heston to the ground, he committed no crime (at minimum, a triable issue of fact exists

24  as to whether Heston was resisting arrest or was rendered incapable of complying with the

25  officers' commands because of the physical effects of the Taser shocks) that would have

26  justified the administering of additional, painful shocks by Ruiz, Livingston or Godwin.

27

28  [8] See: **Ting v. United States**, 927 F.2d 1504 (9th Cir. 1991) – officers have a duty to protect persons
in custody from injury and a failure to do so gives rise to liability under Section 1983.

In **Drummond v. City of Anaheim**, 343 F. 3d 1052, (9th Cir. 2003), a mentally ill man was taken into custody "for his own safety" by officers.  He was knocked to the ground, handcuffed and positioned on his stomach.  The officers place their knees on Drummond's back and neck with the full weight of their bodies on him.  Soon after, he experienced respiratory distress and suffered brain damage, falling into an irreversible coma.  In reversing the trial court's granting of summary judgment to the officers, the court held that "'The essence of the **Graham** objective reasonableness analysis' is that '[t]he force which [i]s applied must be balanced against the need for that force: it is the **need** for force which is at the heart of the **Graham** factors.'" **Id.** at 1057 (quoting **Liston v. County of Riverside**, 120 F. 3d 965, 976 (9th Cir. 1997)) (emphasis in original)

The "need for the force" – the multiple Taser shocks **after** Heston was on the floor was non-existent.  Once he was knocked to the floor, the "window of opportunity" presented itself for the officers – Fairbanks and Paredez – to  restrain Heston in handcuffs. The only reason they failed to do so was the continuing electrical current delivered by Ruiz, Livingston and Godwin, with the approval of Dominici, which caused Heston's body to stiffen making it impossible for him to release his arms out from under him.

(2)     The Immediate Threat Posed to the Officers or Others

While on the ground, Heston was unarmed and surrounded by as many as 7 officers. Under these circumstances, he posed **no** threat to the safety of the officers or anyone else for that matter.

(3)     Active Resistance to Arrest

As previously stated, a triable issue of fact exists as to whether Heston was actively resisting attempts to restrain him or was incapable of doing so as a result of the physical effects from the multiple Taser shocks.

(4)     Attempts to Evade Arrest

Once on the ground, Heston made no attempt to evade arrest.

(5)    Lesser Intrusive Alternatives to Use of Force

In **Smith v. Hemet**,  394 F.3d 689 (9th Cir. 2005), the Ninth Circuit articulated an additional factor that the courts may consider in their **Graham** analysis – the availability of alternative methods of capturing or subduing a suspect.[9]  Although Smith initially refused to comply with officers' commands, he ultimately did so after being bit by a police dog. Despite such compliance, Smith was then bit a second and third time by the police dog. While this was transpiring, Smith was pepper-sprayed at least twice after a police dog had seized him by biting him, and at least once after the officers had pinned him to the ground.

As part of their evaluation of  excessive force, the Court held:

> As we have previously explained, an additional factor that we may consider in our Graham analysis is the availability of alternative methods of capturing or subduing a suspect. **Chew v. Gates**, 27 F.3d at 1441 n. 5. Smith argues that the officers' conduct violated applicable police standards and that there were alternative techniques available for subduing him that presented a lesser threat of death or serious injury. Smith offered an expert declaration on the training of police dogs and police dog handlers . . . . . He concluded that the officers could and should have used control holds to complete the arrest rather than to sic Quando on him once they had him restrained on the ground. . . . ."  **Id**. at 1057

Similarly, plaintiffs' expert, Ernest Burwell, opines that Tasers should not have been employed **after** Heston went to the floor but that "The officers should have used the much less restrictive alternative – used by officers over the years – of manually placing Heston in handcuffs."   (Burwell Declaration at ¶26)  The need for the force actually used by the defendants herein simply did not exist.

(6)    Mental Status of Suspect

The Ninth Circuit has also adopted another factor in their **Graham** analysis – the reasonableness of force used against an individual who appears to be suffering from mental

---

[9]    See also; Chew v. Gates, 27 F.3d at 1441 fn. 5

1   illness as opposed to someone who is a dangerous and/or violent criminal. At the outset
2   of this incident, Sgt. Dominici was briefed by Officer Fairbanks that Heston might be
3   suffering from a mental disorder. "I believe there was some mention of the possibility or
4   being a mental -- have a mental disability or mental issues." (Dominici Depo at 55:5-20)
5   In **Deorle v. Rutherford**, 272 F.3d 1272 (9th Cir. 2001), cert. denied 122 S. Ct. 2660
6   (2002) the court explained:

