1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11  Betty Lou Heston, et al.,                    NO. C 05-03658 JW

12              Plaintiffs,          **ORDER GRANTING IN PART AND**
        v.                           **DENYING IN PART DEFENDANTS'**
13                                   **MOTION FOR SUMMARY JUDGMENT**
    City of Salinas, et al.,
14
                Defendants.
15  _____/

16

17                          **I. INTRODUCTION**

18          Betty Lou and Robert H. Heston ("Robert Sr.") (collectively, "Plaintiffs" or the "Hestons")

    bring this civil rights and products liability action as the result of the death of their son Robert C.
19
    Heston ("Robert Jr."), who died shortly after being subdued by Salinas police officers using taser
20
    guns in the living room of Plaintiffs' home.
21
            Presently before the Court is Defendants' Motion For Summary Judgment or in the
22
    Alternative, Summary Adjudication, submitted by Defendants City of Salinas ("Salinas"), Salinas
23
    Police Department ("Salinas PD"), and the named Salinas Police Officers (collectively, "Salinas
24
    Defendants").  (hereafter, "Motion," Docket Item No. 73.)  The Court conducted a hearing on June
25
    25, 2007.  Based on the papers submitted to date and oral arguments of counsel, the Court GRANTS
26
    in part and DENIES in part Salinas Defendants' Motion for Summary Judgment.
27

28

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

## II. BACKGROUND

**A.** **Undisputed Facts**

On February 20, 2005, Robert Sr. called 911 requesting police to remove Robert Jr. from the Heston residence because Robert Jr. was on drugs.[1] Several Salinas Police Officers responded to the call but left after concluding that Robert Jr. had done nothing illegal and could not be arrested.[2] Shortly after the police left, Robert Sr. called 911 again, reporting that Robert Jr. had knocked him down and was breaking items in the house. (Heston Depo. 1, 95-96.)

Officer Dominici and Officer Fairbanks, who had responded to the first call, returned to the scene to find Robert Jr. throwing household objects out the front door of the Heston residence.[3] (Dominici Decl. ¶¶ 14-16.) When they arrived, Robert Sr. was on the floor, having been knocked down by Robert Jr. (Heston Depo. 1 at 97:5-12.) Officer Dominici, looking through the open front door of the Heston residence, observed Robert Jr. drag Robert Sr. out of sight of the doorway into the home. (Dominici Decl. ¶15.)

Robert Jr. then returned to the doorway and resumed throwing objects out of the house and threw one object directly at Officer Dominici. (Dominici Decl. ¶ 17.) About a minute later, Officer Dominici fired his taser at Robert Jr. (Id. ¶¶ 22-23.) One of Officer Dominici's taser probes missed Robert Jr. and lodged in the door jam. (Id. ¶ 24.) Officer Dominici's taser did not bring Robert Jr. down. (Id.) Officer Fairbanks then fired his taser. (Fairbanks Decl. ¶ 23.) Officer Fairbanks' taser did not bring Robert Jr. down. (Id. ¶ 24.)

---

[1] (Declaration of Vincent P. Hurley in Support of Motion for Summary Judgment or in the Alternative Summary Adjudication, hereafter, "Hurley Decl.," Ex. A. at 81:5-10, hereafter, "Heston Depo. 1," Docket Item No. 74.)

[2] (Declaration of Michael Dominici in Support of Motion for Summary Judgment or in the Alternative Summary Adjudication ¶ 12, hereafter, "Dominici Decl.," Docket Item No. 83.)

[3] (Declaration of Craig Fairbanks in Support of Defendants' Motion for Summary Judgment or in the Alternative Summary Adjudication ¶¶ 18-19, hereafter, "Fairbanks Decl.," Docket Item No. 79.)

2

United States District Court

For the Northern District of California

1       Officer Ruiz then arrived at the scene.[4]  After observing the events and receiving a hurried

2   briefing from Officer Dominici, Officer Ruiz fired his taser at Robert Jr.  (Id.)  Officer Livingston,

3   arriving just a few moment earlier, also fired his taser at Robert Jr.[5]  After being struck by Officer

4   Ruiz and Officer Livingston's tasers, Robert Jr. moved back into the house but did not fall down.

5   (Ruiz Decl. ¶ 22; Livingston Decl. ¶ 11.)

6       Officer Livingston and Officer Ruiz followed Robert Jr. into the house.  (Livingston Decl. ¶

7   11.)  Officer Livingston "cycled"[6] his taser a second time inside the house.  (Id. ¶ 12.)  At this point,

8   Officer Godwin had arrived on the scene.  Officer Godwin observed Officer Ruiz and Officer

9   Livingston fire their tasers and followed the Officers into the house.[7]  Officer Dominici also

10  followed Officer Godwin into the house.  (Dominici Decl. ¶ 29.)

11      Inside the house, Officer Godwin fired his taser at Robert Jr.  (Godwin Decl. ¶ 13.)  Robert

12  Jr. then collapsed to the ground, hit his head on a table as he fell, and ended up prone on his stomach

13  with his arms underneath him.  (Id. ¶ 15.)  While Robert Jr. was on the ground, Officer Godwin

---

[4] (Declaration of Juan Ruiz in Support of Defendants' Motion for Summary Judgment or in the Alternative Summary Adjudication ¶¶ 18-19, hereafter, "Ruiz Decl.," Docket Item No. 81.)

[5] (Declaration of Lek Livingston in Support of Defendants' Motion for Summary Judgment or in the Alternative Summary Adjudication ¶¶ 10-11, hereafter, "Livingston Decl.," Docket Item No. 82.)

[6] The first trigger pull of a taser gun launches the probes at the target.  If the probes hit the target, the target receives a 50,000 volt shock.  The shock lasts for a preset period of 5 seconds.  This period is referred to as a "cycle." Each subsequent trigger pull, referred to as "cycling," sends another 5 second shock, or cycle, to the target.  Holding the trigger down, referred to as "continuous cycling," sends a continuous shock.  (Plaintiffs' Addendum of Exhibits Filed in Opposition to Defendants' Motion for Summary Judgment or in the Alternative Summary Adjudication, hereafter, "Plaintiffs' Addendum," Ex. 1 ¶ 8,  hereafter, "Burwell Decl.," Docket Item No. 101.)

[7] (Declaration of James Godwin in Support of Defendants' Motion For Summary Judgment or in the Alternative Summary Adjudication ¶¶ 10-11, hereafter, "Godwin Decl.," Docket Item No. 80.)

