Vanessa W. Vallarta, City Attorney #142404
Susan J. Matcham, Assistant City Attorney #79562
OFFICE OF THE CITY ATTORNEY
200 Lincoln Avenue
Salinas, CA 93901
Telephone: (831) 758-7256
Facsimile: (831) 758-7257

Vincent P. Hurley #111215
Douglas F. Young #84531
LAW OFFICES OF VINCENT P. HURLEY
A Professional Corporation
38 Seascape Village
Aptos, California 95003
Telephone: (831) 661-4800
Facsimile: (831) 661-4804

Attorneys for Defendants
CITY OF SALINAS and SALINAS POLICE DEPARTMENT;
MICHAEL DOMINICI, JAMES GODWIN,
LEK LIVINGSTON and JUAN RUIZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BETTY LOU HESTON, individually, and ROBERT H. HESTON, individually and as the personal representatives of ROBERT C. HESTON, deceased,<br><br>            Plaintiffs,<br><br>   vs.<br><br>CITY OF SALINAS and SALINAS POLICE DEPARTMENT, SALINAS POLICE CHIEF DANIEL ORTEGA, SALINAS POLICE OFFICERS MICHAEL DOMINICI, CRAIG FAIRBANKS, JAMES GODWIN, LEK LIVINGSTON, VALENTIN PAREDEZ, JUAN RUIZ AND TIM SIMPSON, TASER INTERNATIONAL, INC., and DOES 1 to 10,<br><br>            Defendants. | Case No. C-05-03658 JW (RS)<br><br>MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY OF ROGER CLARK BASED ON *DAUBERT*<br><br>Pretrial Conference:<br><br>Date: April 29, 2008<br>Time: 1:00 p.m.<br>Courtroom 8, 4th Floor<br><br>Trial Date: May 13, 2008 |

## I.

## "DAUBERT" DECISIONS REGARDING EXPERT TESTIMONY AND EVIDENCE

The *Daubert/Joiner/Kumho* trilogy of Supreme Court cases controls the question of whether or not experts can present their opinions to juries when providing opinions based on scientific knowledge or specific experience. In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) the Court set forth some basic tests regarding scientific knowledge that have since been applied to experts providing opinions based on personal experience or expertise which is not necessarily scientific knowledge.

First, the *Daubert* Court set forth that an expert's testimony to assist the trier of fact should be analyzed based on whether or not it can be and has been tested.

Second, another consideration is whether the expert's theory or technique has been subjected to peer review and publication, though even peer review is not necessarily an absolute right to admissibility.

Third, the Court should consider whether a particular scientific technique has a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation.

Finally, *Daubert* suggests that the Court should determine whether there has been general acceptance within the relevant community. *Daubert*, *supra* at 593-594.

*Daubert* interpreted Federal Rule of Evidence 702, which the Court emphasized is a flexible inquiry whose over-arching object is the scientific validity and, thus, evidentiary relevance and reliability of the principles supporting an opinion. *Id*. at 595. Furthermore, the *Daubert* Court also relied on Federal Rule of Evidence 703 which, though it permits expert opinions based on otherwise inadmissible hearsay, still requires that facts or data are of a type reasonable relied upon by experts in a particular field in forming opinions or inferences. *Id.* at 595.

*General Electric Company, et al. v. Joiner*, 522 U.S. 136 (1997) followed *Daubert* primarily for the clarification that review of trial court decisions on admitting or refusing to admit testimony of experts shall be based on the abuse of discretion standard. However, the

