JOHN BURTON, State Bar No. 86029
THE LAW OFFICES OF JOHN BURTON
414 South Marengo Avenue
Pasadena, California 91101

Telephone: (626) 449-8300
Facsimile: (626) 449-4417
E-Mail: jb@johnburtonlaw.com

PETER M. WILLIAMSON, State Bar No. 97309
WILLIAMSON & KRAUSS
18801 Ventura Boulevard., Suite 206
Tarzana, California 91356

Telephone: (818) 344-4000
Facsimile: (818) 344-4899
E-Mail: pmw@williamson-krauss.com

Attorneys for Plaintiffs Betty Lou Heston, individually,
and Robert H. Heston, individually and
as the personal representatives of Robert C. Heston, deceased

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETTY LOU HESTON and ROBERT H. HESTON, individually, and MISTY KASTNER, as the personal representative of ROBERT C. HESTON, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SALINAS, SALINAS POLICE DEPARTMENT, MICHAEL DOMINICI, JAMES GODWIN, LEK LIVINGSTON, JUAN RUIZ and TASER INTERNATIONAL, INC.,<br><br>Defendants. | Case No. C 05-03658 JW (RS)<br><br>**PLAINTIFFS' MOTION IN LIMINE NO. FOUR TO PRECLUDE DEFENDANTS FROM OFFERING CERTAIN IRRELEVANT AND PREJUDICIAL EVIDENCE AND ARGUMENTS AT TRIAL; MEMORANDUM OF LAW**<br><br>**Pretrial Conference:**<br><br>Date: April 29, 2008<br>Time: 1:00 p.m.<br>Courtroom: 8<br><br>**Trial:**<br><br>Date: May 13, 2008<br>Time: 9:00 a.m.<br>Courtroom: 8 |

1  TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF
2  RECORD:
3  **PLEASE TAKE NOTICE** that plaintiffs hereby move for an order precluding
4  defendants from offering certain irrelevant and prejudicial evidence and arguments at
5  trial. These matters include:
6      1.    Comparisons to the Columbine High School Shooting.
7      2.    Evidence and Argument that the Decedent Was Rational and Therefore
8  Willfully Resisted the Officers.
9      3.    Argument that Broken or Shorted Taser Wires Affected Discharges.
10     4.    Evidence or Argument That Rhabdomyolysis Caused the Death.
11     5.    Evidence That the ECD's Were Altered or Modified after Purchase.
12     6.    Evidence That the ECD's Were Misused by the Salinas Defendants.
13     7.    Evidence the Salinas Defendants' Use of the ECD's Was Not Reasonably
14 Foreseeable by TASER.
15     8.    Evidence of ECD Utility and Safety Unrelated to Heston's Death.
16     9.    Evidence of Neuroleptic Malignancy Syndrome.
17     10.    Any other Prejudicial or Irrelevant Matters.
18 This Motion is made under Federal Rules of Evidence 402 and 403 and is based
19 on the supporting Memorandum of Points and Authorities, the pleadings and papers on
20 file in this action, and upon such of the argument and evidence as may be presented
21 prior to or at the hearing of this matter.
22 DATED: March 31, 2008

Respectfully submitted,

THE LAW OFFICES OF JOHN BURTON
WILLIAMSON & KRAUSS

BY:    /s/ JOHN BURTON
             Attorneys for Plaintiffs

## INTRODUCTION

Plaintiffs Betty Lou Heston and Robert H. Heston, in their individual capacities, and their daughter Misty Kastner, as the personal representatives of Robert C. Heston, bring this action for damages after the defendant Salinas Police Department officers shocked Mr. Heston repeatedly with multiple TASER Model M26 Electronic Control Devices ("ECD's"), stopping only once he experienced cardiac arrest. They bring this motion in limine to preclude the defendants from presenting certain highly prejudicial evidence and arguments to the jury without first establishing that relevance outweighs prejudice pursuant to Fed. R. Evid. 402 and 403.