> 7    The problems posed by, and thus the tactics to be employed against, an
> 8    emotionally distraught individual who is creating a disturbance or resisting
> 9    arrest are, and must be, differentiated from those involved in efforts to subdue
> 10   an armed and dangerous criminal who has recently committed a serious
> 11   offense. Even when an emotionally disturbed individual is 'acting out' and
> 12   inviting officers to use deadly force to subdue him, the governmental interest
> 13   in using such force is diminished by the fact that the officers are confronted,
> 14   not with a criminal, but with a mentally ill person. **Id.** at 1282-1283

15  In their efforts to restrain Heston who was unarmed, defendants employed tactics
16  more aptly suited to an "armed and dangerous" criminal who had committed a "serious
17  felony", rather than a mentally disturbed individual who may have become delusional as
18  a result of drug intoxication.

19  In sum, considering the severity and extent of the force used, the **Graham** factors,
20  the availability of lesser intrusive alternatives to handcuff him and the fact that Heston
21  might have been suffering from a mental disorder, it is evident that the question of whether
22  the force used was reasonable cannot be resolved in favor of the defendants on summary
23  judgment.

24  The facts of this case are a far cry from those rare instances where courts have
25  determined uses of force reasonable as a matter of law. The court's finding that the
26  evidence, when viewed in the light most favorable to plaintiffs, could support their claim
27  that the defendants used excessive force against their son, is amply supported by the record.
28  Indeed, significant triable issues of fact have been presented which require the Court to

1   deny defendants' Motion for Summary Judgment/Adjudication.

2          C.      The Law Was Clearly Established that Repeated, Pointless,

3                  Painful Electric Shocks Administered to Heston Amounted

4                  to Excessive Force

5          **Saucier** continues, describing the second step in the qualified immunity analysis:

6   "[I]f a violation could be made out on a favorable view of the parties' submissions, the next,

7   sequential step is to ask whether the right was clearly established." (533 U.S. at 201)  "The

8   relevant dispositive inquiry in determining whether a right is clearly established is whether

9   it would be clear to a reasonable officer that his conduct was unlawful in the situation he

10  confronted."  **Id.** at 202   This inquiry presents a pure question of law because "a reasonably

11  competent public official should know the law governing his conduct."   (**Harlow v.**

12  **Fitzgerald**, 457 U.S. 800, 819, 102 S. Ct. 2727, 2738, 73 L. Ed.2d 396 (1982))

13         Although there is a paucity of case law involving use of the Taser because of its

14  relative newness as a law enforcement tool (The Taser M-26 was first introduced to the law

15  enforcement community in December 1999, and its use has only become widespread over

16  the last four years) by police to take down and/or restrain individuals, defendants cannot

17  shelter themselves in the cloak of qualified immunity simply because of the novelty of the

18  method used to inflict the injury.

19         The Ninth Circuit made this point clear in **Boyd v. Benton County**:

20         [A] victim's constitutional rights may be clearly established in the absence of

21         a  case  'on  all  fours  prohibiting  [the]  particular  manifestation  of

22         unconstitutional conduct at issue.'  **Deorle**, 272 F3d at 1286.  In particular,

23         qualified  immunity  is  not  appropriate  merely  because  no  cases  directly

24         address the use of a new weapon or 'a novel method is used to inflict injury.'

25         Rather, when an officer's conduct '**is so patently violative of the constitutional**

26         **right that reasonable officials would know without guidance from the courts**

27         **that the action was unconstitutional, closely analogous pre-existing case law**

28         **is not required to show that the law is clearly established.'**  "In excessive force

1    cases, the inquiry remains whether 'under the circumstances, a reasonable

2    officer would have had fair notice that the force employed was unlawful, and

3    [whether] a mistake to the contrary would have been unreasonable.'" [10]

4    Id. at 781; quoting **Drummond v. City of Anaheim**, supra, 343 F. 3d 1052 (emphasis

5    added)

6        Similarly in **Drummond**, supra, it was held that "[O]fficials can still be on notice

7    that their conduct violates established law even in novel factual circumstances."[11]  Id. at

8    1061; quoting **Hope v. Pelzer** 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666

9    (2002)

10       While the use of a Taser as a restraint device may be novel, the manner in which the

11   Taser was employed in this case to essentially torture Heston is not.  Any reasonable police

12   officer would know that the continuous tasing of a drug intoxicated, mentally disturbed

13   and unarmed man – subjecting him to continuous shocks of electricity from multiple

14   Tasers for approximately one minute **after** he was knocked on the ground surrounded by

15   numerous officers – was unlawful.  Surely, defendants would not contend that the repeated

16   beating of an individual with batons or a flashlight after he was on the ground surrounded