3

cycled his taser at least three times, (Id. ¶ 15-16), as did Officer Livingston, (Livingston Decl. ¶ 14), and Officer Ruiz.[8,9]

Officer Paredez then entered the house and tried to obtain control of Robert Jr.'s left arm.[10] When Officer Paradez grabbed Robert Jr.'s arm, he felt a taser shock. (Paredez Decl. ¶ 15.) Officer Simpson had also arrived and attempted to assist Officer Paradez in pulling Robert Jr.'s left arm out from underneath him for handcuffing.[11] Meanwhile, Officer Fairbanks had also entered the house and was attempting to remove Robert Jr.'s right arm. (Fairbanks Decl. ¶ 30.)

Officer Godwin, believing Robert Jr. was intentionally keeping his arms underneath him, cycled his taser again. (Godwin Decl. ¶ 15.) Officer Godwin, assuming his taser was having no affect, removed the cartridge from his taser, and replaced it with a new one. (Id. ¶ 15.) Officer Godwin then fired his taser directly into Robert Jr.'s back. (Id. ¶ 17.) After Officer Godwin's taser cycled one more time, the Officers were able to pull out Robert Jr.'s hands and handcuff him. (Id.)

When Robert Jr. was handcuffed, Officer Godwin observed his head turning purple. (Id. ¶ 19.) Officers rolled Robert Jr. over and observed him to be in medical distress. (Dominici Decl. ¶ 34.) Officer Dominici and Officer Fairbanks called for an ambulance. (Id.; Fairbanks Decl. ¶ 33.) Officer Godwin began rescue breathing. (Godwin Decl. ¶ 19.) Robert Jr. was taken to the hospital where he died the following day without regaining consciousness. (First Amended Complaint ¶ 16, hereafter, "FAC," Docket Item No. 26.)

---

[8] (Plaintiffs' Addendum, Ex. 2, hereafter, "Dataport Readout".)

[9] Officer Ruiz claims he cycled his taser twice after the initial firing, but noticed his taser was "arching at the cartridge" after the second and third cycles, which he understood to mean his taser lines had broken or falling out. (Ruiz Decl. ¶ 21.) Defendants contend, therefore, that Robert Jr. did not receive shocks from Officer Ruiz's taser after the initial deployment. (Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication, hereafter, "Reply," Docket Item No. 102.)

[10] (Declaration of Valentin Paredez in Support of Defendants' Motion For Summary Judgment or in the Alternative Summary Adjudication¶ 14, hereafter, "Paredez Decl.," Docket Item No. 85.)

[11] (Declaration of Tim Simpson in Support of Defendants' Motion For Summary Judgment or in the Alternative Summary Adjudication ¶ 4, hereafter, "Simpson Decl.," Docket Item No. 84.)

United States District Court
For the Northern District of California

**B.     Procedural History**

On September 12, 2005, Plaintiffs filed a Complaint against Salinas, the Salinas PD, Salinas Police Chief Daniel Ortega ("Chief Ortega"), and Taser International, Inc., the manufacturer of the taser gun.  On May 22, 2006, Plaintiffs amended their complaint to include Officers Dominici, Fairbanks, Godwin, Livingston, Paredez, Ruiz, and Simpson.  The operative Complaint alleges eight causes of action.  Against the Salinas Defendants, Plaintiffs allege: (1) wrongful death under 42 U.S.C. § 1983; (2) survival action under 42 U.S.C. § 1983; (3) deprivation the rights to familial relationships under 42 U.S.C § 1983; (4) violation of California Civil Code § 52.1; (5) assault and battery; and (6) police negligence.  Against Taser International, Plaintiffs allege: (7) negligent products liability; and (8) strict products liability.

Before the Court is Defendants' Motion for Summary Judgment, or in the alternative, Summary Adjudication, filed on behalf of the Salinas Defendants.

Plaintiffs do not oppose the grant of summary judgment to the following issues:  (1) their causes of action against Officers Paredez, Fairbanks, and Simpson; (2) the issue of whether Defendants were deliberately indifferent to the medical needs of Robert Jr.; and (3) their Fourth Cause of Action for violation of California Civil Code § 52.1.[12]  Plaintiffs also do not oppose the grant of summary judgment in Defendants' favor with respect to the following issues:  (1) the City of Salinas has no policy, custom or practice regarding unconstitutional use of a taser; (2) the City of Salinas has no official policy likely to result in a constitutional violation; (3) the City of Salinas has no custom or practice permitting conduct which would lead to a constitutional violation; and (4) the City of Salinas and Chief Ortega did not show deliberate indifference with respect to officer hiring or retention.  (Non-Opposition at 2-3.)

The issues remaining in the present motion are Plaintiffs' First, Second, and Third Causes of Action under § 1983 and their Fifth and Sixth Causes of Action for assault and battery and police

---

[12]  (Notice of Non-Opposition to Granting Defendants' Motion for Summary Judgment/Adjudication of Certain Parties/Issues at 1, hereafter, "Non-Opposition," Docket Item No. 96.)

negligence against Salinas, Salinas PD, Chief Ortega and Officers Ruiz, Livingston, Godwin, and Dominici.

### III.  STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact." Id. at 323.  The non-moving party must then identify specific facts "that might affect the outcome of the suit under the governing law," thus establishing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. See, e.g. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. T.W. Elec. Serv., 809 F.2d 626, 631 (9th Cir. 1981).  In such a case, summary judgment is inappropriate. Anderson, 477 U.S. at 248.  However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

United States District Court
For the Northern District of California

# IV.  DISCUSSION

**A.      Plaintiffs' Section 1983 Claims**

Defendants move for summary judgment of Plaintiffs' First, Second, and Third Causes of Action[13] on the grounds that:  (1) Robert Jr.'s constitutional rights were not violated because the Officers did not use unreasonable force; and (2) the Officers are entitled qualified immunity. (Motion at 5.)  The Court proceeds to examine whether there are triable issues of fact as to whether Defendants violated Robert Jr.'s constitutional rights, and then consider whether Defendants are entitled to qualified immunity because the rights allegedly violated were not clearly established.

### 1.      Applicable Standards in Fourth Amendment Analysis

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Blanford v. Sacramento County, 406 F.3d 1110, 1115 (9th Cir. 2005); Quintanilla v. City of Downey, 84 F.3d 353 (9th Cir. 1996); see also Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003); Robinson v. Solano County, 278 F.3d 1007, 1009 (9th Cir. 2002) (en banc).  The Fourth Amendment reasonableness standard requires a court to balance the amount of force applied against the need for the use of that force.  Billington v. Smith, 292 F.3d 1177, 1185 (9th Cir. 2002).