1  *Joiner* Court also made an important point about experts extrapolating from existing data.  Trial
2  courts are not required to admit opinion evidence which is connected to existing data only by the
3  *ipse dixit* of the expert.  In other words, without valid substantiation the expert's opinion is not
4  admissible just because an expert says it is so.  A Court may conclude that there is simply too
5  great an analytical gap between the data and the opinion proffered.  *Joiner*, *supra* at 146.
6  　　　*Kumho Tire Company Limited, et al. v. Carmichael,* 526 U.S. 137 (1999) completed the
7  trilogy, holding that *Daubert* applies to other experts who are not scientists, but whose testimony
8  is based on technical or other specialized knowledge as referred to in Rule 702.  In such cases,
9  the Court held that the trial court may consider one or more of the specific factors of *Daubert*,
10 but the test of reliability is flexible, giving the district court broad latitude to determine reliability
11 or lack thereof when deciding whether to permit expert testimony.  *Kumho*, *supra* at 141-142.
12 The decisions of the *Daubert* trilogy with Rules 702 and 703 grant expert witnesses testimonial
13 latitude on "the assumption that the expert's opinions will have a reliable basis in the knowledge
14 and experience of his discipline."  *Kumho*, *supra* at 147-148, citing *Daubert*, *supra* at 592.
15 　　　In *Kumho*, the Court emphasized that the district court <u>may</u> consider *Daubert's* list, and,
16 in addition, relevant reliability concerns may also focus upon the personal knowledge or
17 experience of the expert.  *Id.* at 149.
18 　　　Some of *Daubert's* questions can help to evaluate the reliability of an experienced based
19 expert as well as scientific experts.  In certain cases it is appropriate for the trial judge to ask how
20 often an engineering expert's experience based methodology has produced erroneous results or
21 whether the method is generally accepted in the relevant community.  Likewise, the *Kumho*
22 Court found that it will at times be useful to ask an experienced based witness whether his or her
23 opinion is of a kind that others in the field would recognize as acceptable.  *Kumho*, *supra* at 152.
24 In *Kumho*, the Supreme Court agreed with the trial court that it could reasonably wonder about
25 the reliability of a method of visual and tactile inspection sufficient to ascertain with some
26 certainty how many miles a tire had traveled.  *Id.* at 155.  In the *Kumho* case, the trial court found
27 that none of the *Daubert* factors, including general acceptance in the relevant community had
28 been met, and the Court's own analysis revealed no countervailing factors in favor of

admissibility. In such a case, it is appropriate for the trial court to scrutinize whether the principles and methods employed by the experts have been properly applied to the facts of the case. *Id.* at 156-157.

*Kumho* found it important that in its record there was no indication that other experts in the industry used the trial experts' tests or that other experts normally made such distinctions as were made by the purported expert in *Kumho*. The *Kumho* Court found that, when no other experts were of the same opinion as the expert testifying and the proffered expert's opinion is connected to existing data only by the *ipse dixit* of the expert, nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit such testimony. *Id.* at 157, citing *Daubert*, *supra* at 146. Rule 702 grants the district judge the discretionary authority to determine reliability in light of the particular facts and circumstances of a particular case, and when the expert fails to satisfy either *Daubert's* factors or any other set of reasonable reliability criteria, the expert could reasonably be excluded. *Id.* at 158.

One of the more recent Northern District decisions on the subject is *Ayala v. City of South San Francisco, et al.*, 2007 U.S Dist. LEXIS 54051 (N.D. Cal. July 13, 2007). In *Ayala,* defendants objected to the testimony of Roger Clark (one of Plaintiffs' experts in this case), testifying on medical issues outside of his expertise, and testifying to causes and effects of positional asphyxia after physical exertion and struggle without any supporting information. Relying on *Daubert*, District Judge William Alsup excluded such testimony. *Id.* slip op. at 17.

In *LeBlanc v. City of Los Angeles, et al.*, 2006 U.S. Dist. LEXIS 96768 (C.D. Cal. August 17, 2006), defendants objected to the testimony of Roger Clark that a TASER device may cause serious injury or death. Again relying on *Daubert*, Judge Stephen V. Wilson held that Clark could not testify that a TASER device may cause serious injury of death because it is beyond his expertise. Just as in this case, in his deposition Clark could not identify any police training manual or material that discussed TASER's potential to cause serious injury or death. In addition, Clark had no experience with TASER-related death in his police career and had only personally handled the M-26 a few times himself. *Id.*, slip op. at 28-29.

Additionally, the Los Angeles defendants moved to exclude Clark's testimony that "early intercession by a competent officer would have saved Mr. Leblanc's life". Relying again on *Daubert*, Judge Wilson excluded such testimony because it was a medical opinion regarding LeBlanc's physical state during the incident and Clark lacked the qualifications to render such opinions. *Id.*, slip op. at 28-29.