Plaintiffs called 911 for assistance with their 40-year-old son, who appeared to be under the influence of methamphetamine and was highly agitated, damaging household items and throwing some of them out of his parent's house. The responding Salinas police officers shocked Mr. Heston repeatedly with multiple TASER ECD's. As many as twenty-two were administered after Mr. Heston fell to the floor. During the last five-second shock – the twenty-fifth within a period of seventy-four seconds, Mr. Heston suffered a cardiac arrest. Although he was revived after several minutes of down time, Mr. Heston suffered irreversible brain damage, and died in the hospital after being disconnected from life support the following day.

In considering the following in limine requests, plaintiffs respectfully request that the court focus on the specific matters at issue. Plaintiffs contend that the Salinas defendants used excessive force when they continued to shock Mr. Heston after the ECD's had their intended effect of knocking him to the floor. Plaintiffs contend that TASER is liable for failing to warn adequately about the potentially lethal consequences of repeated TASER shocks on an agitated person. Plaintiffs contend that the defendants' repeated Taser shocks caused Mr. Heston's cardiac arrest by inducing metabolic acidosis. Defendants deny these contentions.

Equally important for the Court's determination of these motions in limine is what the case is *not* about. This case is *not* a referendum on the use of ECD's generally.

Plaintiffs do not contend that the Salinas defendants should not have responded to their home. Indeed, they called 911 and asked for help with their son. This case does not turn on whether Mr. Heston was in an agitated and irrational state, having ingested methamphetamine, all parties agree on that. Moreover, plaintiffs do not challenge the objective reasonableness of the decision to use an ECD in connection with placing Mr. Heston into restraints so that his condition could be treated.

Plaintiffs' causation evidence, which also relates to the defective warning claim, is very specific. Defendants should not be allowed to confuse matters unnecessarily by erecting and demolishing straw men.

Although various law enforcement agencies have equipped officers with ECD's for more than 30 years, the more powerful 26-watt TASER ECD's (models M26 and X26) have been in use only for about eight years. During this relatively brief time, there have been media reports of over 300 deaths following TASER ECD use. Safety questions have spurred recent research into possible health hazards.

Plaintiffs do not contend that all, or even most, of these deaths were in any way causally linked to the ECD's, and they do not intend to introduce evidence regard any ECD death other than Mr. Heston's. This preclusion should apply both ways; defendants should not be allowed to introduce evidence that ECD applications did not kill people other than Mr. Heston.

Plaintiffs' contention is that the Salinas defendants' application of 22 unnecessary five-second shock cycles from three M26's while Mr. Heston was lying on his parents' living room floor was a substantial factor in causing Mr. Heston's February 19, 2005 cardiac arrest, the consequent irreversible brain damage, and his demise on February 20, 2005.

A lay person might suspect that ECD deaths result from direct electrical stimulation of the heart – electrocution – which can induce a potential lethal arrhythmia known as ventricular fibrillation (VF). TASER emphatically denies such a risk, based in part on experiments it performed on dogs and pigs, and in part on the fact that

**MOTION TO LIMIT OPINIONS OF EXPERT WITNESSES TO AREAS OF EXPERTISE**
N.D. Cal. Case No. C 05-03658 JW (RS)
- 2 -


thousands of police officers survived after being shocked during training sessions.[1]

Plaintiffs agree that Mr. Heston likely did not experience VF.[2] They contend, however, that defendants' multiple and repeated ECD cycles induced severe, involuntary muscle contractions, which in turn discharged voluminous amounts of lactic acid (lactate) into his blood stream, causing a precipitous increase in his blood acid level (measured as a decline in pH), resulting in a deadly condition known as metabolic acidosis.

Mr. Heston was severely acidotic when his blood was tested at the emergency room to which he was taken after the cardiac arrest. Metabolic acidosis alone can trigger a cardiac arrest. The anticipated arrhythmia, asystole, was noted by the paramedics. Indeed, like plaintiffs' cardiologist, Mark Myers, M.D., all but one of TASER's medical experts attribute Mr. Heston's cardiac arrest to metabolic acidosis. They contend, however, that the condition resulted from his agitated behavior alone, rather than Taser shock. Defendants call this purported cause of death "excited delirium" or "excited delirium syndrome," a diagnosis of some controversy within the field of forensic pathology. *See* Di Maio Deposition P. 41-42.