17   by officers or using a police dog to repeatedly bite an individual (**Smith v. Hemet**) after he

18   has been restrained would be lawful absent a case in the Court of Appeals condemning the

19   precise conduct.  This case is analogous.  Once Heston, who was unarmed and posed no

20   significant and immediate threat to the safety of the officers or others, was knocked to the

21   ground surrounded by numerous officers and was effectively restrained, the use of the

22   Tasers should have stopped immediately.  Surely seven officers could have placed one man

23   in handcuffs without resorting to shocking him with 50,000 volts of electricity for an

24   additional 50 to 69 seconds.  "In a situation in which an arrestee surrenders and is rendered

25   helpless, any reasonable officer would know that a continued use of [force] or a refusal

26   without cause to alleviate its harmful effects constitutes excessive force."  **Drummond**,

27

28

[10]   See also; **Mendoza** *v. Block* (9th Cir. 1994) 27 F. 3d 1357, 1361

[11]   See also; **Kennedy v. City of Ridgefield** 439 F.3d 1055, 1066 (9th Cir. 2006)

1   *supra*, 343 F. 3d at 1062, citing; **LaLonde v. County of Riverside**, 204 F.3d 947, 961 (9th

2   Cir. 2000)

3       Perhaps, most importantly, the defendant officers received fair warning from their

4   own training that the Taser was not to be used as a pain compliance device.

5       Although such training materials are not dispositive, we may certainly

6       consider a police department's own guidelines when evaluating whether a

7       particular use of force is constitutionally unreasonable.  As the Fifth Circuit

8       stated, it may be difficult to conclude that the officers acted reasonably if they

9       performed an action that had been banned by their department or of whose

10      dangers in these circumstances they had been warned. [12]  **Id.** at 1059

11      Accordingly, the Court should deny the individual defendants qualified immunity.

12  5.  <u>TRIABLE   ISSUES   OF   FACT   EXIST   WHICH   SUPPORT</u>

13      <u>PLAINTIFFS' MONELL CLAIM.</u>

14      The City of Salinas and the Salinas Police Department may be liable if their

15  policymakers "'acquiesced in the constitutional deprivations of which [the] complaint is

16  made.'"  **Larez v. City of Los Angeles**, 946 F.2d 630, 646 (9th Cir. 1991) (brackets in

17  original) (quoting **Meade v. Grubbs**, 841 F.2d 1512, 1528 (10th Cir. 1988)  There is

18  evidence that the Salinas Police Department was deliberately indifferent to excessive Taser

19  shocks by its officers.  For example, it did not, as a matter of pattern or practice, routinely

20  require evaluation of Taser usage.   In fact, the Salinas Police Department did not even

21  spend the $100.00 necessary to purchase the software for monitoring Tasers used by its

22  officers to determine usage patterns.  The Taser comes equipped with a DataPort, the

23  purpose of which is to provide officer "accountability" and to "protect officers from

24  unfounded [abuse] allegations."  (See; Taser Training Manual, Ver. 13, "M26 Serial

25  DataPort", attached hereto as Exhibit "14")  The Dataport is "a powerful management tool

26

27      [12] See also; **Gutierrez v. City of San Antonio**, 139 F.3d 441, 449 (5th Cir.1998); **Scott v. Henrich**,
    39 F.3d 912, 916 (9th Cir.1994) ("Thus, if a police department limits the use of chokeholds to protect
28  suspects from being fatally injured, ... such regulations are germane to the reasonableness inquiry in an
    excessive force claim.")

1    to track usage patterns and prevent abuse." (Burwell Declaration at ¶ 21)

2      According to Sgt. Michael Groves, [13] the Salinas Police Department first purchased

3    Model M-26's for its officers' use in approximately March 2003. (Groves Depo at 12:16-

4    19)  The subject incident occurred on February 19, 2005.  Prior to the date of this

5    incident, the Salinas Police Department had not even purchased the software necessary to

6    download the Dataport data to determine a Taser's usage pattern.  (Groves Depo at 44:3-

7    23)  The Salinas Police Department had slightly less than two years to implement a policy

8    of monitoring Taser usage by its officers, yet it failed to do so.  These facts alone evidence

9    a deliberate indifference to the training of its officers and it's Taser policies regarding Taser

10   usage of its officers by the Salinas Police Department .