The determination of reasonableness must "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. 386, 396-97 (1989); Drummond, 343 F.3d at 1058; Billington, 292 F.3d at 1182; Robinson, 278 F.3d at 1009.  In the Ninth Circuit, the

---

[13]  Plaintiffs' Section 1983 claims are for (1) wrongful death, (2) survival action, and (3) deprivation of the rights of Plaintiffs to familial relationships with Robert Jr.  These claims derive from allegations that the Officers used excessive force on Robert Jr. in violations of his Fourth and Fourteenth Amendments.  The parties do not dispute Plaintiffs' standing to pursue their survival and wrongful death actions.

United States District Court

For the Northern District of California

United States District Court<br/>For the Northern District of California

1  availability of alternative methods of capturing or subduing a suspect is also taken into

2  consideration.  Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005) (en banc).[14]

3      Generally, the use of tasers or stun guns to effectuate an arrest is not per se excessive or

4  unconstitutional.  Courts have found the use of these devices to be reasonable in certain

5  circumstances and excessive in others.[15]  The relevant cases highlight the fact-intensive and case-

6  specific nature of the inquiry.  However, with respect to whether excessive force was used, courts

7  generally consider  (1) the "type and amount of force inflicted," Drummond, 343 F.3d at 1056; (2)

8  the threat posed by the suspect and the severity of the crime at issue, City of Hemet, 394 F.3d at

9  702-703; and (3) balancing the severity of the force against the minimal need to use the force, and in

10 doing so considers, (a) whether the suspect resisted arrest or attempted to flee and (b) the availability

11 of less intrusive means.  Id. at 703-704; Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

12     In this case, Defendants contend that the use of tasers was reasonable because Robert Jr. was

13 under the influence of metamphetamines, had a history of violence, had attacked his father, and had

14 attacked the police officers.  (Motion at 24.)  Plaintiffs do not contend that Defendants' use of tasers

15 to bring Robert Jr. down was excessive.[16]  Rather, Plaintiffs challenge the multiple tasings that

16 occurred after Robert Jr. had fallen to the floor.  (Id.)  Therefore, the critical question in this case is

17 _____

18 [14]  The incident at the Hestons' residence occurred on or about February 20, 2005.  This
   Ninth Circuit en banc opinion was published on January 10, 2005.

19
20 [15]  A taser's potential to cause serious injury has been recognized in other states.  Although
   the Ninth Circuit has held that using a taser on a healthy inmate did not constitute cruel and unusual
21 punishment, the court noted that tasers had been classified as deadly force in the Georgia penal
   system.  Michenfelder v. Sumner, 860 F.2d 328 (9th Cir. 1988).  The court further noted that tasers
22 had been banned by the state of New York due to concern over its impact on individuals with heart
   problems.  Id.; Compare Draper v Reynolds, 369 F.3d 1270 (11th Cir. 2004) (Single taser discharge
23 to arrest angry and belligerent suspect following a traffic stop was not unreasonable) and
   Schumacher v. Halverson, 467 F. Supp. 2d 939 (D. Minn. 2006) (Single taser discharge to arrest
24 intoxicated driver who refused to comply with officer's request for identification and held on to a
   pole to resist arrest in the middle of the night was not excessive) with Williams v Franklin County,
25 Ohio Sheriff's Department, 619 N.E.2d 23 (Ohio Ct. App. 1992) (Jury could find that multiple taser
   discharges to arrest one hundred forty pound female suspect who was already restrained on the
   ground by six police officers was excessive, thereby precluding summary judgment for officers).
26
27 [16]  (Plaintiffs' Opposition to Defendant's Motion for Summary Judgment or in the
   Alternative Summary Adjudication at 19, hereafter, "Opposition," Docket Item No. 100.)

28                                          8

whether the officers used excessive force when they tased Robert Jr. after he had collapsed to the ground and was surrounded by seven police officers.  Since the evidence and theory of liability against each individual Officers differ, the Court considers the potential for liability as to each of them separately.

> **a.      Liability of Officers Godwin, Ruiz, and Livingston**

> **i.      The Type of Amount of Force Inflicted**

The first issue to consider is the "type and amount of force inflicted."  <u>Drummond</u>, 343 F.3d at 1056.  In this case, once on the ground, Robert Jr. was surrounded by seven police officers, with Officer Dominici holding his head down, (Dominici Decl. ¶ 31), Officer Paradez and Officer Simpson controlling his left arm, (Paredez Decl. ¶ 14; Simpson Decl. ¶4), and Officer Fairbanks controlling his right arm.  (Fairbanks Decl. ¶ 30.)  The evidence shows that Robert Jr. was tased multiple times after he collapsed and hit his head on a table.[17]

The coroner[18] has testified that the "application of taser" partially caused Robert Jr.'s death.  In addition, Plaintiffs' experts opine that Defendants should not have tased Robert Jr. after he had fallen and instead should have manually placed him in handcuffs.[19]  There was no indication that Robert Jr. was armed while on the floor[20] or that he threatened any Officers once on the ground.  No other evidence convincingly suggests that he was a danger to others once pinned to the ground because there were no civilians within his reach and he was surrounded by seven police officers.  While the relevant events occurred over a short time span which required the Officers to make quick

---

[17]  (<u>See</u> Godwin Decl. ¶¶ 15-17; Livingston Decl. ¶ 14; Ruiz Decl. ¶ 21; Paredez Decl. ¶ 15; Fairbanks Decl. ¶ 30.)

[18]  (Plaintiffs' Addendum, Ex. 11, Deposition of Terri L. Haddix, M.D. at 120:7-9, hereafter, "Haddix Depo.")

[19]  (Burwell Decl. ¶ 16; Plaintiffs' Addendum, Ex. 15 ¶ 30, hereafter, "Clark Decl.")

[20]  Officer Dominici was concerned that Robert Jr. might use shards of broken glass or broken objects as weapons.  (Dominici Decl. 30).  However, no allegations or evidence have been presented that Robert Jr. clearly was holding broken glass or broken objects.

United States District Court
For the Northern District of California

1  decisions, there is evidence that Officer Godwin's last taser firing was done after pause, deliberation,

2  and consultation.  (Fairbanks Decl. ¶ 31).