In *Gonzalez v. Pierce County,* 2005 U.S Dist. LEXIS 35205 (W.D. Wash. August 29, 2005), the district court, on deciding a motion for summary judgment, was presented with the declaration of plaintiff's expert D. P. Van Blaricom who rendered an opinion that "it is the policy, custom and practice of the [police department] to make arrests without probable cause". Slip op. at 16. Relying on *Daubert* and *Kumho*, the district court held that such an opinion does not meet the standard of evidentiary reliability because the theory and technique used by the expert to reach such a conclusion was unclear and not explained, and there was no showing that it had been tested.[1] There was no showing that it had been subjected to peer review of publication or that there was any rate of error considered by the expert. Furthermore, there was no showing that the theory was generally accepted in the law enforcement community. In that situation, the district court held that such an opinion, ie., that a police department had a policy, custom and practice of violating civil rights was an *ipse dixit* analysis of the expert and was not admissible since it was not helpful to the Court or trier of fact. Slip op. at 18.

In *Morales v. County of Ventura,* 2003 U.S. App. LEXIS 27561 (C. D. Cal. July 14, 2003), Judge Patrick J. Walsh admitted in part and excluded in part Roger Clark's testimony. In a case in which officers were called to a report of two men fighting over a gun and a shot was fired, and one of the men was subsequently shot by a deputy sheriff, defendants objected to Clark's testimony that the deputy was negligent or that her conduct was "reprehensible". Mr. Clark was allowed to testify on his opinions about police practice. However, relying on

---

[1] In our case this Court has already ordered, based on Plaintiffs' stipulation, that the City of Salinas and Salinas Police Department have no official policy, custom or practice likely to result in a constitutional violation; and, there is no custom or practice permitting conduct which would lead to a constitutional violation. *See* Order on Defendants' Motion for Summary Judgment 5:13-20.

1  *Kumho* and *Daubert*, the Court held that Clark would not be able to testify to the ultimate issue
2  that a particular defendant was negligent, or that her conduct was "reprehensible" as Clark had
3  proffered in his deposition. *Id.*, slip op. at 5-6.
4        As shown below, the testimony should not be admitted for consideration by the jury as
5  specified by the expert's testimony.

## II.

## CLARK'S BACKGROUND, TRAINING AND EXPERIENCE

Roger Clark was a deputy sheriff in Los Angeles County, retiring at the rank of lieutenant in 1993. He has no reported experience of any kind in the use of electronic control devices or controlling persons under the influence of methamphetamine in excited delirium. He taught patrol school in the academy between 1974 and 1976. Clark Dep. 22:6-20. After several administrative jobs he was a lieutenant at Cresenta Valley Station from 1980 to 1981. From 1984 to 1987, he worked in the executive offices in charge of reserve forces. When in charge of reserve deputies between 1984 and 1987, he revamped the reserve deputy academy. He taught "legal and moral use of force" during the same years, 1984 to 1987. Clark Dep. 18:8-19. He lectured occasionally at the regular sheriff's academy in his last two years of employment, last teaching on 1990. Clark Dep. 22:6-20; 25:15-17. He attended command college and wrote a thesis (for which he has no copy) regarding community expectations of police. Clark Dep. 20:13-22.

His last assignment was as a lieutenant in the Northern Regional Surveillance and Apprehension Team. His unit never had a patrol function. The unit conducted planned surveillance and arrest of felons. In every case, they had the opportunity to meet in advance, brief and plan, before going out on operations. The teams and briefings included teams of 5 to 25 officers. Clark Dep. 11:12-13:9. He has been a consultant since 1993. Clark Dep. 13:23-14:9.

He has not written any books or journals. Clark Dep.16:20-25. He has never helped write or submitted any suggestions for the California Commission on Peace Officer Standards and Training (POST) teaching materials known as "domains". Clark Dep.19:22-20:4.