Plaintiffs' proof that defendants' excessive ECD shocks contributed significantly to Mr. Heston's metabolic acidosis is strongly supported by peer-reviewed scientific literature. The role of metabolic acidosis in cardiac arrests which occur in agitated people during police restraint procedures was documented in 1999 by Hicks, et al., *Metabolic Acidosis in Restraint-Associated Cardiac Arrest: a Case Series*.[3] The logical

---

[1] Typically officers are shocked for five seconds or less. In some experiments officers have been administered fifteen seconds of shocks. None has been shocked like the Salinas defendants shocked Mr. Heston.

[2] All the cardiac experts agree that the paramedics' restoration of Mr. Heston's normal sinus rhythm from asystole effectively eliminates the possibility that he experienced VF. These experts also have testified that the absence of VF also tends to eliminate the probability that Mr. Heston died from a methamphetamine overdose or excessive production of catecholamines such as adrenaline.

[3] The medical literature to which plaintiffs refer in their motions in limine are attached as
(continued...)

link between ECD-induced muscle contractions and severe metabolic acidosis was documented in 2005 by Jauchem, et al., *Acidosis, Lactate, Electrolytes, Muscle Enzymes, and Other Factors in the Blood of* Sus Scrofa *Following Repeated TASER Applications*, and again just last October by Dennis, et al., *Acute Effects of TASER X26 Discharges in a Swine Model*. In this last study, repeated TASER cycles comparable to those administered Mr. Heston actually induced cardiac arrest in two pigs.

Defendants certainly are free to dispute plaintiffs' evidence of causation, and plaintiffs do not dispute their right to present the jury an alternative explanation of "excited delirium syndrome." But defendants should be required to do so within the confines of Fed. R. Evid. 402 and 403, which prohibits evidence where the prejudicial effects substantially outweigh any probative value.

**1.     Comparisons to the Columbine High School Shooting**

The Salinas defendants submitted two rebuttal expert reports contending that tactics changed after the tragic massacre of Columbine High School students by two deranged and suicidal young men. There is no comparison. This incident involved a single unarmed man in his parents' living room.

**2.     Evidence and Argument that the Decedent Was Rational and Therefore Willfully Resisted the Officers.**

All the evidence in this case is that after the Salinas officers left the Heston home the first time, the decedent became delusional, hallucinatory, agitated and irrational. Accordingly, he could not have willfully resisted the officers. Defendants should not be allowed to argue that on the one hand the decedent was so out of his mind that he exercised himself to death, while on the other hand arguing that he deliberately failed to follow the officers' commands and submit to their lawful arrest.

---

[3](...continued)
exhibits to the Declaration of John Burton re Exhibits in Support of Plaintiffs' Motions in Limine filed herewith.

### 3. Argument that Broken or Shorted Taser Wires Affected Discharges

Defendants contend that the decedent did not receive the discharges from the twenty five trigger pulls of Sgt. Ruiz and Officers Livingston and Godwin. They should not be allowed to make up facts in support of this contention. There is no evidence that any of their ECD wires broke, or that there was a short-circuit between the wires that affected their electrical discharges.

### 4. Evidence or Argument That Rhabdomyolysis Caused the Death

Rhabdomyolysis results when muscle tissue breaks down and enters the blood stream. Mr. Heston had severe rhabdomyolysis when tested at the emergency room.

There are three potential sources of the rhabdomyolysis: (1) Mr. Heston's exertion prior to the ECD discharges, (2) the ECD discharges themselves, and (3) the subsequent cardiac arrest and resuscitation. Sorting out the various expert opinions on the source of the rhabdomyolysis would cause confusion and waste time.