11     As to the absence of policy to monitor Taser usage, plaintiff's Police Practices Expert,

12   Ernest Burwell, opines:

13     The person in charge of the Tasers at Salinas Police Department should have

14     frequently downloaded the Dataport information and reset the clock to the

15     current computer time. The Salinas Police Department did not even own the

16     necessary program to download the Dataport, however.   That information

17     should have been downloaded after every field use and attached to the police

18     report, corroborating the number of shocks administered to a subject. The

19     data should be kept in a file on each Taser, showing the number and times of

20     activations.   A log should be attached to each Taser file listing training

21     activations, test activations, demonstration activations, and actual deployment

22     activations.  Each cartridge should be assigned to an individual officer and a

23     log maintained for the assignment. Salinas did none of this. Then in this

24     incident one of its sergeants and two officers discharged their tasers far too

25     many times. That is attributable to the department's failure to monitor usage

26     prior to the incident.   (Burwell Declaration at ¶ 23)

27

28    [13] Sgt. Groves was designated by the Salinas Police Department as the person most knowledgeable regarding the Taser program and the management of the Taser weapons that were used in this incident.

1   Without this kind of management policy in place, the Salinas Police Department's
2   ability to train, supervise and discipline its officers was seriously impeded.   Had such a
3   policy or practice of monitoring Taser usage been in place at the time of this incident, it
4   likely would not have occurred.

5   Additionally, the Salinas Police Department's ratification of the repeated and
6   prolonged tasing of Heston is sufficient in itself to support **Monell** liability. The inability
7   of seven police officers to handcuff an unarmed man without killing him cries out for
8   remedial action even to the lay observer, yet the Department took no remedial action
9   whatsoever and, instead, ratified the conduct of its officers.

10   Accordingly, the entity defendants' motion for summary judgment should be denied
11   as well.

12   6.   <u>THERE ARE NO APPLICABLE STATE IMMUNITIES</u>

13   Plaintiffs agree that the standards for state-tort assault and battery liability are the
14   same as those for their section 1983 excessive force claim. Accordingly, for the reasons
15   stated above, the claims should be submitted to the jury.

16   Defendants interject Cal. **Gov't Code** § 820.2 "discretionary acts" immunity. It has
17   been settled California law for almost forty years that the immunity is a narrow one, which
18   does not apply to "ministerial" decisions such as the application of force by police officers
19   in the field.   In **Johnson v. State of California**, 69 Cal.2d 782, 793-794 (1968), the court
20   established that  section 820.2 is available only for basic policy  decisions, "activity which
21   may be characterized as the 'planning' rather than the 'operational' level of decision
22   making." [14]

23   Similarly, defendants misconstrue Cal. **Gov't Code** § 820.4 immunity. That
24   provision only protects an officer "for his act or omission, exercising due care, in the
25   execution or enforcement of any law."   On its face, it was not intended to bar plaintiff's

26

27

28
___
[14]  See also; e.g., **Susan A. v. County of Sonoma**, 2 Cal. App.4th 88, 96-97 (1991)

negligence claim, and certainly not excessive force claims against police.[15] For "governmental tort cases the rule is liability, immunity is the exception. . . . Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." **Lopez v. Southern California Rapid Transit District**, 40 Cal.3d 780, 792-93 (1985) (internal quotation omitted).  Since defendants cannot clearly demonstrate their conduct falls within any statutory immunity, their motion as to the state-tort causes of action must fail as well.

7.    CONCLUSION

The factual issues of this case cannot properly be decided by Summary Judgment. The defendants' motion should be denied, except to the extent identified in plaintiffs' notice of non-opposition.

DATED:   April 2, 2007

Respectfully submitted,

LAW OFFICES OF JOHN BURTON
WILLIAMSON & KRAUSS


By:  /s/ Peter M. Williamson
     PETER M. WILLIAMSON
     Attorneys for Plaintiffs

---

[15]  See, e.g., **Edson v. City of Anaheim**, 63 Cal. App. 4th 1269, 1272 (1998);  **Scruggs v. Haynes**, 252 Cal. App.2d 256, 262-69 (1967).

## DECLARATION OF PETER M. WILLIAMSON

I, Peter M. Williamson, declare:

1.     That I am an attorney at law duly licensed to practice before all the Courts of the State of California and am a member of the Bar of this Court.  I am co-counsel along with John Burton on behalf of the plaintiffs herein.

3.     If duly sworn, I could and would testify to the following facts of my own personal knowledge.

4.     I have personally reviewed the excerpted deposition transcripts of various defendants and other witnesses attached hereto and filed as exhibits in opposition to defendants' Motion for Summary Judgment, and in the alternative, Summary Adjudication, and can attest to the fact that such excerpted portions of the deposition transcripts are true and correct copies of the testimony of each witness.

I declare under penalty of perjury, pursuant to the laws of the United States, that the foregoing is true and correct.

Executed this 2nd day of April, 2007 at Tarzana, California.


_/s/ PETER M. WILLIAMSON_____
            Peter M. Williamson