3          The Ninth Circuit has held that a use of force is considered deadly if it "creates a substantial

4  risk of causing death or serious bodily injury."  City of Hemet, 394 F.3d at 706.  The question of

5  whether the above standard applies to "non-lethal" weapons such as tasers is not well developed in

6  this circuit.  However, in this case, the Officers were trained in the use of tasers by the Salinas PD.

7  (Godwin Decl. ¶ 2; Ruiz Decl. ¶ 2; Livingston Decl. ¶ 2; Dominici Decl. ¶ 2.)  Trainers for the

8  Salinas PD use materials provided by Taser International.[21]  Although it is not clear exactly which

9  materials are used, version 8 of the Taser Training Manual[22] advises to "NEVER USE [A TASER]

10  FOR PHYSICAL COERCION."[23]

11          Nevertheless, the Officers continued to tase Robert Jr. to obtain compliance.  For example,

12  Officer Ruiz declares that he was preparing to use his taser to perform a "drive stun pain compliance

13  on [Robert] Jr.'s leg."[24]  (Ruiz Decl. ¶ 27.)  It is not clear whether Ruiz actually performed the drive

14  stun.  Officer Livingston, however, did cycle his taser specifically to obtain compliance.  Officer

15  Livingston states, "I cycled my Taser again because [Robert] Jr. was not complying with commands

16  and not pulling his arms out and it seemed to me he was trying to get up."  (Livingston Decl. ¶ 14.)

17  Finally, the evidence shows that Officer Godwin deployed his taser a second time specifically for

18  pain compliance.  Officer Goodwin states:

19          It seemed that [Robert] Jr. was still refusing to pull his arms out and Tasers were not
           working, so I put a new cartridge on my Taser.  I could not hear any Tasers cycling and
20         [Robert] Jr. was still resisting and officers could not get his hands out from under him.  I

21  _____

22          [21] (Declaration of Michael Groves in Support of Defendants' Motion for Summary Judgment
       or in the Alternative, Motion for Summary Adjudication ¶ 11, hereafter, "Groves Decl.," Docket
23     Item No. 78.)

24          [22] Version 8 was in effect prior to the February 2002.  (Declaration of Vincent P. Hurley in
       Support of Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, or in the
25     Alternative, Summary Adjudication ¶ 20, Docket Item No. 103.)

26          [23] (Plaintiffs' Addendum, Ex. 14, hereafter "Taser Training Manual," emphasis in original.)

27          [24] A "drive stun" is application of the taser directly to a person's skin without the probes.

28                                                    10

United States District Court

For the Northern District of California

asked the officers if they wanted me to deploy another Taser and they said they could not get [Robert] Jr.'s arms out, so I deployed another Taser into [Robert] Jr.'s back.

(Godwin Decl. ¶ 17.)

Considering Robert Jr.'s vulnerability, and the coroner's testimony that the "application of taser" partially caused Robert Jr.'s death, it would not be unreasonable for a jury to find the applied force to be deadly. See Drummond, 343 F.3d at 1056 (finding that force applied by two officers, who pressed their body weight on the handcuffed plaintiff's neck and torso even as he begged for air, was capable of causing death or serious injury). However, even if the force used was not deadly, a reasonable jury could find that the force was excessive under the circumstances.

ii.     The Threat Post by Robert Jr. and the Severity of the Crime at Issue

The second factor the Court must consider in an excessive force inquiry is the threat posed by the suspect. City of Hemet, 394 F.3d at 702. Here, the Officers claim Robert Jr. was resisting arrest. (Paredez Decl. ¶ 15; Livingston Decl. ¶ 17.) At the time of the arrest, Robert Jr. had committed battery on Robert Sr. and on Officer Dominici. (Dominici Decl. ¶¶ 15-17). However, there is no evidence that either Robert Sr. or Officer Dominici were injured. (Id. ¶ 22.) Once he was on the ground, there is no evidence that Robert Jr. attempted to hit any of the Officers. In fact, Robert Jr. was prone on his stomach with his arms underneath him. (Godwin Decl. ¶ 13.) The Officers have admitted that they thought Robert Jr. was intentionally keeping his arms underneath him and tased him to obtain compliance with their directions. (Fairbanks Decl. ¶ 30; Paredez Decl. ¶ 15; Godwin Decl. ¶ 15). Based on the Officers' tactical formation around Robert Jr. once he was on the ground, a reasonable jury could find that they were not concerned about Robert Jr. being armed.

With respect to the severity of the crime at issue, Robert Sr. twice requested the police to remove Robert Jr. from the Hestons' residence because his son "was on drugs." (Heston Depo. 1 at 81:5-10.) When the Officers arrived the second time, they observed that Robert Jr. was throwing household objects out the front door. They also observed Robert Jr. dragging Robert Sr. out of sight

of the doorway.  (Dominici Decl. ¶¶ 14-16; Heston Depo. 1 at 97:5:12.)  Again, there is no evidence

that Robert Jr. was armed.  Accordingly, at best, Robert Jr. could have been charged with assault and

battery on his father.  However, the issue is not whether the Officers used excessive force to get

Robert Jr. on the ground, rather, the multiple tasings once he was on the ground.  A reasonably jury

could find that Robert Jr.'s suspected crime did not warrant the force applied once he was already on

the ground.

### iii.    Whether Robert Jr. Resisted Arrest or Attempted to Flee and the Availability of Less Intrusive Means

The third factor looks at whether the suspect resisted arrest or attempted to flee, and the

availability of less intrusive means.  City of Hemet, at 703-704; Santos, 287 F.3d at 854.  Here, it is

undisputed that Robert Jr. did not comply with the Officers' instructions.  However, it is also

undisputed that Robert Jr. appeared to be either mentally ill or under narcotic influence.  (Godwin

Decl. ¶ 8; Ruiz Decl. ¶ ¶ 16-17; Livingston Decl. ¶ 9; Dominici Decl. ¶ 11.)  In addition, based on

their own experiences of being tased as part of their training, the Officers knew that Robert Jr. would

not respond to verbal commands and that the tasing would cause him to become rigid.  (Godwin

Decl. ¶ 2; Ruiz Decl. ¶ 16; Livingston Decl. ¶ 10; Dominici Decl. ¶ 20; Livingston Decl. ¶ 2;

Dominici Decl. ¶ 3.)  The Officers had Robert Jr. pinned to the ground and outnumbered him seven

to one.  Thus, surrounded by seven officers, Robert Jr.'s ability to resist or flee was minimal.