6

Motion in Limine No. 1 to Exclude Testimony of R.Clark        Case No. C 05-03658 JW (RS)

## III.

## OPINIONS THAT SHOULD BE EXCLUDED

**A.     Statements about qualifications or expertise.**

Clark included in his report that he has never been excluded from testifying on any matter for which he has been retained. Expert Report p. 9. As shown in the District Court decisions above, Clark has been precluded from testifying on matters about which he has been retained, and he should not be allowed to testify as he claimed in his report.

**B.     Clark lacks the personal, scientific, technical or specialized knowledge or experience to assist the trier of fact about the manufacture, operation, use or effect of TASER, and his opinions do not have a "reliable basis in the knowledge and experience of his discipline." *Kumho*, supra at 147-149; *Daubert*, supra at 592; Fed. R. Evid. 702.**

Clark should not be allowed to testify about <u>any subject</u> relating to electronic control devices, including TASER. He has admitted that he does not consider himself an expert on the use of TASER sufficient to testify in trial. Clark Dep. 36:20-37:3. Furthermore, he has admitted that he does not know what (if anything) is wrong with TASERS, or if anything is wrong with multiple uses of TASERS. He does not know the effect of multiple uses. He does not know if two TASERS equals 100,000 volts. He just thinks two TASERS hurts a lot more. Clark Dep. 155:16-156:8. Clark admits that he has no information to support his opinion that multiple TASERS used at the same time cause increased pain. Clark Dep. 180:5-13.

Clark has never attended any TASER training course. His only training is by Ernie Burwell about one and a half years before his deposition. Clark Dep. 26:7-19. Burwell's training consisted of giving him the TASER training materials. They did not have a TASER so he never test-fired a TASER with Burwell. Clark Dep. 27:10-18. Though he spent 30 to 40 hours together with Burwell of which 15 hours were devoted to discussion about TASER with Burwell (Clark Dep. 30:13-20), Clark agrees that 15 hours of discussion with Ernie Burwell about TASERS was not TASER training. Clark Dep. 188:15-25.

Clark has only actually deployed a TASER ten times, all in his office. Clark first claimed he obtained a TASER from TASER International and test-fired a TASER several hundred times

7

1  with cartridges that he purchased himself.  Clark Dep. 52:9-24.  In the same deposition he
2  revealed that he actually received the TASER from Ernie Burwell, who also gave Clark all of his
3  cartridges.  Clark Dep.  172:2-17.  Clark claims he pulled the trigger on the TASER hundreds of
4  times in spark testing (Clark Dep. 173:25-174:16) in his office in order to experiment.  Clark
5  Dep. 35:15-21.  He eventually admitted that he has only received 20 cartridges, all from Ernie
6  Burwell, and has only fired about ten of them.  Clark Dep. 172:24-173:24.  Clark got the
7  download software from Ernie Burwell and does not know where Burwell got it.  Clark Dep.
8  174:17-25.

9       He knows the TASER is 50,000 volts, but cannot remember how many amps.  He does
10 not know the number of amps before it reaches a danger level.  Clark Dep. 191:24-192:8.

11      Therefore, there is no certification or standard of reliability established since no one has
12 seen the device Clark claims to have used for his "spark tests" or his ten deployments of a device
13 which he says he received from Burwell.

14     **C.**     **Clark has not applied the principles and methods reliably to the facts of this**
15 **case, and has no information about any rate of error or standards controlling the**
16 **techniques in his studies, preparation of a chart, or calculation of times (*Daubert, supra* at**
17 **594); and Clark's opinions have not been tested (*Daubert, supra* at 593).**

18      Clark proposes to testify and present a chart of TASER deployments during the incident
19 from TASER data download records of Salinas Police Officer TASERs used in the incident.  The
20 chart was prepared by Plaintiffs' attorney, John Burton, Ernest Burwell and Roger Clark.  Clark
21 Dep. 53:5-23, Ex. 1 to Clark's Dep.  The purpose of admitting the chart is to support his opinion
22 that electricity was delivered to Heston for approximately 74 seconds.  Clark Dep. 96:2-11.
23 However, Clark admits that there is a corruption in the TASER data of Livingston or Ruiz.  He
24 has in his chart purportedly compensated for the known corruption of the data by listening to a
25 911 telephone recording, even though he agrees the TASER data in Livingston's TASER did not
26 record as having been deployed at the same time Ruiz deployed, as the officers have testified.
27 Clark Dep. 76:16-77:8.  Furthermore, he has attempted to compare the data download with the
28 911 recording and the Monterey County Communications dispatch record (called a CAD), but he