No witness in the case attributes Mr. Heston's cardiac arrest to rhabdomyolysis. As succinctly explained by Dr. Di Maio, one of defendant TASER's seven medical experts,

> Most people do survive . . . rhabdomyolysis, they'll put you on – you know, what you're afraid is knocking out the kidney. So what they'll do is put you on dialysis.
>
> Q. Right. It's like pieces of muscle tissue that get in the bloodstream that clog up the kidney, right?
>
> A. Yes. That's a good way of saying it. And so what they'll do is put you on dialysis. You should not die of rhabdomyolysis under normal circumstances.
>
> Q. But under some circumstances, rhabdomyolysis could impede a recovery?
>
> A. Oh, yes. Oh, sure. But the thing is, by the time he got – in this case he's got hypoxic encephalopathy by the time he got to the hospital. So you could heal everything in his body, but he was brain dead. He was essentially, for all practical purposes, dead at the scene.
>
> Q. Because of the degree of –
>
> A. – hypoxia of the brain. Lack of oxygen to the brain.

Q. Caused by the cardiac arrest?

A. That's correct.

(Di Maio Deposition, P. 98:2 to 98:25)

**5.    Evidence That the ECD's Were Altered or Modified after Purchase.**

TASER contends as one of its defenses, Joint Pretrial Statement, Section 1, para. 14, that its ECD's were altered or modified. There has been no such evidence, and the contention is contradicted by the results of the examination and testing of the devices by their expert, Dr. Aleksander. Accordingly, they should not be allowed to argue this theory at trial.

**6.    Evidence That the ECD's Were Misused by the Salinas Defendants.**

TASER contends as one of its defenses, Joint Pretrial Statement, Section 1, para. 15, that its ECD's were misused. There has been no such evidence, and the contention is contradicted TASER's response to Robert H. Heston's Special Interrogatory No. 5. Accordingly, they should not be allowed to argue this theory at trial.

**7.    Evidence the Salinas Defendants' Use of the ECD's Was Not Reasonably Foreseeable by TASER.**

TASER contends as one of its defenses, Joint Pretrial Statement, Section 1, para. 17, that "The alleged injury did not result from a use of the TASER product which was reasonably foreseeable by TASER." There has been no such evidence. Accordingly, they should not be allowed to argue this theory at trial.

**8.    Evidence of ECD Utility and Safety Unrelated to Heston's Death.**

TASER boasts that its ECD's save lives, and present a better force option than others available to law enforcement officers. Much of their data is problematic, as it derives from self-reporting forms submitted by police agencies and unfair inferences. Litigating the veracity of these claims in this lawsuit would unnecessarily confuse the jury and waste time. As mentioned above, plaintiffs do not contend that TASER ECD'S should be banned, or even that they should not have been used in this incident.

Plaintiffs claim only that the shocks should not have continued once Mr. Heston fell to the floor, and that TASER should have warned its end users that repeated ECD shocks can depress blood pH and cause cardiac arrest. All the argument and evidence presented to the jury should relate to those fundamental issues and not to cases and situations not before the Court.

**9.     Evidence of Neuroleptic Malignant Syndrome**

TASER's counsel, Michael Brave, and his friend, John Peters, who also lacks a medical degree, have attempted to attribute Mr. Heston's "excited delirium" to Neuroleptic Malignant Syndrome, see, e.g., Peters Deposition, P. 28:15-23. None of the medical doctors mention any such condition in their reports or depositions. It should not be mentioned at trial.

**10.    Other Prejudicial and Irrelevant Evidence and Arguments**

Plaintiffs perceive that defendants, especially TASER International, having inundated the Court with experts, papers and contentions way beyond the limited issues presented by this case, will attempt to introduce before the jury prejudicial and irrelevant matters which plaintiffs have not anticipated. Plaintiffs request that they be cautioned not to do so.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to exclude irrelevant and prejudicial matters should be granted.

DATED:   March 31, 2008

                                         Respectfully submitted,

                                         THE LAW OFFICES OF JOHN BURTON
                                         WILLIAMSON & KRAUSS

                                         BY:   /s/   JOHN BURTON
                                                      Attorneys for Plaintiffs