With respect to whether there were less intrusive means, Plaintiffs' taser expert, Ernest

Burwell, opines that in his experience and according to police training standards, the Officers used

excessive force in arresting Robert Jr.  Burwell states:

> The Taser is designed to knock down a subject and incapacitate him briefly to create a "window of opportunity" for officers to move in and safely apply handcuffs.  Once Heston went down in the living room, he should have been handcuffed immediately.  Every Taser shock delivered after he fell to the floor constituted excessive force, violated Taser training guidelines and was counterproductive.

(Burwell Decl. ¶ 4.)  Similarly, Plaintiffs' police practices expert, Roger Clark, opines that all tasing

of Robert Jr. should have stopped after he collapsed to the floor.  (Clark Decl. ¶ 23.)  Clark states:

United States District Court

For the Northern District of California

> [T]he officers here had much less intrusive alternatives to repeatedly shocking Heston once the Tasers accomplished their intended goal of bringing him down.  The shocks delivered subsequent to the fall contributed to Heston's death, but not to the successful resolution of the situation.  What that the officers needed to do, consistent with POST[25] standards and generalized police practices, was to STOP tasing him so that his muscles could relax enough for the arms to be placed in handcuffs.

(Clark Decl. ¶ 30, emphasis in original.)  A jury could reasonably rely on such expert testimony to conclude that lesser force should have been used.  See City of Hemet, 394 F.3d at 703.

In sum, viewing the above factors in the totality of the circumstances, it appears that a reasonable jury could find that the Officers used unreasonable force in tasing Robert Jr. multiple times after he had fallen and had hit his head on the table.  Even if the use of taser was not deadly, it may still have been unreasonable given the testimony of Plaintiffs' experts.  A jury could also reasonably find that Officers Godwin, Ruiz and Livingston's use of taser to be non-lethal yet excessive considering that Robert Jr. was already on the ground, that he was not a suspect for a serious crime, and that less intrusive means were available to effect his arrest.

The Court proceeds to consider Officer Dominici's liability as the Senior Officer in charge at the scene.

### b.      Liability of Officer Dominici

Plaintiffs contend that Officer Dominici is liable because he was the Senior Officer during the incident and he failed to control the other Officers' use of excessive force.  (Opposition at 18).

In a § 1983 action, a plaintiff must demonstrate that the defendant personally participated in the alleged denial of rights because there generally is no liability based on a *respondeat superior* or other theories of vicarious liability.  Monell v. Dep't of Soc. Serv. of the City of New York, 436 U.S. 658 (1978); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  However,  "a supervisor is liable for the constitutional violations of subordinates 'if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.'"  Hydrick v. Hunter, 466 F.3d 676, 689 (9th Cir. 2006).  In addition, a plaintiff must allege and prove a causal connection.

---

[25]  The California Commission on Peace Officer Standards and Training (POST).

13

Rizzo v. Goode, 423 U.S. 362, 370-71 (1976); Hydrick, 466 F.3d at 689.  If there is no affirmative

link between the defendant's conduct and the alleged injury, the defendant is not liable for any

deprivation of the plaintiff's constitutional rights.  Rizzo, 423 U.S. at 370-71.

In this case, there is no dispute that Officer Dominici did not tase Robert Jr. once he was on

the ground.  However, Plaintiffs' police procedure experts opine as follows:

> As a line officer, Sergeant Dominici failed to supervise the incident, allowing too many
> Taser applications to be administered to [Robert Jr.], which resulted in the use of excessive
> force.

(Burwell Decl. ¶ 18.)

> Proper police procedure requires that when a multi-unit field response occurs, someone must
> become the lead officer, or officer in charge.  This is always a ranking officer - usually a
> Sergeant when one is available.  This was clearly Dominici's role during this incident.  The
> necessity for command and control during incidents where force is likely to occur cannot be
> overstated because the lack of proper command is most frequently a key factor in tragic and
> unnecessary uses of force in the police profession.

(Clark Decl. ¶¶ 28-29.)  Thus, if Officers Godwin, Ruiz, and Livingston used unreasonable force, a

reasonable jury could rely on the expert testimony regarding police procedure to find that Officer

Dominici participated, directed, or knew of the violations and failed to act to prevent them.

(Dominici Decl. ¶ 12; Burwell Decl. ¶ 18.)  Accordingly, the Court finds triable issues of fact as to

Officer Dominici's potential liability.

## 2. **Qualified Immunity**

Even if the officers violated the Fourth Amendment under Plaintiffs' account of the facts,

they are entitled to qualified immunity if the unconstitutionality of their conduct was not clearly

established at the time of the incident.  Here, Defendants contend that no cases have held taser use to

be unconstitutional and therefore, the Officers have qualified immunity from any finding that they

used unreasonable force.  (Motion at 28-29.)

Qualified immunity is a defense against liability available to government officials who

perform executive and administrative functions and who are sued for monetary relief in their

personal capacities.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The doctrine shields public

officers from "undue interference with their duties and potentially disabling threats of liability."

Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982); Brosseau v. Haugen, 543 U.S. 194 (2004).  To determine whether a public official is entitled to qualified immunity from § 1983 liability, a court must consider (1) whether the plaintiff has identified a specific federal law or constitutional right that allegedly has been violated; (2) whether that right was so clearly established as to alert a reasonable official to its parameters; and (3) whether a reasonable officer could have believed his or her conduct was lawful.  See Sweaney v. Ada County, 119 F.3d 1385, 1388 (9th Cir. 1997) (citing Newell v. Sauser, 79 F.3d 115, 117 (9th Cir. 1996)).  "In excessive force cases, the inquiry remains whether 'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable." Boyd v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004) (alteration in original) (quoting Drummond, 343 F.3d at 1060); See also Blankenhorn v. City of Orange, 485 F.3d 463 (9th Cir. 2007)

Under the governing Ninth Circuit law at the time of the incident, force was deadly only if it created a "substantial risk of death or serious bodily injury."  City of Hemet, 394 F.3d at 706.  Here, the Court reemphasizes that the crucial issue is not whether police officers generally may use force against agitated suspects, but whether tasers may be used multiple times once a suspect is knocked to the ground.  Unlike weapons that rely on blunt force, such as guns, knives, or batons, a taser is an energy-based weapon whose inner workings and physiological impact are not obvious.  Thus, there can be no fair notice regarding the constitutionality of taser use unless the notice is provided by sources that specifically address the proper use of tasers.