8

1  admits the three different sources do not match. Clark Dep. 56:9-22. Clark has opined that a
2  clicking sound he hears on the 911 recording is the sound of a TASER, but when the clicking
3  sound does not match his conclusion to substantiate his opinion about duration of TASER, he
4  excuses the inconsistency by concluding the cell phone was momentarily too far away from
5  Heston. Clark Dep. 97:4-11.

6  Clark offers the chart even though he admits and does not assume for his opinion that the
7  time entries on his chart regarding TASER trigger pulls were complete cycles, because he knows
8  cycles are not documented in the data download. In addition, he agrees that he does not know if
9  electricity was actually being delivered to Heston because things can interfere with that. Clark
10 Dep. 189:17-190:8.

11 Therefore, Clark's testimony about his "chart" purporting to represent the number of
12 trigger pulls, the elapsed time of trigger pulls, and the delivery of electricity to Heston should be
13 excluded, including any testimony claiming to establish the amount of time that TASERS were
14 operating, the amount of time electricity was being delivered from the TASERs, and whether any
15 of the TASERS were connected to Heston when he was on the floor.

16 Clark's testimony regarding his calculations and theories related to the chart and elapsed
17 times should be excluded as follows:

18 Any testimony that, "The record documents a 74-second continuous use of taser . . . on
19 Mr. Heston by the officers . . ." (p. 16 ¶ 4) "after Ruiz deployed his Taser." Clark Dep. 55:8-22,
20 or that Heston was "shocked continuously for 50 seconds". Clark Dep. 99:25-100:6.

21 Any testimony that there were "clear physical indicators that Mr. Heston was
22 continuously tased (after he had fallen to the floor) for at least one 74-second period of time".
23 Expert Rpt., p. 16 ¶ 4

24 Any testimony that Dominici committed unreasonable force by allowing "multiple Taser
25 weapons in sequence". Expert Rpt. p. 13, bullet pt. 4.

26 Any testimony that Dominici committed unreasonable force by allowing "multiple
27 Taser . . . fired at the same time". Expert Rpt., p. 13, bullet pt 5.

28

9

1   Any testimony that Dominici committed excessive force by allowing ". . . multiple
2   Taser . . . fired for an excessive period of time". Expert Rpt., p. 13, bullet pt 6.

3   **D.    Clark's opinions have not been subjected to peer review or publication**
4   *Daubert*, **supra at 593.**

5   Clark collaborated with Burwell in writing Clark's expert opinion report. Clark Dep.
6   40:24-42:14. Other than working with Burwell, he cannot cite any other professional or
7   scientific publication that agrees with or has ever used Clark's methodology.

8   **E.    Clark's opinions do not have widespread acceptance in any relevant**
9   **community.  *Daubert, supra* at 594.**

10  He agrees that the California Commission on Peace Officer Standards and Training
11  (POST) has not developed training for TASER, even to this day. Clark Dep. 34:5-13. Clark has
12  never seen any training manual or training material of any kind that existed prior to February 19,
13  2005, that said officers should not deploy two TASERS. Clark Dep. 77:9-78:1. Clark was not
14  aware of any articles written by anyone prior to February 19, 2005 that said two TASERS should
15  not be deployed. Clark Dep. 78:2-5. He admits that there is no video training that says a person
16  cannot be handcuffed while a TASER is operating. Clark Dep. 123:15-21. Clark has no
17  scientific knowledge or support for his opinion that TASERS should not be used sequentially.
18  Clark Dep. 156:9-157:18. Clarks renders the unilateral opinion that there must be data
19  downloads attached to all reports about TASER use. Clark Dep 146:22-147:20. Clark can offer
20  no other departments that train at all similar to his opinions, or that required TASER downloads
21  whenever a TASER was used in February 2005.