Plaintiff has not cited any authority that has held the use of a taser to apprehend an unarmed suspect constitutes a Fourth Amendment violation.  Instead, Plaintiff relies on Drummond, 343 F.3d 1052, and Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001).  Both cases are distinguishable.  In Deorle, for instance, the plaintiff was a mentally disturbed individual who was shot and seriously wounded by a beanbag round fired from a police shotgun.  Police had responded to a call made by the plaintiff's wife, who reported that the plaintiff was behaving erratically and suicidal.  After the

United States District Court

For the Northern District of California

officers arrived, the plaintiff marched toward one of the officers at a steady pace with a can of lighter fluid in his hand, while shouting expletives. A beanbag round was fired without warning, striking one of the plaintiff's eyes. Shooting a beanbag round from a shotgun, however, is far different from launching a taser charge against a narcotically intoxicated individual. The key difference is the nature of the force applied. A beanbag round can inflict physical injuries regardless of who the target is; in contrast, the injurious potential of a taser appears to be highly dependent on the state of the target's health. <u>Deorle</u> does not give the Officers in this case fair warning that their conduct was unconstitutional.

However, judicial opinions are not the only source of notice to the Officers that their conduct was unconstitutional; another possible source of notice is police training materials. See <u>Drummond</u>, 343 F.3d at 1061-62. In this case, the Officers were advised to "NEVER USE [A TASER] FOR PHYSICAL COERCION" as part of their training. Nevertheless, the Officers continued to tase Robert Jr. to get him to comply once he was on the ground. The evidence shows that Officers Godwin, Livingston, and Dominici knew from their training that while a person is being tased, he becomes rigid. (Godwin Decl. ¶ 2; Livingston Decl. ¶ 2; Dominici Decl. ¶ 3.) Moreover, Officer Godwin believed that a person being tased could not respond to verbal commands. (Godwin Decl. ¶ 2.) Each Officer further knew, or had reason to know, that Robert Jr. was on drugs and that tasers would be, and were, less effective on him. (Groves Decl., Ex. A-6; Godwin Decl. ¶ 8; Ruiz Decl. ¶ ¶ 16-17; Livingston Decl. ¶ 9; Dominici Decl. ¶ 11.) Finally, the Officers were on notice that they should not use tasers as pain compliance devices.

In sum, the record show that the Officers were on notice that the use of a taser as a pain compliance device on an individual who was already knocked to the ground had a substantial risk of death or serious bodily injury. The Ninth Circuit has repeatedly cautioned lower courts to take care in deciding excessive force cases at the summary judgment stage. The court has explained that:

> Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted

sparingly. This is because police misconduct cases almost always turn on the jury's credibility determinations.

<u>Santos</u>, 287 F.3d at 853; <u>See also</u> <u>City of Hemet</u>, 394 F.3d at 701; <u>Lolli v. County of Orange</u>, 351 F.3d 410, 415-16 (9th Cir. 2003).  Given the disputed issues of material fact addressed above, the Court DENIES summary judgment on the ground of qualified immunity.

      **3.**        **Liability of Chief Ortega**

      Plaintiffs allege that Chief Ortega is liable because he failed to discipline the officers and encouraged the complained of behavior.  (FAC ¶ 11.)  It is unclear whether Plaintiffs are suing Chief Ortega in his official capacity or in his individual capacity or both.  The Court proceeds to consider both possibilities.

      With respect to claims against Chief Ortega in his official capacity, under § 1983, an official capacity suit represents "only another way of pleading an action against an entity of which an officer is an agent."  <u>Monell</u>, 436 U.S. 658 at 690 n. 55.  Any official capacity claims against Chief Ortega are really claims against the government entity—the City of Salinas.  <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991).  Thus, for purposes of summary judgment, an official capacity claims against Chief Ortega are redundant because the City is also a Defendant.  Therefore, those official capacity claims against Chief Ortega are DISMISSED as duplicative.

      With respect to claims against Chief Ortega in his individual capacity, the Ninth Circuit has held that "supervisory liability is imposed against a supervisory official in his individual capacity for his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' [or] for his 'acquiescence in the constitutional deprivations of which the complaint is made.'"  <u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 646 (9th Cir. 1991); <u>Watkins v. City of Oakland</u>, 145 F.3d 1087, 1093 (9th Cir. 1998); <u>Blankenhorn</u>, 485 F.3d at 485.  In this case, if the jury finds that Officers Godwin, Ruiz, or Livingston used excessive force, Chief Ortega's liability as supervisor depends upon whether he "'set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury.'"  <u>Watkins</u>, 145 F.3d at 1093 (quoting <u>Larez</u>, 946 F.2d at 646).

United States District Court

For the Northern District of California

However, <u>Blankenhorn</u>, <u>Larez</u>, and <u>Watkins</u> are distinguishable from this case.  First, in <u>Blackenhorn</u>, the plaintiff presented evidence that the police chief approved the alleged offending officer's personnel evaluations despite three complaints of excessive force having been lodged against him.  In addition to the approved evaluations, the plaintiff presented expert testimony that the police department's discipline of the officer in all three matters was insufficient.  485 F.3d at 485.  Second, in <u>Larez</u>, the plaintiff presented evidence that the police chief personally dismissed his excessive force complaint against the officers who searched plaintiff's house.  946 F.2d at 635.  The plaintiff also presented an expert witness who testified that the police chief should have disciplined the officers and established new procedures to avoid future similar incidents.  <u>Id.</u> at 636.  The expert further testified that, based on a two-year comparative study he had conducted, Los Angeles police officers almost never received discipline as a result of citizens complaints.  <u>Id.</u>  The <u>Larez</u> court held that on this evidence, the jury could have found that the police chief "condoned, ratified, and encouraged excessive use of force" among the officers he supervised, and thereby caused the plaintiff's constitutional violations.  <u>Id.</u> at 646.  Finally, in <u>Watkins</u>, the plaintiff presented evidence that the police chief, without determining whether ameliorative action was called for, signed an internal affairs report dismissing the plaintiff's complaint against the alleged offending officer despite evidence in the report of the officer's excessive force during plaintiff's arrest and in other dog bite incidents.  145 F.3d at 1093.