22  **Based on the facts set forth in Section II. B, C, D and E above, Clark's testimony**
23  **regarding mechanics, operation, or use of TASER should be excluded:**

24  Clark's opinions about the effects of TASER have been excluded before. *See LeBlanc*,
25  *supra* at slip op. 28-29, discussed above.

26  Any testimony that he is competent to testify about "taking corrective measure of known
27  risks" if such opinion relates to TASER. Expert Rpt., p. 9.

28  Any testimony that the Taser restricted Heston's breathing. Expert Rpt., p. 17

10

1     Any testimony that "the deployment [of Tasers] . . . was never justified at any time during this incident." Expert Rpt., p. 3 No 8 (actually No. 9, but misnumbered).

    Any testimony that multiple or simultaneous use of TASER is lethal force. Clark Dep. 192:19-193:6.

    Any testimony relying on a Los Angeles Police Department training document in forming his opinions, because he is not competent to testify about TASER or TASER training, and because he did not bring such materials to his deposition. Clark Dep. 31:17 to 32:22.

    Any testimony that officers "incorrectly determined that multiple use of Taser weapons operating in sequence and/or together was allowed". Expert Rpt., p. 2 No. 4.

    Any testimony that officers made "illogical, unrealistic and erroneous assumptions regarding the TASER and its potential to become a lethal weapon" which "resulted in the unnecessary and excessive use of lethal force causing Mr. Heston's death". Expert Report Pg.2 No. 4.

    Any testimony that there was a "lack of reasonable and realistic training regarding the TASER weapon" or that such lack of training ". . . combined with a gross lack of . . . policy, training . . . and supervisory intervention" resulting in "departure from established apprehension methods." Expert Rpt., p. 2 No 5.

    Any testimony that there was ". . . no policy or procedure in place to monitor the use and activity of . . . M26 TASER . . . without the requisite computer programs . . . the department could not properly monitor . . . use of . . . Taser . . ." . Expert Rpt., p. 3 No 8.

    Any testimony that Dominici committed unreasonable force by allowing "multiple Taser weapons in sequence". Expert Rpt., p. 13, bullet pt 4.

    Any testimony that Dominici committed unreasonable force by allowing "multiple Taser . . . fired at the same time". Expert Rpt., p. 13, bullet pt. 5.

    Any testimony that Dominici committed excessive force by allowing ". . . multiple Taser . . . fired for an excessive period of time". Expert Rpt., p. 13, bullet pt 6.

    Any testimony that "Excessive force will occur unabated and unnecessary injuries and deaths will inevitably occur. Without the requisite computer programs . . . the Salinas Police

11

1  Department could not properly monitor their field use of their TASER weapons." Expert Rpt.,
2  p. 3.
3         Any opinion that the Salinas Police Department did not have a policy or procedure in
4  place to control the use of TASERS because they did not use data downloads. Clark Dep. 133:1-
5  134:3.
6         Any opinion that the Police Department should have instructed officers not to use the
7  TASER in multiple ways, or simultaneously or sequentially more than one or two times, or that
8  the Department should have required data downloads to be attached to every report. Clark Dep.
9  139:10-141:1.
10         Any testimony that the Police Department accepted TASER'S training without question
11  (Clark Dep. 151:13-152:6), or that Salinas should be faulted for accepting TASER'S training.
12  Clark Dep. 152:20-25.
13     **F.    Clark lacks the personal knowledge or experience to testify about physical,**
14  **medical or mental conditions of Heston or the physical effects on him of a TASER.** *Kuhmo*,
15  *supra* **at 149.**
16         Clarks attempts to testify about areas outside his expertise regarding medical opinions
17  and cause of death have been excluded before. *See Ayala, supra* at slip op. 17.
18         Clark admits that he cannot testify about irregular heart rhythm and cardiac arrest. Clark
19  Dep. 127:3-14. He also admits that he cannot give an opinion about whether there is increased
20  pain with multiple TASER use because that is a scientific evaluation. Clark Dep. 180:20-181:9.
21  Clark agrees that there are factors that could have interfered with the flow of electricity into
22  Heston's body. Clark Dep. 190:14-25. He does not have the expertise to know what they are.
23  Clark's opinions are based in part on looking at only one other death case where a TASER was
24  used in the incident, and that was also a person under the influence of methamphetamine. Clark
25  Dep. 162:2-17.
26         Clark described Heston as physically fragile in his report, even though he did not
27  consider him to be fragile. He believes Heston displayed physical powers that did not make him
28  appear fragile even though he included that in his report. Clark Dep. 48:3-9. Furthermore,