Contrary, in this case, there is no evidence that Chief Ortega personally dismissed complaints against the Officers prior to or after the incident in question as was the case in <u>Larez</u> and <u>Watkins</u>. Further, there is no evidence that Chief Ortega approved any of the Officers' personnel evaluations despite repeated and serious complaints against the Officers' for use of excessive force as was in <u>Blankenhorn</u>.  Rather, the only evidence that Plaintiffs rely on is Chief Ortega's declaration, which he prepared in support of Defendants' present motion.  In this declaration, Chief Ortega states that, "There was not and is not any reason to have considered [the Sergeants and Officers involved]

18

1   anything but a credit to the Salinas Police Department."[26]  Since Plaintiffs have produced no

2   evidence establishing that Chief Ortega "ratified" any prior or subsequent conduct taken with

3   respect to Robert Jr., the Court finds an absence of triable issues of fact with respect to Chief

4   Ortega's individual liability for the conduct of Officers Godwin, Ruiz, Livingston and Dominici.

5           **4.      Liability of City of Salinas and the Salinas Police Department**

6           Plaintiffs contend that City of Salinas and Salinas Police Department's[27] failure to track

7   individual taser usage constituted deliberate indifference to excessive taser shocks by its officers.

8   (Opposition at 25-27.)  Defendants contend that Plaintiffs have offered no evidence that the failure

9   to track caused the alleged abuses.  (Motion at 5.)

10          A public entity defendant cannot be held liable for a § 1983 violation caused by an individual

11  employee's actions under a theory of respondeat superior.  Monell, 436 U.S. at 694  (1978).  To be

12  liable, the defendant must act as a "lawmaker[ ] or ... [one] whose edicts may fairly be said to

13  represent official policy."  Id. at 691.  Under Monell, municipal liability must be based upon

14  enforcement of a municipal policy or custom that causes the deprivation of a plaintiff's federal right,

15  and not upon the municipality's mere employment of a constitutional tortfeasor.  Id.  To maintain a §

16  1983 claim against a public entity defendant, or supervisors not personally involved in the alleged

17  violation, a plaintiff must allege that his or her constitutional injury resulted from a policy, practice

18  or custom of the local entity.  Id.

───────────────

20      [26] (Declaration Of Chief Of Police Daniel Ortega In Support Of Defendants' Motion For
    Summary Judgment or in the Alternative Summary Adjudication ¶ 22, hereafter "Ortega Decl.,"
21  Docket Item No. 75.)

22      [27]  Federal Rule of Civil Procedure 17(b) requires the standing of a police department to be
    determined by the law of the state.  California Government Code section 945 provides that public
23  entities may sue or be sued.  California Government Code section 811 .2 defines a public entity as
    "... a county, city, district, public authority, public agency, and any other political subdivision or
24  public corporation in the state."  The Ninth Circuit has held that a police department is a public
    entity under Section 811.2 and, therefore may be sued in federal court. Shaw v. State of California
25  Dept. of Alcoholic Beverage Control. 788 F.2d 600, 604-605 (9th Cir. 1986); see also
    Karim-panachi v. Los Angeles Police Dept., 839 F.2d 621, 624 (9th Cir. 1988).  However, as with
26  claims against municipalities, a plaintiff must prove that the violation of his rights was pursuant to a
    custom or policy of the department.  Shaw, 788 F.2d at 610-11.  Accordingly, the Salinas Police
27  Department is a proper party in this action.

28                                          19

1    There are three ways to meet the policy, practice, or custom requirement for municipal

2    liability under § 1983:  (1) the plaintiff may prove that a public entity employee committed the

3    alleged constitutional violation pursuant to a formal policy or a longstanding practice or custom,

4    which constitutes the standard operating procedure of the local government entity; (2) the plaintiff

5    may establish that the individual who committed the constitutional tort was an official with "final

6    policy-making authority" and that the challenged action itself thus constituted an act of official

7    government policy; or (3) the plaintiff may prove that an official with final policy-making authority

8    ratified a subordinate's unconstitutional decision or action.  See Hopper v. City of Pasco, 241 F.3d

9    1067, 1083 (9th Cir. 2001).   An unconstitutional policy need not be formal or written to create

10   municipal liability under § 1983; however, it must be so permanent and well settled as to constitute a

11   custom or usage with the force of law.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

12   Furthermore, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose

13   liability under Monell, unless proof of the incident includes proof that it was caused by an existing,

14   unconstitutional municipal policy, which policy can be attributed to a municipal policy maker."

15   Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  Finally, after establishing one of the three

16   circumstances listed above, a plaintiff must prove that the policy was both the cause in fact and the

17   proximate cause of the constitutional deprivation.  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir.

18   1996).  In this case, Plaintiffs remaining two bases of municipal liability are (1) failure to train and

19   (2) failure to supervise.  The Court proceeds to consider each theory.

20   With respect to Plaintiffs' failure to train claim, "[a] municipality's failure to train an

21   employee who has caused a constitutional violation may be the basis for § 1983 liability where the

22   failure to train amounts to deliberate indifference to the rights of persons with whom the employee

23   comes into contact."  Long v. County of Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006).  A

24   plaintiff "might succeed in proving a failure-to-train claim without showing a pattern of

25   constitutional violations where 'a violation of federal rights may be a highly predictable

26   consequence of a failure to equip law enforcement officers with specific tools to handle recurring

27

28                                                          20

United States District Court
For the Northern District of California

situations.'" Id. (quoting <u>Board of County Commissioners v. Brown</u>, 520 U.S. 397, 409 (1997)). "[A] county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place." Id. In this case, although training materials in the record provide no guidance on how and whether taser should be used when dealing with narcotically intoxicated individuals, the manual does advise users to "NEVER USE [A TASER] FOR PHYSICAL COERCION." Nevertheless, the evidence suggests that the Officers used their tasers for pain compliance. This is circumstantial evidence that the Officers were not adequately trained.

With respect to Plaintiffs' failure to supervise claim, Plaintiffs contend that the Salinas PD failed to supervise or audit taser use by its officers. Plaintiffs' experts opine as follows:

> Each and every one of the officers deposed in this case, including their certified Taser instructor, Officer Fairbanks, has testified that they never received any training from Taser International, or any other source, that multiple, and/or sequential, and/or simultaneous uses of Taser weapons could become lethal force. Apparently, no such training existed from Taser International, and no such training was provided by the Salinas Police Department to their personnel. In my opinion this is clearly a gross incompetence and a reckless disregard for any persons in similar circumstances as Mr. Heston. The absence of necessary discipline, policies, procedures, and supervision within the Salinas Police Department demonstrates a systemic culture, pattern and practice that prevented any implementation of the correct decisions and actions that would have prevented this incident.

(Clark Decl. ¶ 31.)