1  Clark has no facts to indicate that Heston was medically dependent (Clark Dep. 49:4-17), and
2  agrees that he should not have used the words medically dependent or mentally disabled in his
3  report. Clark Dep. 50:15-23.
4      Therefore, Clarks opinions should be excluded as follows:
5  **1.   Clark's testimony about the following opinions related to physical, medical**
6  **or mental conditions should be excluded:**
7      Any testimony that Heston was an "impaired, delusional, and emotional distraught
8  individual" (Expert Rpt., p. 2 No.3), or that Heston was "either substance impaired, or mentally
9  impaired, or both". Expert Rpt., p. 16 ¶ 3.
10     Any testimony that it "is reasonable to assume that Mr. Heston was incapacitated and fell
11 to the floor". Expert Rpt., p.16 ¶4.
12     Any testimony that there were "clear physical indicators that Mr. Heston was
13 continuously tased (after he had fallen to the floor) for at least one 74-second period of time".
14 Expert Rpt., p. 16 ¶ 4.
15 **2.   Clark's opinions about cause of death should be excluded:**
16     Any testimony that "it is likely that an early intercession (sic) by a competent officer
17 would have saved Mr. Heston's life." Expert Rpt., p. 2 No 6. *See also, LeBlanc, supra* at slip
18 op. 28-29, discussed above.
19     Any testimony that data downloads could have prevented Heston's death because there
20 would have been oversight. Clark Dep. 132:11-25.
21     Any testimony that ". . . absence of policies, procedures, and supervision . . .
22 demonstrates a systematic culture, pattern, and practice preventing implementation of correct
23 decisions and actions that would have spared Mr. Heston's life". Expert Rpt., p. 2 No 7.
24     Any testimony that the sequential use of the TASER caused Heston's body to become
25 rigid and restricted his ability to breathe. Clark Dep. 160:4-18.
26     Any testimony that Clark believes anyone should know the TASER restricts breathing.
27 Clark Dep 161:2-10.
28

1   Any testimony that ". . . fatally flawed assumptions resulted in the unnecessary and
2   excessive use of lethal force causing Mr. Heston's tragic death." Expert Rpt., p. 2 No. 4.

3   **G.   Clark's opinions should be excluded when connected to existing data only**
4   **through his own *ipse dixit*, ie, his bare assertion on no authority other than his own. *Joiner*,**
5   ***supra* at 146.**

6   **1.   Clark's unsupported claims about credibility of witnesses should be**
7   **excluded.**

8   Clark testified that he does not believe the officers' testimony that TASERS stopped
9   when they tried to get Heston's arms out from under him.  He bases such opinion about
10  credibility on the data downloads discussed at length above that were prepared by Plaintiffs'
11  attorney, Clark and Burwell without any substantiation or standards.  Clark Dep. 89:8-22.
12  Clark concluded that Dominici's testimony was not correct, therefore not credible, that
13  there were times when TASERS were not operating.  Clark Dep. 111:14-23.

14  **2.   Clark's unsupported claims about credibility of the City of Salinas and the**
15  **Salinas Police Department should be excluded.**

16  Clark accuses the police department of bending the evidence by not asking enough
17  questions of Sergeant Dominici in the investigation (Clark Dep. 149:10-24; Expert Rpt., p.3,
18  No.8 (9)), but he admits that he never watched the recording of Dominici's interview.  Clark
19  Dep. 150:7-14.  Furthermore, such testimony is irrelevant to Plaintiffs' claims and or to
20  causation.

**3.    Clark's unsupported claims about the "systemic culture" of the police should be excluded.[2]**

It is Clark's opinion that there is a systemic culture in the police department to use excessive force (Clark Dep.141:18-143:1; Expert Rpt., p. 2, No. 7), and that the systemic culture, pattern and practice of preventing correct decisions would have spared Heston's life, but admits that he has no information to substantiate that there is any pattern of conduct in the Salinas Police Department regarding TASERS. Clark Dep. 144:20-25. *See Gonzalez, supra* at slip op. 18, discussed above.