> The person in charge of the Tasers at Salinas Police Department should have frequently downloaded the Dataport information and reset the clock to the current computer time. The Salinas Police Department did not even own the necessary program to download the Dataport, however. That information should have been downloaded after every field use and attached to the police report, corroborating the number of shocks administered to a subject. The data should be kept in a file on each Taser, showing the number and times of activations. A log should be attached to each Taser file listing training activations, test activations, demonstration activation, and actual deployment activations. Each cartridge should be assigned to an individual officer and a log maintained for the assignment. Salinas did none of this. Then in this incident one of its sergeants and two officers discharged their taser far too many times. That is attributable to the department's failure to monitor usage prior to the incident.

//

21

(Burwell Decl. ¶ 23.)[28]  Plaintiffs contend that prior to the incident, the Salinas PD had not purchased the software necessary to download the Dataport data to determine a taser's usage pattern. Defendants admit that they did not regularly download usage information from their department-issued tasers.[29]  However, Defendants contend that Plaintiffs have no evidence to establish any causal link between the fact and the alleged misuse of the tasers.  Id.

The absence of an audit trail is not, by itself, sufficient to establish a failure to supervise. However, a reasonable jury could rely on the experts' testimony to conclude that in failing to purchased the software necessary to download the Dataport data on its own, and in failing to properly maintain the tasers, the Salinas PD demonstrated a custom of deliberate indifference to the abusive use of tasers in the field.  A reasonably jury could conclude that the presence of an audit trail would deter the Salinas PD officers from using the weapon in abusive ways.  As stated in Trevino, if the challenged municipal practice is not a formal policy, Plaintiffs must show the existence of a custom that is "so persistent and widespread that it constitutes a permanent and well-settled city policy."  99 F.3d at 918 (citation omitted).  Here, Plaintiffs have presented evidence that the Salinas PD had almost two years to implement a policy of monitoring tasers' usage by its officers, but failed to do so.

Accordingly, the Court finds that the lack of an audit trail on the Officers' tasers  may support an inference of deliberate indifference on Plaintiffs' failure-to-train theory.  The Court DENIES summary judgment on the issue of municipal liability.

**B.    Plaintiffs' State Law Claims**

Defendants move for summary judgment on Plaintiffs' Fifth Claim for Assault and Battery, and Sixth Claim for Police Negligence on the grounds that there was no excessive force and, in the

---

[28]  Defendants' objections to Burwell's testimony go to the weight of the evidence and not its admissibility.

[29]  (Supplement Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, or in the Alternative, Motion for Summary Adjudication, hereafter, "Defendants' Supplement," Docket Item No. 106.)

alternative, that they are immune under California Government Code §§ 820.2 and 820.4.  (Motion at 32-33.)

### 1.    Immunity Under California Government Code

California Government Code § 820.2 provides:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission whether the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused.

California Government Code § 820.4 provides:

> A public employee is not liable for his act or omission exercising due care, in the execution or enforcement of any law.

However, police officers are not immune from liability under state law from claims for false arrest, false imprisonment, or excessive force.  See Robinson, 278 F.3d at 1016; Scruggs v. Haynes, 252 Cal. App. 2d 256, 264 (Cal. Ct. App. 1967).   Therefore, to the extent that Defendants seek summary judgment of the state law claims on this ground, the motion is DENIED.

### 2.    Wrongful Death By Assault and Battery

In California, a battery claim against a police officer performing official duties is analyzed under the reasonableness standard of the Fourth Amendment.  "[A] prima facie battery by a police officer is not established unless and until the plaintiff proves unreasonable force was used."  Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1273 (Cal. Ct. App. 1998); see also Saman v. Robbins, 173 F.3d 1150, 1157 fn. 6 (9th Cir .1999).  As discussed above in the Fourth Amendment context, a jury could reasonably find that excessive force was used against Robert Jr.  Accordingly, the Court DENIES summary judgment as to Plaintiffs' Fifth Cause of Action for Assault and Battery.

1

**3.      Police Negligence**

2          Defendants did not raise separate issues with respect to this claim.  Rather, they discussed it

3   in the context of the immunity defense.  To the extent that the Court has denied summary judgment

4   on that ground, and denied summary judgment as to the assault and battery claim, the Court

5   DENIES summary judgment as to Plaintiffs' Sixth Cause of Action for Police Negligence.

6                                            **V. CONCLUSION**

7          The Court GRANTS in part and DENIES in part Defendants' Motion for Summary

8   Judgment as follows:

9          1)      Against all Defendants, Plaintiffs' Claims that Defendants were deliberately
                   indifferent to the medical needs of Robert Jr. as alleged in paragraphs 12, 17, and 21
10                  of the First Amended Complaint are DISMISSED.

11         2)      Against Defendant City of Salinas, Salinas Police Department, and Chief Daniel
                   Ortega, Plaintiffs' claim that Defendants showed deliberate indifference to officer
12                  hiring or retention as alleged in paragraph 11a of the First Amended Complaint is
                   DISMISSED.
13
           3)      Against all Defendants, Plaintiffs' Fourth Cause of Action for violation of California
14                  Civil Code § 52.1 in the First Amended Complaint is DISMISSED.

15         4)      Against Defendants Craig Fairbanks, Tim Simpson, and Valentin Paredez, all of
                   Plaintiffs' Claims are DISMISSED.
16
           5)      Against Defendant Chief Daniel Ortega, in his official and individual capacities, all
17                  of Plaintiffs' Claims are DISMISSED with prejudice.

18         6)      The Court DENIES Defendants City of Salinas and the Salinas Police Department's
                   motion for summary judgment as to Plaintiffs' First, Second, and Third Causes of
19                  Action for municipal liability under § 1983, and Fifth and Sixth Causes of Action for
                   assault and battery and police negligence.
20
           7)      The Court DENIES Defendants Juan Ruiz, James Godwin, Lek Livingston, Michael
21                  Dominici's, motion for summary judgment as to Plaintiffs' First, Second, and Third
                   Causes of Action for violations under § 1983 and Fifth and Sixth Causes of Action
22                  for assault and battery and police negligence.

23

24
    Dated: December 20, 2007              _____
25                                        JAMES WARE
                                          United States District Judge
26

27

28                                                24

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Douglas Frank Young dyoung@hurleylaw.com
John Christopher Burton jb@johnburtonlaw.com
Michael A Brave brave@laaw.com
Mildred Katherine O'Linn mko@mmker.com
Peter M. Williamson pmw@williamson-krauss.com
Susan K. Blitch sblitch@hurleylaw.com
Vincent P. Hurley vhurley@hurleylaw.com

**Dated:  December 20, 2007**                    **Richard W. Wieking, Clerk**


                                                 **By:   /s/ JW Chambers**
                                                        **Elizabeth Garcia**
                                                        **Courtroom Deputy**

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28