**4.    Clark's unsupported personal conclusions about Taser efficiency at the incident constitute *ipse dixit* conclusions, in addition to arguments above about Clark's lack of knowledge or experience to testify about TASER.**

Clark should not be allowed to testify that a TASER is a tool that can inflict "enormous pain" making it a tool of torture. Clark Dep. 39:3-40:4.

Clark should not be allowed to testify to his unsupported personal conclusion that TASERS were continuously delivering electricity to Heston (Clark Dep. 89:23-91:15) based on his opinion of a clicking sound on the cell phone recording as Satree was talking on the phone. Clark Dep. 87:3-10.

Clark should not be allowed to testify to his unsupported personal conclusion that TASER put out a bulletin about being careful on multiple uses of TASERS because he thinks TASER concluded that TASERS restricted the subject's breathing. Clark Dep. 168:19-169:9.

**5.    Clark's unsupported opinions about what Heston was thinking and intending should be excluded.**

Any testimony similar to Clark's "Overview of Events", that in his opinion Heston was doing well, ie., not using methamphetamine, until the day of the incident should be excluded. Expert Rpt., p. 10.

---

[2]    As previously noted above, the Court has already ruled that there was no unconstitutional policy, custom or practice of violating civil rights.

1    Without any support or evidence, Clark opines that Heston was not attacking the police;
2    instead, he was thrashing about and throwing things in the general direction of the police as part
3    of tearing up the living room, but he was not attacking the police. Clark Dep. 51:4-23. Such
4    testimony should be excluded.

5    Clark should not be permitted to testify on any subject related to TASER or Heston's
6    physical, medical or mental condition, but in addition, Clark's personal opinion that Heston
7    could not respond to police commands to show his hands because he was under the influence of
8    the TASER should be excluded. Clark Dep. 114:16-23.

9    Clark's conclusion that, because Heston was found to not have a weapon after the
10   incident, proves to him that the officers should not have been concerned about him having a
11   weapon should be excluded. Clark Dep. 184:16-185:12.

12   **6.     Clark's unsupported opinions about clicking noises on the 911 recordings**
13   **should be excluded.**

14   Clark's testimony that it is his opinion he could hear a TASER in a 911 telephone
15   recording should be excluded. Clark concluded that TASERS can be heard in the 911 recording
16   by a clicking noise that he says he hears. Clark Dep. 87:11-88:8. Clark has not done any study
17   to accurately determine what the clicking is. In fact, he only listened to the recording three or
18   four times with Mr. Burton, he did nothing to identify the clicking sound, he did not compare the
19   stops in the clicking sound to witness testimony, he did not time the sound, and he did not keep a
20   copy of the recording other than what he heard in Mr. Burton's office. Clark Dep. 90:20-93:24.

21   Clark's opinion that a person cannot be handcuffed while a TASER is operating should
22   be excluded. Clark Dep. 116:4-19. Clark has no training documents that support his personal
23   conclusion that it is not possible to handcuff someone while a TASER is operating.

24                                    **IV.**
25                                **CONCLUSION**

26   Mr. Clark is familiar with restricting his testimony to only those matters for which he can
27   argue he has some expertise. All of the subjects of testimony and the "chart" regarding TASER
28

1  discharges prepared by Plaintiffs' attorney, Clark and Burwell should be excluded as set forth
2  above.
3  Dated:  March 31, 2008

                              LAW OFFICES OF VINCENT P. HURLEY
                              A Professional Corporation

                              By:     /s/ Vincent P. Hurley
                                      VINCENT P. HURLEY
                              Attorneys for Defendants CITY OF SALINAS and
                              SALINAS POLICE DEPARTMENT; MICHAEL
                              DOMINICI, JAMES GODWIN, LEK
                              LIVINGSTON and JUAN RUIZ

Motion in Limine No. 1 to Exclude Testimony of R.Clark          Case No. C 05-03658 JW (RS)