1  JOHN BURTON, State Bar No. 86029
   THE LAW OFFICES OF JOHN BURTON
2  414 South Marengo Avenue
   Pasadena, California  91101
3
   Telephone:   (626) 449-8300
4  Facsimile:   (626) 449-4417
   E-Mail:      jb@johnburtonlaw.com
5
   PETER M. WILLIAMSON, State Bar No. 97309
6  WILLIAMSON & KRAUSS
   18801 Ventura Boulevard., Suite 206
7  Tarzana, California  91356
8  Telephone:   (818) 344-4000
   Facsimile:   (818) 344-4899
9  E-Mail:      pmw@williamson-krauss.com
10 Attorneys for Plaintiffs Betty Lou Heston, individually,
   and Robert H. Heston, individually and
11 as the personal representatives of Robert C. Heston, deceased

12

13            UNITED STATES DISTRICT COURT

14          NORTHERN DISTRICT OF CALIFORNIA

15

| | |
|---|---|
| 16  BETTY LOU HESTON and ROBERT H. HESTON, individually, and MISTY KASTNER, as the personal representative of ROBERT C. HESTON, deceased, | Case No. C 05-03658 JW (RS) |
| 17 | |
| 18 | PLAINTIFFS' MOTION IN LIMINE NO. TWO TO LIMIT OPINIONS OF EXPERT WITNESSES TO THEIR AREAS OF  EXPERTISE; MEMORANDUM OF LAW |
| 19  Plaintiffs, | |
| 20  v. | Pretrial Conference: |
| 21  CITY OF SALINAS, SALINAS POLICE DEPARTMENT, MICHAEL DOMINICI, JAMES GODWIN, LEK LIVINGSTON, JUAN RUIZ and TASER INTERNATIONAL, INC., | Date:       April 29, 2008 Time:       1:00 p.m. Courtroom: 8 |
| 22 | |
| 23 | Trial: |
| 24  Defendants. | Date:       May 13, 2008 Time:       9:00 a.m. Courtroom: 8 |
| 25 | |

26

27

28

TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that plaintiffs hereby move for an order excluding any and all evidence, references to evidence, testimony or argument relating to the opinions of defendants' experts which exceed the scope of their particular area of expertise.   This Motion is made under Federal Rules of Evidence 403 and 702 and is based on the supporting Memorandum of Points and Authorities, the pleadings and papers on file in this action, and upon such of the argument and evidence as may be presented prior to or at the hearing of this matter.

DATED:   March 31, 2008

Respectfully submitted,

THE LAW OFFICES OF JOHN BURTON
WILLIAMSON & KRAUSS


BY:   ___/s/ PETER M. WILLIAMSON___
Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................ 3

TABLE OF AUTHORITIES ................................................ 3

MEMORANDUM OF LAW ................................................ 4

I.     INTRODUCTION ............................................ 4

II.    PLAINTIFF'S THEORY OF CAUSATION.................... 6

III.   FEDERAL RULE OF EVIDENCE 702 REQUIRES
       THAT KNOWLEDGE, SKILL, EXPERTISE,
       TRAINING OR EDUCATION BE SHOWN BEFORE A
       WITNESS MAY QUALIFY AS AN EXPERT WITNESS
       AND TESTIFY ABOUT A PARTICULAR AREA
       OF EXPERTISE ................................................ 8

       A.   Adam Aleksander, Ph.D. ......................... 9

       B.   Vincent Di' Maio, M.D. ........................... 10

       C.   Dr. Michael Evans, Ph.D. ........................ 13

       D.   Dr. Jeffrey Ho, M.D. .............................. 14

       E.   Dr. Raymond Ideker, M.D. ...................... 17

       F.   Mark Kroll, Ph.D. ................................. 18

       G.   Mark Lehto, Ph.D. ................................ 25

       H.   Dr. Richard Luceri, M.D. ........................ 26

       I.   Dr. Deborah Mash, Ph.D. ....................... 27

       J.   Dr. Dorin Panescu, Ph.D. ....................... 29

       K.   John G. Peters, Ph.D. ............................ 30

IV.    CONCLUSION ............................................... 33

1

<u>TABLE OF AUTHORITIES</u>

2                                                                                    <u>Page</u>

3    <u>FEDERAL CASES</u>

4    <u>Jenkins v. Whittaker Corp.,</u>

5        785 F.2d 720, 729 (9th Cir.1986) .............................................    8

6    <u>Jinro America Inc. v. Secure Investments, Inc.,</u>

7        266 F. 3d 993, 1005-06 (9th Cir. 2001) ....................................    8

8    <u>Reno-West Coast Distribution Co. v. Mead Corp.,</u>

9        613 F.2d 722, 726 (9th Cir.), **cert. denied**, 444 U.S. 927, 100

10       S. Ct. 267, 62 L. Ed.2d 183 (1979) .........................................    8

11   <u>Salem v. United States Lines Co.,</u>

12       370 U.S. 31, 35, 82 S. Ct. 1119, 1122, 8 L. Ed.2d 313 (1962)....    8

13   <u>Taylor v. Burlington Northern R. Co.,</u>

14       787 F. 2d 1309, 1315-16 (9th Cir. 1986) ..................................    8

15

16   <u>FEDERAL RULES OF EVIDENCE</u>

17   Fed. R. Evid. § 702 ...............................................................    8

18

19   <u>PEER REVIEW ARTICLES</u>

20   1999 by Hicks, et al., **Metabolic Acidosis in Restraint-Associated**

21       **Cardiac Arrest: a Case Series.** ..........................................    6

22   2005 by Jauchem, et al.,  **Acidosis, Lactate, Electrolytes, Muscle**

23       **Enzymes, and Other Factors in the Blood of** Sus Scrofa

24       **Following Repeated TASER Applications** ..................................    6

25   October 2007  Dennis, et al., **Acute Effects of TASER X26**

26       **Discharges in a Swine Model** .........................................    6

27

28

1       <u>MEMORANDUM OF LAW</u>

2 I.  INTRODUCTION

3    Plaintiffs Betty Lou Heston and Robert H. Heston, in their individual capacities,

4 and their daughter Misty Kastner, as the personal representatives of Robert C. Heston,

5 bring this action for damages after the defendant Salinas Police Department officers

6 shocked Mr. Heston repeatedly with multiple TASER Model M26 Electronic Control

7 Devices ("ECD's"), stopping only once he experienced cardiac arrest. They bring this

8 motion in limine to obtain an order to confine the opinions of experts who testify at trial

9 to areas within their expertise, in particular 11 of the 14 experts retained by defendant

10 TASER International, Inc., who are proffering opinions well beyond their specific areas of

11 expertise.

12    Plaintiffs called 911 for assistance with their 40-year-old son, who appeared to be

13 under the influence of methamphetamine and was highly agitated, damaging household

14 items and throwing some of them out of his parent's house. The responding Salinas police

15 officers shocked Heston repeatedly with multiple TASER ECD's. During the last five-

16 second shock – the twenty-fifth within a period of seventy-four seconds – Mr. Heston

17 suffered a cardiac arrest. Although he was revived after 10-12 minutes of down time, Mr.

18 Heston suffered irreversible brain damage and died in the hospital the following day.

19    Plaintiffs claim that TASER is liable for failing to warn adequately about the

20 potentially lethal consequences of repeated taser shocks on an agitated person. Accordingly,

21 the key liability issue for plaintiffs' products liability claim is whether the TASER ECD's

22 electrical current was a cause of Mr. Heston's cardiac arrest.

23    The parties exchanged expert reports in early December 2006. TASER designated

24 fourteen retained experts. All were deposed. Most offered expert opinions in their Rule 26

25 Reports or depositions that exceeded the scope of their particular area of expertise. For the

26 reasons that follow, they should be precluded from doing so at trial.

27 ///////////////

28 ////////

## II.    PLAINTIFFS' THEORY OF CAUSATION

Although various law enforcement agencies have equipped police officers with ECD's for more than 30 years, the more powerful 26-watt TASER ECD's (models M26 and X26) have only been in use for about eight years. During this relatively brief time, there have been media reports of over 300 deaths following TASER ECD use. Safety questions have spurred recent research into possible health hazards.

Plaintiffs do not contend that all, or even most, of these deaths were in any way causally linked to the ECD's, and they do not intend to introduce any evidence of other ECD deaths at trial. (As explained in Plaintiffs' Motion in Limine No. 4, this preclusion should apply both ways; defendants should not be allowed to introduce evidence that ECD applications did not kill people other than Mr. Heston.) Plaintiffs contend, however, that the Salinas defendants' application of as many as 22 unnecessary five-second shock cycles from three M26's were a substantial factor in causing Mr. Heston's February 19, 2005 cardiac arrest, the consequent irreversible brain damage, and his death on February 20, 2005.

A lay person might suspect that ECD deaths result from direct electrical stimulation of the heart – commonly known as electrocution – which induces a potential lethal arrhythmia known as ventricular fibrillation (VF). TASER emphatically denies such a risk, based in part on experiments performed on dogs and pigs, and on the fact that thousands of police officers have survived after being shocked during training sessions.[1]

Plaintiffs agree that Mr. Heston likely did not experience VF. They contend, however, that defendants' multiple and repeated ECD cycles induced severe, involuntary muscle contractions, which in turn discharged lactic acid (lactate) into his blood stream, causing a precipitous increase in his blood acid level (measured as a decline in pH), and resulted in a deadly condition known as metabolic acidosis.

---

[1] Typically officers are shocked for five seconds or less. In some experiments officers have been administered fifteen seconds of shocks. No police officers, as part of their training, have ever been subjected to shocks like the Salinas defendants delivered to Mr. Heston.

1   Mr. Heston was severely acidotic when his blood was tested at the emergency room

2   to which he was taken after the cardiac arrest. Metabolic acidosis alone can trigger a cardiac

3   arrest. Indeed, like plaintiffs' cardiologist, Mark Myers, M.D., all but one of TASER's

4   medical experts attribute Mr. Heston's cardiac arrest to his metabolic acidosis. They

5   contend, however, that the metabolic acidosis was generated by his agitated behavior and

6   supposed struggle with the police. Defendants call this purported cause of death "excited

7   delirium" or "excited delirium syndrome," a diagnosis of some controversy within the field

8   of forensic pathology. (See; Di Maio Deposition P. 41-42)

9   Plaintiffs' proof that the ECD shocks contributed to Mr. Heston's metabolic acidosis

10  is strongly supported by peer-reviewed scientific literature. The role of metabolic acidosis

11  in cardiac arrests which occur in agitated people during police restraint procedures was

12  documented in 1999 by Hicks, et al., **Metabolic Acidosis in Restraint-Associated Cardiac**

13  **Arrest: a Case Series.**[2]   The logical link between ECD-induced muscle contractions and

14  severe metabolic acidosis was documented in 2005 by Jauchem, et al., **Acidosis, Lactate,**

15  **Electrolytes, Muscle Enzymes, and Other Factors in the Blood of** Sus Scrofa **Following**

16  **Repeated TASER Applications**, and again just last October by Dennis, et al., **Acute Effects**

17  **of TASER X26 Discharges in a Swine Model.**   In this last study, repeated TASER cycles

18  comparable to those administered to Mr. Heston actually induced cardiac arrest in two

19  pigs.

20  Defendants certainly are free to dispute plaintiffs' evidence of causation, and

21  plaintiffs do not dispute their right to present the jury an alternative explanation of "excited

22  delirium syndrome." But defendants should be required to do so within the confines of

23  Fed. R. Evid. 702, which restricts expert opinion testimony to matters within the particular

24  expert witness' area of expertise.

25

26

27

28  [2] The medical literature to which plaintiffs refer in their Motions in Limine are attached as exhibits to the Declaration of John Burton re Exhibits in Support of Plaintiffs' Motions in Limine filed herewith.

III.   FEDERAL RULE OF EVIDENCE 702 REQUIRES THAT KNOWLEDGE, SKILL, EXPERTISE, TRAINING OR EDUCATION BE SHOWN BEFORE A WITNESS MAY QUALIFY AS AN EXPERT WITNESS AND TESTIFY ABOUT A PARTICULAR AREA OF EXPERTISE.

The touchstone for opinion testimony is, of course, Fed. R. Evid. 702, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court has broad discretion in admitting and excluding expert testimony. Appellate courts routinely sustain the trial court's action unless it is manifestly erroneous. **Salem v. United States Lines Co.**, 370 U.S. 31, 35, 82 S. Ct. 1119, 1122, 8 L. Ed.2d 313 (1962); **Reno-West Coast Distribution Co. v. Mead Corp.**, 613 F.2d 722, 726 (9th Cir.), **cert. denied**, 444 U.S. 927, 100 S. Ct. 267, 62 L. Ed.2d 183 (1979). Allowing a witness to testify as an expert on a subject matter about which the witness lacks the required expertise and for which there is no reliable foundation, however, may constitute an abuse of discretion. **Jinro America Inc. v. Secure Investments, Inc.**, 266 F. 3d 993, 1005-06 (9th Cir. 2001) (investigator cannot give expert opinion regarding behaviors of Korean businessmen); **accord, e.g.,** Taylor v. Burlington Northern R. Co., 787 F. 2d 1309, 1315-16 (9th Cir. 1986); **Jenkins v. Whittaker Corp.**, 785 F.2d 720, 729 (9th Cir.1986) (district court did not abuse discretion in excluding expert testimony).

One blanket limitation which plaintiffs request the Court place on the testimony of all "non-medical" experts called by any party concerns opinion regarding Mr. Heston's cause of death. Such opinions should be limited to medical doctors only. Such testimony by non-medical experts lacks proper foundation and is highly speculative. Allowing such evidence would create unfair and significant prejudice to the parties, and therefore should be excluded.

1   Following are discussions of those TASER-designated experts who lack the

2   background, education, training, knowledge or experience to offer various opinions set

3   forth by them in their Rule 26 reports or deposition testimony. The court should exercise

4   its Rule 702 gate-keeping function to limit each expert's testimony to opinions within his

5   or her area of expertise.

6       A.      Adam Aleksander, Ph.D.:

7   Dr. Aleksander is an industrial engineer with a doctorate in Industrial Engineering,

8   with an emphasis in human factors and safety engineering. Dr. Aleksander has no degrees

9   in electrical engineering and, in fact, has taken no graduate level courses in electrical

10  engineering. (Aleksander depo, P. 27: 10-25; 28:1-8).

11  Dr. Aleksander inspected the five ECD's used in this incident. He determined each

12  were functional units, free of defects and in good working order. He test fired them and

13  reviewed dataport printouts. Dr. Aleksander confirmed 25 trigger pulls by the three crucial

14  ECD's during the critical 74-second period, which ended with Mr. Heston's cardiac arrest.

15  However, Dr. Aleksander did not limit his opinions to his inspection of the units.

16  Despite the fact that he has no medical training or education (Aleksander depo, P. 26, ll.

17  10-12), he opined on the issue of cause of death by repeating the opinion of four other

18  TASER experts, only one of which – Dr. Luceri – is a physician.

19
20      A review of the expert opinions of Dr. Mark Kroll, Dr. Dorin Panescu, Dr.
        Richard M. Luceri, and Dr. Mark Lehto indicated no reasonable method in
        which the TASER M26 ECD's in any way caused or contributed to the death
21      of Mr. Heston. I concur with their general opinions and methodologies.

22      Based on my findings and testing and knowledge of the product, I know of
        no reason or method by which these five SPD TASER M26 ECD's could
23      have caused or contributed to the death of Mr. Heston on February 19, 2005
        [**sic**].

24  (Aleksander Rule 26 Report, P. 18)

25

26  These opinions regarding causation lack any foundation in Dr. Aleksander's

27  background, education, specialized knowledge or experience. His deposition testimony is

28  particularly instructive regarding the limitations of his expertise in this subject area:

Q.   As I understand your opinion, you're essentially saying that you do not believe that the TASER caused any – had any electrical effect on the heart; correct?

A.   That's correct.

Q.   And are you also discounting any other possible physical consequences of the – a TASER discharge?

. . . .

A.   I don't know what those would be.   So –

Q.   Actually, let me just ask you that question.
     Do you know what physiological changes occur in the body as a result of a TASER discharge, apart from –

A.   What I have read and experienced, having had a five-second TASER application myself, suggests that the changes are minimum.

Q.   Are you aware of any human studies that have been done that replicate the number of discharges that occurred in this case?

A.   Not sitting here, no.

Q.   Are you aware of any other scientific peer-reviewed studies that have been done that discuss, for example, the chemical changes that occur in the body as a result of TASER discharge?

A.   I'm aware that there are some such studies, but I don't have them at my fingertips right now.

(Alexsander Deposition P. 90:3-25; 91:1-25)

It is clear from the previous quoted testimony that Dr. Aleksander lacks the requisite education, knowledge, training or experience to opine about whether the TASER "caused or contributed" to the metabolic acidosis that plaintiffs contend triggered Mr. Heston's cardiac arrest.  Lacking proper foundation for such opinions, the court should limit Dr. Aleksander's testimony to his inspection and testing of the ECD's used in this incident.

B.   Vincent Di Maio, M.D.:

Dr. Vincent Di Maio is a medical doctor board certified in Forensic Pathology.  Dr. Di Maio authored, along with his wife, Theresa G. Di Maio (a registered nurse, not a physician), a 2006 book entitled **Excited Delirium Syndrome – Cause of Death and Prevention**.

1   Dr. Di Maio's central opinion is that Mr. Heston died from excited delirium
2   syndrome. While this might sound to the lay person like an accidental death somewhat akin
3   to a drug overdose, Dr. Di Maio's view is that the police struggle with the decedent is an
4   indispensable element of the "syndrome," and that therefore such deaths should be
5   classified as "homicides" rather than "accidents." **Excited Delirium Syndrome – Cause of**
6   **Death and Prevention** at 80-81.

7   Accordingly, Dr. Di Maio's opinion is that the police intervention – which was
8   characterized principally by the use of ECD's – was indispensable to Mr. Heston's demise.

9   Q.   Okay.  So, therefore, it is not your opinion to a reasonable medical
10      certainty that he would have died anyway regardless of the police
11      intervention?

12   A.   The answer is yes.

13   (Di' Maio Deposition P. 32:11 to 32:14)

14   Nevertheless, Dr. Di Maio opined in his Rule 26 report that there was no causal link
15   between the ECD usage and Mr. Heston's cardiac arrest.

16   In regard to the use of the TASER, attributing the death to its' use is
   speculative and without a scientific basis.   There are no scientific studies
17   showing the use of a TASER causes death by producing a cardiac arrhythmia.

18   (Di Maio Rule 26 Report, P. 4, ¶ 1)

19   The use of the TASER did not cause or directly contribute to this death.

20   (Di Maio Rule 26 Report, P. 4, ¶ 2)

21   Although it is not clear from his report, Dr. Di Maio seems to be referring only to
22   the direct electrical stimulation hypothesis for ECD causation, not metabolic acidosis.
23   When questioned about the latter, Dr. Di Maio conceded that he is unfamiliar with the
24   latest peer-reviewed research that has been done on this very subject.

25   Q.   Okay.  So you didn't consider Dr. Jauchem's study in reaching your
   opinion  that  the  lactic  acid  build-ups  from  TASER  are  not
26   life-threatening?

27   A.   I'd have to see it.  But the problem is –

28   Q.   Okay.  You haven't looked at it?

1    A.    Right.

2  (Di Maio Deposition, P. 83:22-25; 84:1-2).

3        Dr. Di Maio agrees, however, that metabolic acidosis can trigger cardiac arrest. **Id.**

4  at 50.

5        Unlike other TASER-designated medical experts, Dr. Di Maio attributes Mr.

6  Heston's cardiac arrest to a surfeit of catecholamines (adrenaline) rather than lactic acid –

7  what is medically referred to as "a hyper-adrenergic state."

8    Q.    So we were talking about the repeated doses of the TASER before.
         Even though the electrical charge itself doesn't accumulate, the
9         amount of adrenaline released as a result of TASER shocks could
         accumulate to a certain extent?

10   A.    I don't think it would really accumulate.  Just the fact that you're
11        getting TASERed would just boost it up there.  It wouldn't make that
         much difference whether it was repeated or once, you know.  And
12        during the struggle and such.

13   Q.    Why wouldn't it make a difference if it was repeated?

14   A.    It could.  I mean, I'm not going to argue with that.  It's not worth
         arguing.

15   Q.    I mean, basically I understand what you're saying is that – and correct
16        me if I'm wrong just to be kind of a layman and make it
         over-simplified –  but excited delirium syndrome is like an overdose
17        of adrenaline –

18   A.    That's what it is.

19   Q.    -- that causes cardiac arrest?

20   A.    That's what it is.   That's what I'm saying.   You know, it's the
         hyper-adrenergic.  Well it's hyper-adrenaline.  It's increased adrenaline.
21        Essentially what you're doing in the excited delirium syndrome is you're
         OD-ing on adrenaline.

22   Q.    And so if you're repeatedly subjecting somebody to a device that
23        releases adrenaline, wouldn't that be contributing to the hyper –

24   A.    Hyper-adrenergic.

25   Q.    – adrenergic state?

26   A.    I have trouble saying it myself, too.  You could argue it that way, yes.

27  (Di Maio Deposition, P.113:10 to 114:15)

28

Dr. Di Maio thus concedes that repeated ECD shocks could contribute to the adrenaline buildup, **id**., supporting plaintiffs' allegation that the defendants caused Mr. Heston's cardiac arrest, albeit through a different physiological mechanism than the other medical experts.

According, Dr. Di Maio's Rule 26 opinion that the physiological effects of TASER cannot possibly result in death lacks proper foundation, is contradicted by scientific research and his own deposition testimony.  Dr. Di Maio is certainly qualified to offer opinions about the physiological consequences of Mr. Heston's agitated behavior and how they may have related to his demise. However, any opinions offered by Dr. Di Maio concerning the physiological effects of ECD discharges on blood acid levels should be excluded, along with any opinion that the ECD's could not have had any causal effect on his cardiac arrest.

C.     Dr. Michael Evans, Ph.D.:

Michael Evans, Ph.D., is not a medical doctor. He has a degree in Toxicology from Indiana University School of Medicine, and owns AIT Laboratories in Indianapolis, Indiana, which analyzes tissue specimens for drugs and other foreign substances.

Dr. Evan's opinions should be limited to his expertise regarding detecting the presence of methamphetamine in the human body.  While Dr. Evan's interpretation of the amount of methamphetamine found in Mr. Heston's blood may be very relevant to this case, Dr. Evans is not a medical doctor and should not be permitted to offer any opinions as to Mr. Heston's cause of death.

Dr. Evans opined in his Rule 26 Report that "the death of Mr. Heston" was "directly related to his ingestion of methamphetamine." Evans Rule 26 Report at 14, He should not be permitted to offer at trial this opinion that the drug caused Mr. Heston's death.

Dr. Evans conceded this point during his deposition:

Q.     All right.  Now, let's talk about, is it your opinion in this case that Robert Heston died of a methamphetamine overdose?

A.     Well, his death is consistent with the methamphetamine.  And I don't mean to – I'm not trying to walk – I am walking a line, because I'm

not qualified to declare cause of death for an individual. I'm not a pathologist. That's a diagnosis that can be done by a pathologist, an M.D. who's treating – and a pathologist basically is treating dead people. He's defining diagnosis of cause of death. I can speak to the fact that this blood concentration's consistent with those blood concentrations found in cause of death and that that's in those cases, what we found similar to this case with regards to the signs and symptoms and blood levels and that sort of thing and activity. But I'm not qualified to declare Mr. Heston's cause of death.

(Evans Deposition, P. 94:24-25; 95:1-18)

Dr. Evans went even further by stating that because of his inability to offer any opinions about cause of death, he was incapable of excluding other possible causes (apart from methamphetamine ingestion) such as the ECD shocks.

Q.    Since we all agree in this case that Mr. Heston's behavior was caused by the methamphetamine, do you feel that you're capable of making the opinion that his death was caused by the methamphetamine rather than by the TASER applications of the police officers?

A.    No. I'm not qualified to declare his cause of death. And I find his cause of death to be consistent with and directly related to, as I use that terminology, to methamphetamine ingestion.

(Evans Deposition P. 122:3-10)

As with all the other non-medical experts in this case, Dr. Evans should not be permitted to offer any opinions about Mr. Heston's cause of death, an opinion he concedes he should not be making.

D.    Dr. Jeffrey Ho, M.D.:

Dr. Jeffrey Ho is a Medical Doctor who is Board Certified in Emergency Medicine. Dr. Ho currently serves as a senior faculty physician for Emergency Medicine in Hennepin County Medical Center in Minneapolis, Minnesota.    Dr. Ho has conducted several studies, as the principal researcher, concerning the physiological effects of TASER ECD discharges on human beings. Much of this research has been funded either directly or indirectly by defendant, TASER, itself.

In this case, TASER retained Dr. Ho to offer opinions specifically relating to the physiological effects on human beings caused by TASER ECDs based, in large part, on the research he has personally conducted. Plaintiffs do not object to Dr. Ho testifying to the

various peer-reviewed, published research studies he has conducted on human subjects who have been subjected to TASER discharges ranging from 5-15 seconds even though such studies have little relevance to the present case in which Mr. Heston was subjected to 74-seconds of continuous discharge from three ECD's.

However, plaintiffs anticipate that Dr. Ho also will attempt to give testimony regarding studies he has conducted but not completed or published regarding supposed discharges of 45-seconds in duration.  These current TASER funded studies are being conducted specifically in response to claims (such as the one presented in this case) that multiple and prolonged durations of TASER discharges can contribute to sudden cardiac arrest in particularly vulnerable individuals.

Dr. Ho provided the following deposition testimony concerning the status of his current XREP (a different device than the M26 and X26) study:

Q.    Are you currently involved in any research regarding XREP?

A.    Yes I am.

Q.    What research are you involved in generally speaking?

A.    Basically the same types of human physiology research that we've done with the X.

Q.    This summary of data is that from your study that you're in the process of conducting?

A.    This is -- yes.  This is preliminary data.

Q.    Now, the 45-second exposure is that continuous?

A.    That is continuous.

Q.    You actually got 24 people to volunteer for the study?

A.    So far.  We actually have more by now.  We're continuing to gather data as we go.

(Ho Deposition, P. 233:22-25; P. 234:1-6, 16-21)

Plaintiffs request that the court exclude any opinions offered by Dr. Ho concerning incomplete, on-going research that can only provide fragmentary preliminary results that have not been validated by peer-review or medical journal publication.  Dr. Ho should be

prevented from discussing or offering opinions about his preliminary data for the following reasons:

1.     The 45-second study is being conducted with XREP, which is not a hand-held ECD. The XREP is not similar to the  X26 or M26 (the model used in this case). Defendants have not provided any information and plaintiffs have no way of knowing or independently testing whether the XREP has the same wave form or produces a similar electrical output as the M26 or X26. The XREP does not create the same probe spread, and therefore does not induce the same muscle contractions as an M26 or X26, and therefore does not necessarily pose the same threat of lactic acidosis.

2.     Dr. Ho's data is preliminary and has not been sufficient analyzed by his research team;

3.     Dr. Ho has not produced his preliminary data during the discovery phase of this case  (despite requests that he do so and a stipulation to a protective order) in order to have it analyzed by plaintiffs' experts;

3.     Dr. Ho has failed to produce any information regarding his test subjects, their ages, physical conditions, relationships to the principal researchers, or relationships to defendant, TASER;

4.     Dr. Ho has failed to produce any information concerning how his tests were conducted, how the electrical discharges were administered, under what circumstances the discharges were administered, whether the test subjects were involved in any physical exertion prior to the discharges, values of their blood chemistry before and after the discharges, and for what period of time they were monitored after the test, among many other things; and

5.     Dr. Ho's research has not been scrutinized by peer review or published in any recognized scientific journal.

For these reasons, Dr. Ho's preliminary research regarding prolonged 45-second exposures to XREP should be excluded from this trial on the grounds that it is irrelevant, lacks proper foundation, is highly prejudicial, and will lead to tremendous confusion on the

1   part of the jury.

2        Additionally, Plaintiffs ask that the Court caution defense counsel and their

3   witnesses not to mention that TASER ECD's have been tested on human beings up to 45

4   seconds.

5        E.      Dr. Raymond Ideker, M.D.:

6        Raymond E. Ideker, M.D., was retained by TASER International, Inc., to offer

7   opinions concerning:  (1) Mr. Heston's pre-existing cardiac condition and whether it

8   increased his risk of sudden cardiac arrest; (2) whether Mr. Heston's ingestion of

9   methamphetamine increased his risk of sudden cardiac arrest; and (3) whether the electrical

10  pulses delivered by the TASER ECD's could have caused sudden cardiac arrest.[3]  Dr.

11  Ideker is a Medical Doctor and earned a Ph.D. from the University of Tennessee in

12  Physiology.  His focus of research is cardiac electro-physiology.   Dr. Ideker is neither a

13  cardiologist nor a toxicologist, and has minimal experience treating patients (such

14  experience was limited to his medical school training).

15       Dr. Ideker describes his background as follows:

16       Q.      Now, you said that as to point 3, which is the point you just made, the
                 direct stimulation of the heart by the TASER discharge, you said you
17               were certainly most comfortable based on your background experience
                 to comment on that. But there are also questions about drug usage,
18               methamphetamine usage.  Do you feel qualified to render opinions
                 about methamphetamine – well, just leave it at that, about
19               methamphetamine in general?

20       . . . .

21       A.      I don't consider myself an expert in that area.

22       Q.      In other words, you don't consider yourself an expert toxicologist?

23       A.      That's correct.

24  (Ideker Deposition P. 19:20-25; 20:1-23)

25       While admitting that he is not a "expert" toxicologist and has only "some"

26  knowledge of the effect methamphetamine has on the heart, Dr. Ideker, nonetheless, offers

27  _____

28       [3] Dr. Ideker conceded in his deposition that he was only comfortable responding to Question No.
         3 since it directly related to his specific area of expertise.

the following opinion:

> It is also my opinion, to a reasonable degree of medical probability, that the sudden cardiac arrest leading to Mr. Heston's death was caused by excited delirium state to acute-on-chronic drug abuse.

(Ideker Rule 26 Report, P. 9, ¶ 3)

This opinion should not be allowed. Dr. Ideker's opinions should be limited to whether TASER discharges can cause cardiac arrest through direct electrical stimulation of the heart. Any opinions offered by Dr. Ideker regarding toxicological issues clearly exceed his expertise. Those opinions should be left to the designated toxicologists, Dr.. Clark or Dr. Evans.

F.     Mark Kroll, Ph.D.:

Dr. Mark Kroll is an engineer who received his Ph.D., in electrical engineering from the University of Minnesota.   Dr. Kroll holds numerous patents mostly involving medical devices such as defibrillators.  Dr. Kroll currently serves as both a member of the Board of Directors of TASER International and as Chairman of TASER International's Medical and Scientific Advisory Board.   Dr. Kroll was retained by TASER to offer his opinions regarding the effects of direct electrical stimulations from TASER discharges on the heart.

Before discussing the myriad of opinions that Dr. Kroll has offered either in his Rule 26 Report or deposition testimony, it is important to understand the limitations of Dr. Kroll's background.

Q.     What medical school did you attend?

A.     I did not attend any medical school.

Q.     Can you list then for me all the medical related courses that you've completed as part of your education.

A.     I'm smiling because I've actually done more teaching at medical schools than I've taken courses.  My background begins at age 18 being hired by Medtronic –

Q.     I didn't ask you about your work.  My specific question is: What medical related courses have you completed as part of your education?

A.     I've not had any formal medical school courses.

Q.     Do you consider yourself a professional forensic pathologist?

1    A.    No.

2    Q.    Tell me what courses you have completed as part of your education which involve forensic pathology.

3

4    A.    None.

    Q.    Do you consider yourself a professional toxicologist?

5

6    A.    No.

    Q.    What courses have you completed as part of your education that involve toxicology?

7

8    A.    None.

9    Q.    What law school did you attend?

10    A.    I'm smiling because my limited legal education is based on an hourly synopsis every evening while my best friend went through law school, and we would meet, and he would tell me what he learned that day.

11

12    MR. BRAVE:  The question is:  What law school did you attend?

13    THE WITNESS:  I did not attend law school.

14  (Kroll Deposition, P. 13:19-25; 14:1-25; 15:1-11)

15       Despite his lack of education, knowledge ,training and experience in the fields of

16  medicine, forensic pathology, toxicology and law, Dr. Kroll offers a multitude of opinions

17  in his initial Rule 26 Report as well as in his four Supplemental Rule 26 Reports, that

18  should be excluded because they lack foundation, are highly prejudicial, and go far beyond

19  Dr. Kroll's actual area of expertise.  Some of his more outlandish opinions are as follows:

20       Dr. Haddix' conclusions are simply wrong.  Some of these can be excused because of the lack of medical knowledge but some present simply logical errors.

21

22  (Kroll Rule 26 Report, P. 10, ¶ 6) (Dr. Haddix is the medical examiner who performed

23  the autopsy on Mr. Heston for the Monterey County Coroner.)

24       Dr. Haddix and the two medical examiners consulted by the Monterey County Sheriff-Coroner were wrong in their analysis of the role of the TASER discharges in Heston's demise.

25

26  (Kroll Rule 26 Report, P. 17-18)

27       It was inappropriate for Dr. Haddix to suggest that the number of TASER device applications or the duration of those applications had any of relevance to Mr. Heston's death, either causal or contributory. This lack of scientific

28

1   rigor mandates finding Dr. Haddix' conclusions unreliable.

2   (Kroll Rule 26 Report, P13, ¶ 2)

3       Heston was in a state of "excited delirium with metabolic acidosis" which "is
        a usually fatal condition."

4   (Kroll Rule 26 Report, P. 20, ¶ 2)[4]

5       It is also my opinion, to a reasonable degree of medical probability (certainty),
6       that Mr. Heston's death was caused by drug-induced excited delirium.

7   (Kroll Rule 26 Report, P. 23 ¶ 2)

8       Dr. Kroll was also asked at his deposition about his qualifications for offering

9   opinions concerning the conduct of the Salinas Police Officers in this case. His flippant

10  response exposes a man who is willing to offer an "expert" opinion in regard to just about

11  anything:

12      Q.    You believe you're qualified to render an opinion regarding the
              conduct of the police officers in this case?

13      A.    In some narrow areas, yes.

14      Q.    What would those narrow areas be?

15      A.    Well, I was a wrestler for nine years counting high school and
16            university tournaments. Counting my years coaching youth wrestling,
              I have 20 years of experience in wrestling. I have a reasonable
17            knowledge of how to take another person to the ground, how to
              remove their arms out from underneath them which is a very critical
18            part of wrestling. So I think I would be qualified to offer opinions on
              some of the attempts to restrain Mr. Heston.

19  (Kroll Deposition, P. 22:7-21)

20

21      Much of what Dr. Kroll intends to offer under the guise of Rule 702 expert opinion

22  is simply rhetoric geared for closing arguments by defense counsel, as exemplified by the

23  following:

24      In spite of impressive professionalism – and the use of the latest technologies
        – the Salinas Police Department (SPD) and Emergency Medical Services
25      (EMS) were unable to save Mr. Heston from his own poor choices and he
        died the next day.

26

27  _____

28      [4] An interesting opinion given the fact that every physician retained by TASER holds a contrary
    opinion – the vast majority of people who suffer from excited delirium do not die from its effects.

(Kroll Rule 26 Report, P. 6 ¶ 3)

Dr. Kroll was  asked about his qualifications for offering opinions about "excited delirium."   Once again, his response is telling in regard to his willingness to exceed the limits of his expertise:

> Q.   I want to talk now about excited delirium for a minute.  Doctor Kroll, have you received any formal training in excited delirium syndrome?  Any formal medical training?
>
> A.   No.
>
> Q.   Let me ask my question again though.  I asked a very specific question.  What education or training have you received that qualifies you to render a diagnosis specifically of excited delirium syndrome?
>
> A.   The training is from reading the same journals that anyone else would read and books on the condition.  I haven't had any classes in it.

(Kroll Deposition, P. 40:2-6; 41:4-11)

As an electrical engineer, with no medical training, Dr. Kroll does not hesitate to offers his own opinions about Mr. Heston's cause of death.

> Q.   Earlier today we talked about the mechanism of death that you opined for excited delirium syndrome individuals.  I want you to tell me what your opinion is regarding the mechanism of death specifically in Mr. Heston's case.  First of all, do you feel qualified to offer that opinion?
>
> A.   Yes I do.
>
> Q.   So what's your opinion about the mechanism of death specifically in Mr. Heston's case?
>
> A.   Original cause was the chronic methamphetamine use.  The secondary cause would be the acute methamphetamine use which provoked an excited delirium episode which led to metabolic acidosis which eventually led to cardiac asystole.

(Kroll Deposition, P. 98:22-25; P. 99:1-11)

In fact, in his Third Supplemental Report, Dr. Kroll criticizes plaintiff's expert, Dr. Mark Meyers, who offered his opinion regarding metabolic acidosis being the precipitating cause of Heston's death.   Dr. Meyers is a medical doctor with a very specific speciality in electro-cardiophysiology.   Dr. Kroll, as previously stated, is not a medical doctor nor has any speciality in cardiology.   Nonetheless, he disputes Dr. Meyers opinion by stating:

1  "TASER ECD applications do not cause any significant increase in acidity in humans."
2  This statement has no basis in scientific fact because no human studies have been
3  performed that resemble the duration of TASER discharge that Heston was subjected to.
4  The absence of such studies does not make Dr. Kroll's statement true.   In fact, peer-
5  reviewed published animal studies conducted with pigs do in fact show that prolonged
6  TASER discharges of a minute or more cause profound metabolic acidosis.

7      The danger in allowing so-called "experts" to offer opinions outside their area of
8  expertise which are represented to a jury as scientific fact, is obvious.  Fact finders need to
9  rely on valid science to inform their decisions, not the unsupported musings of an
10  unqualified party advocate who purports to be all-knowing about subjects in which he has
11  received no formal education whatsoever.

12      Finally, perhaps the most outlandish and unsupported opinion Dr. Kroll offered
13  during his deposition was his estimate of the length of time that Mr. Heston was subjected
14  to an electrical discharge during this incident. The electrical engineer that TASER hired to
15  test the ECD's used during this incident (Dr. Adam Aleksander) testified that there was no
16  way for him to determine, one way or the other, at what times Mr. Heston  was being
17  subjected to electricity from the ECD's, and that he was not aware of any tests that could
18  establish that fact. (Aleksander Deposition, P. 81:1-10) Dr. Kroll, nonetheless, opined as
19  follows:

20      Q.   Let's go back to my question.  Forgetting about whether there actually
was — well, I want you to assume for my question that there was
21      electrical discharge, okay, and that it continued for 74 consecutive
seconds, that at various times during the course of those 74 seconds
22      multiple devices were discharging.  Okay?  Are you following me so
far?

23      A.   Yes I do.

24      Q.   Assuming that were true, do any of your opinions change in this case?

25      A.   I have to put myself in a little bit of a scientific Neverland here because
26      I've gone through the records, and it's clear to me there was a
maximum nine seconds of current delivery.   Assuming your
27      hypothetical, even if it was 74 seconds, none of my opinions would
change.

28

(Kroll Deposition, P. 81:19-25; 82:1-12)

Dr. Kroll's testimony concerning the basis for his opinion that Mr. Heston received only 9 seconds of current delivery continues in this lengthy exchange:

Q.  So you have a two second by Godwin, you have a five second by Goowin, and you have a two second by Fairbanks, and you say that is all the electricity that Mr. Heston was subjected to?

A.  That's correct.

Q.  What happened to Officer Ruiz?

A.  Officer Ruiz missed.

Q.  What about -- how do you know that?

A.  Because his shots had no effect, and we know from multiple eyewitness testimony that they heard a loud arcing sound which suggests failure to make contact.

Q.  What about Livingston?

A.  Livingston clearly failed to make connection because he kept pulling the trigger and pulling the trigger for some effect, and it was absolutely no effect. That's why Paredez and Simpson could not pull Heston's arms out,[5] and that's why Godwin finally realized that none of these shots were having an effect and put in his second cartridge in.

Q.  What did Officer Livingston testify is the number of times he discharged his TASER?

A.  It was a few.

Q.  Three wasn't it?

A.  Typically -- people tend -- in these stressful situations, they always under count.

Q.  You said he continued to fire his -- to discharge his TASER. He said he only did it three times.

A.  The DataPort shows it was more than that. It doesn't matter. If you walk into a room, a light doesn't work, you flip the switch a number of times.

Q.  So your supposition is that because the TASER had no effect that therefore you extrapolate that it must not have been working; correct?

A.  No. The TASER ECD was working, that's what Doctor Alexander

---

[5] Plaintiffs contend the reason Heston could not pull his arms out from under him was because he was actually being subjected to the electrical discharge causing his arm muscles to involuntarily lock-up.

demonstrated after the fact, but the connection was not made. Typically police in stressful situations maybe shoot on average – maybe 20 percent of the time are able to hit a suspect.[6]  The barb is no different.  It's more difficult because you have to connect with two barbs. The idea that every one of these pairs of barbs connected with Heston is just impossible. The probabilities of that are -- against it are astronomical.  So Number 1 we know it goes against all probability. Number 2, we know from multiple testimony, Goodwin, Simpson, and from Paredez that Livingston's discharge had no effect,[7] and we know from independent eyewitness testimony, or ear witness testimony I should say that there was a very loud noise suggesting arcing. Heston's father described it as short.  Satre described it as f'ng fireworks.[8]  So we have multiple pieces of evidence supporting Livingston was making no contact.

Q.     How many TASER wounds according to Doctor Haddix were in Mr. Heston's body?

A.     She didn't count them.[9]

(Kroll Deposition, P. 117-121)

It is abundantly clear that Dr. Kroll's opinions are highly speculative, argumentative and lack any basis in scientific fact in order to meet the **Daubert** threshold of admissibility. They intrude on factual determinations to be made by the jury.

Indeed, since plaintiffs do not claim that direct electrical stimulation to Mr. Heston heart caused his cardiac arrest, the court should consider barring Dr. Kroll's testimony in its entirety.   If permitted to testify, the court should preclude Dr. Kroll from offering any opinions that relate to medical issues including cause of death and excited delirium, toxicological issues including the cause and effects of methamphetamine on the body including producing cardiac arrest, and police procedures including restraint techniques

---

[6] This statistic for firearms (which is incorrect anyway) is directly contrary to TASER's own claimed results, which boast  a success rate greater than 80 percent.

[7] Officer Paredez testified that he received an electrical shock when he grabbed Mr. Heston's arm for cuffing.

[8] Satree's contemporary comment was "They're tasing him like a son of a bitch."

[9] Dr. Haddix' autopsy documented  "multiple sites on the trunk and extremities (approximately ten . . .) which were consistent with dart impacts." Five different officers fired ECD's but six separate cartridges were fired (Godwin reloaded and fired a second time).  One of Sgt. Dominici's darts hit the door jam. That leaves only one of the remaining 11 darts unaccounted for. Regardless, it is not necessary for the darts to actually penetrate the skin in order to be effective.  The M26 is designed to arc through two inches of clothing and still incapacitate the subject.

1   and the professionalism of the Salinas Police Department.

2       G.     Mark Lehto, Ph.D.:

3       Mark Lehto  received his Ph.D. in Industrial and Operations Engineering from the

4   University of Michigan, is currently an Associate Professor of Industrial Engineering at

5   Purdue University, and is President of Consumer Research, Inc., a research and consulting

6   firm involved in the creation and design of warnings and labeling, among other things.

7       Dr. Lehto was retained by TASER to offer his opinions regarding the adequacy of

8   warnings and instructions provided by TASER to law enforcement officers specifically as

9   it relates to the potential for death under some circumstances when TASER ECD's are

10  used.

11      Dr. Lehto was never asked nor did he conduct any research, review, testing or

12  analysis of the specific Model M26 ECD's used during this incident.  Nonetheless, Dr.

13  Lehto offers the following opinion in his Rule 26 Report:

14      With respect to warnings regarding its potential use leading to possible death
        under special circumstances, I do not find the TASER M-26, used under the
15      circumstances of this matter, to have been either defective or unreasonably
        dangerous.

16  (Lehto Rule 26 Report, P. 7, ¶ 6)

17      Dr. Lehto had no knowledge of the "circumstances of this matter," however, when

18  he rendered this opinion. The following exchange is illustrative:

19      Q     Okay.  How many TASER devices was Mr. Heston shot with?

20      A     I don't have an opinion on exactly how many he received. I think there
              was a lot of ambiguity in that particular case in terms of determining
21            that, so I have not developed an opinion on exactly how many he
              received.

22      Q     Well, let's do the part that's not ambiguous.  How many officers say
23            they fired their TASER's?

24      A     Again, I'm not really quite sure how many people fired, but it was
              more than one.
25

26      Q     All right.  Now, you're familiar with the data port?

27      A     Yes.

28      Q     Okay.  Of the TASERs that were fired, how many discharges were

1    recorded on the data ports?

2        . . . .

3    A    It wasn't something I analyzed for this report.  I do remember that
     number was in the data somewhere and so I could give you a rough
4    guess, but I really don't know for sure.  If I'm remembering right, it
     was maybe around five, something like that.

5  (Lehto Deposition, P. 66:4-23)[10]

6

7        Dr. Lehto's obvious ignorance concerning the key circumstances of this incident

8  should bar him from offering any expert opinions concerning whether the warnings for the

9  Model M26 ECD's used in this incident were defective, and, more importantly, whether

10 they were unreasonably dangerous.

11       H.    Dr. Richard Luceri, M.D.:

12       Dr. Richard Luceri is a Medical Doctor who is Board Certified in Internal Medicine

13 and Cardiovascular Medicine and currently serves on TASER's Medical and Scientific

14 Medical Advisory Board.[11]  Dr. Luceri specializes in cardiac electrophysiology and was

15 retained by defendant, TASER, to offer an opinion as to whether electrical discharges from

16 TASER M-26's can cause direct stimulation of the heart to the extent that they produce a

17 fatal cardiac arrest. Plaintiffs have no objection to Dr. Luceri offering an opinion on this

18 subject even though it is irrelevant to the actual claims being made by the plaintiffs.

19       However, like other TASER experts, Dr. Luceri offers an opinion that far exceeds

20 his particular and very specialized area of expertise.   For example, Dr. Luceri offers the

21 following opinion in his Rule 26 Report concerning Heston, Jr.'s cause of death:

22       It is also my opinion, to a reasonable degree of medical probability, that Mr,
     Heston's death was caused by an excited delirium state due to acute-on-
23       chronic drug abuse with subsequent metabolic, respiratory, hepatic, renal and
     cardiac failure.

24
   (Luceri Rule 26 Report, Section VI. Conclusion, ¶ 2)
25

_____

26       [10]  There were more than 30 discharges recorded on the data ports of the five tasers.

27       [11]TASER's counsel insisted on an incorrect spelling of Dr. Luceri's name on their
28 portion of the witness list in the joint pretrial statement, even after plaintiffs' counsel tried
   to correct it for them.

By his own admission, Dr. Luceri is not an expert in excited delirium:

Q.     Do you consider yourself an expert in excited delirium syndrome?

A      Not at all.

Q      What is the mechanism of death in excited delirium syndrome?

A      Well, from what I understand -- and again, I am not an expert in this -- it's a consequence of metabolic disturbances that could be multiple and that ultimately result in chemical processes in the body that cause electrolyte abnormalities, chemical abnormalities, and essentially shut down the major functions of the body.

Luceri Deposition, P. 100:24-25; 101:1, 12-20)

Dr. Luceri is not an expert in excited delirium and should not be permitted to offer any opinions at trial that Heston, Jr.'s death was caused by excited delirium.

I.     Dr. Deborah Mash, Ph.D.:

Dr. Deborah Mash, Ph.D., holds a a Ph.D. in Neuropharmacology. She is the Director of the University of Miami Brain Endowment Bank, which collects specimens of brain tissue. She is not a medical doctor and has never treated patients. She proffers several opinions that should only be rendered only by an expert with a degree in medicine.

For example, Dr. Mash opines:

The pathologic investigation noted that the decedent's heart was hypertrophied, dilated, and contained patchy scars. These findings are highly consistent with the decedent's long-standing history of psychostimulant abuse and they are a predictor of sudden death in cases of excited delirium. The pulmonary edema is consistent with psychostimulant abuse of "smoked" methamphetamine prior to death.[12]

(Mash Rule 26 Report, at 6 (unnumbered))

One possible contributing cause of death was due to the decedent's cardiac findings of hypertrophy, dilatation, and patchy scarring. These cardiac abnormalities are consistently seen in methamphetamine abusers. The absence of coronary atherosclerosis, which could also have caused these conditions, increases the likelihood that these conditions are caused by chronic methamphetamine use. In addition, acute methamphetamine toxicity also increases the risk of sudden cardiac death, particularly in the presence of cardiac disease such as hypertrophy, dilatation, and patchy scarring.

---

[12]  The pulmonary edema documented at autopsy followed 30 hours of Mr. Heston's being kept alive on a ventilator. This non-physician has no basis for attributing it to the smoking of methamphetamine the day before his death.

**Id.** at 9.  None of these opinions has anything to do with brain tissue, Dr. Mash's sole area of expertise. There is no basis for this non-physician to predict from heart tissue which agitated people survive and which do not survive confrontations with the police. Dr. Mash should not be allowed to opine on cause of death. That issue should be left to one or more of the seven medical doctors TASER has designated.

Underscoring the problem, Dr. Mash gave a rambling two-page answer to a question about treatment for "excited delirium," which included the statements that "It is to the best of my scientific and academic knowledge over the years that I've been working on this topic that they don't survive, that they are usually lethal." (Mash Deposition, P. 26-27). This directly conflicts with Dr. Di Maio, who literally wrote the book on excited delirium syndrome:

> Q.    And so when we talk about somebody being in a state of excited delirium, that is not a cause of death.  That's just a state that somebody who both has delirium and is –
>
> A.    Excited.
>    . . . .
>
> Q.    And they may or may not, you know, survive the incident.
>
> A.    **Virtually everyone in excited delirium survives.  It's the rare cases that a person dies** if he goes into excited delirium syndrome.  If you're in mental institutions, people go into excited delirium all the time.

(Di Maio Deposition, P. 22:1 to 22:14) (emphasis added).

Dr. Di Maio's testimony is echoed by a defense expert who actually treat patients experiencing excited delirium – emergency room physician Dr. Jeffrey Ho.

Dr. Ho sees 150 to 200 "excited delirium" cases a year in his emergency room (Ho Deposition, P. 34:7); yet in the last 15 years has seen only 12 to 15 of them die – a fraction of one percent. (**Id.** P. 44:17 to 44:22)   Dr. Ho agrees with Dr. Di Maio that "excited delirium rarely results in death in the absence of forced restraint." (**Id.** at P. 121:11 to 121:13)

Accordingly, the Court should preclude Dr. Mash from testifying that Mr. Heston died from "excited delirium," or from any other cause.

1    J.    Dr. Dorin Panescu, Ph.D.:

2    Dr. Dorin Panescu is yet another engineer retained by TASER to offer opinions in

3    this case.  Dr. Panescu earned his Ph.D. in Electrical and Computer Engineering from the

4    University of Wisconsin-Madison and currently serves as the Principal Staff Scientist for

5    Cardiac Rhythm Management at St. Jude Medical in Sunnyvale, California.   Dr. Panescu

6    was asked by TASER to render opinions regarding the electrical distributions of electrical

7    currents produced by TASER ECD's and whether such currents could have had a causal

8    role in the death of Heston, Jr.

9    Dr. Panescu is not a medical doctor, admittedly has limited medical training and is

10   neither an expert toxicologist nor forensic pathologist. Like most of TASER's other experts,

11   he, nonetheless, offers opinions about subjects he has no expertise in such as the following

12   statement taken from his Rule 26 Report:

13   > Methamphetamine causes fatal cardiac arrhythmias.  Taken in dosage that
14   > exceeds 0.5 milligrams per liter blood concentration, methamphetamine can
15   > cause symptoms that irreversibly degenerate the body condition and may
     > result in death.  Mr. Heston's autopsy measured methamphetamine levels of
     > 0.64 milligrams per liter.

16   (Panescu Rule 26 Report, P. 2, ¶ 1.2.6)

17   The admitted limitations of Dr. Panescu's expertise are revealed when asked about

18   this opinion at his deposition testimony:

19   Q.    Do you consider yourself a toxicologist?

20   A.    No.

21   Q.    This – I mean, this strikes me as beyond your expertise.

22   A.    Well it's a finding, so I have done some research.  I went to the NIH's
23         website where they provide knowledge about many drugs, including
           methamphetamine.  And they provide the charts which say what are the
24         effects of over-dosage, what are the dangerous dosage, what are the
           effects of dosages.  This is just a finding I had based on research I've
           done on those accepted websites.

25   Q.    Right.  Well I can do that too.  But you have no special training or
26         expertise in this area; is that correct?

27   A.    That is correct.

28   (Panescu Deposition, P.  73:2-23)

Q.   Would you consider yourself an expert on -- on the effect of chronic methamphetamine abuse on the human body?

A.   No, I am not.  I am just reporting from again the research I've conducted, and also the field I'm working in right now.  Most of these illegal drugs they facilitate heart failure that can degenerate and turn into a fatal cardiac arrhythmias, either ventricular fibrillation or asystole.

(Panescu Deposition, P. 74:22-25; 75:1-5)

Once again, Dr. Panescu's testimony should be limited to the specific area of his expertise – whether or not electrical stimulation from TASER ECD's can cause direct electrical stimulation of the heart such that it produces a fatal cardiac arrhythmia.   Of course, the relevance of this testimony is dubious at best considering the fact that this is not a theory that plaintiffs intend to present at trial as to the cause of death.

        K.    John G. Peters, Ph.D.:

"Dr." Peters claims a Ph.D. degree in something called "Applied Management and Decision Sciences" from Walden University (an on-line program), a Master of Business Administration from Babson College, and a degree in Public Relations from Boston University.  None of these subjects relates to any scientific or technical knowledge which might assist the trier of fact assess the evidence in this case.

Dr. Peters provided a 48-page Rule 26 report stating  21 opinions on technical subjects such as drug intoxication and its behavioral effects, physiological components of excited delirium, effects of electrical stimulation on the body, police practices, product warnings, ventricular fibrillation (a lethal cardiac arrhythmia), and Mr. Heston's cause of death.  He also opines on legal issues, including the sufficiency of the complaint, "opining" that the plaintiffs' claims are baseless because no privity of contract existed between TASER and the decedent – the same argument rejected by the Court when denying TASER's Rule 12(b) motion to dismiss.

Dr. Peters offers a wide range of opinions which go far beyond any claimed expertise he possesses.   For example, he is not a medical doctor, has never attended medical school and has no education, special knowledge, background or experience in medicine or

toxicology. Nonetheless, he opines that "Mr. Heston's behavior and medical issues are consistent with being in a state of 'excited delirium,'" (Peters' Rule 26 report, P. 31, Opinion No. 12), and that "Mr. Heston's chronic abuse of stimulants contributed to the effects on his body and the excited delirium episodes." (Peters' Rule 26 Report, P. 28, para. 2). He also offers this opinion on the ultimate issue in the case: "In my professional opinion, Mr. Heston's alleged injuries and death (apparently he has some doubt as to whether Mr. Heston actually died) came from independent conduct that was not controlled by TASER." (Peters' Rule 26 Report, P. 30, para. 1). Peters even offers an opinion critical of the autopsy report authored by Terri Haddix, M.D., the pathologist assigned by Monterey County Sheriff-Coroner to determine the cause of Mr. Heston's death: "In my professional opinion, Dr. Haddix appears to have misapplied the underlying definition of causation with respect to the TASER." (Peters' Rule 26 Report, P. 40, para. 1).

Peters also offers opinions concerning the effectiveness of the Taser product in subduing Mr. Heston. While his CV indicates that he has no education, special knowledge, background or experience in electrical engineering, he nonetheless "opines": (1) "[T]here is no indication that that [sic] the TASER electronic control device did anything other than what it was designed to do with proper use," (Peters' Rule 26 Report, P. 30, para. 1); (2) "Correlation of TASER-brand electronic control device application to a part of the human body followed by the person's dying from alleged heart or respiratory arrest does not scientifically establish causality," (Peters' Rule 26 Report, P. 37, Opinion No. 15); (3) "The TASER ECD is a safe device for the capturing of an individual such as Mr. Heston," (Peters' Rule 26 Report, P. 45, Opinion No. 19); and (4) TASER did not produce a defective ECD, did not cause Mr. Heston's excited delirium, respiratory arrest, rhabdomyolosis, and/or fatal cardiac arrhythmia." (Peters' Rule 26 Report, P. 47, Opinion No. 21)

Still another area of expertise in which Peter's offers opinions regards police practices. The question of whether the police officers used excessive force goes to the Section 1983 claims brought against defendants City of Salinas and its individual police officers. This

claim is not even directed at TASER.  The claims alleged against TASER involve theories of strict products liability – the failure to properly warn of a known danger.  Nonetheless, Peters offers the following opinion:  "It was reasonable and consistent with suggested protocols that at least four Salinas peace officers attempted to manage Mr. Heston's violent and bizarre behavior."  (Peters' Rule 26 Report, P. 32, Opinion No. 13)[13]  While Peters' CV indicates that he spent one year of service as a police officer in the Northern York County Regional Police Department and five years of service as a Deputy Sheriff with the York County Sheriff's Department, these experiences do not qualify him as a police practices expert.  Even if he were qualified to render such opinions, which he clearly is not, such opinions on police practices are irrelevant to the claims made against TASER.

Finally, Peters, who is not an attorney and possesses no legal education, background or experience, has the temerity to proffer legal opinions regarding causation, the merits of plaintiffs' action and even the validity of the Court's previous ruling.  For example, he opines that  "Mr. Heston should not recover on a cause of action for alleged injuries based upon his own illegal and resistive acts."  (Peters' Rule 26 Report, P. 30, para. 4). Apparently dissatisfied with the Court's denial of Taser's Motion to dismiss, Peters offers the following opinion: "Mr. Heston was not the buyer or the end user of the TASER product.  Neither Mr. Heston nor anything in the complaint suggests that the TASER ECD was sold to him. . . . In my professional opinion, TASER did not have a relationship with Mr. Heston." (Peters' Rule 26 Report, P. 29, para. 4).

Dr. Peters is unqualified to render any opinion because he has no special knowledge, skill, experience, training, or education which would qualify him as an expert to testify on subjects as varied as drug toxicology, electrical engineering, physiology, forensic pathology, police practices or law.   Peters is nothing more than an expert in "public relations" and many of the opinions he offers are simply taken from the opinions offered by other experts designated by TASER (who are actually qualified in their respective fields).

---

[13]  Plaintiffs do not disagree with the number of officers involved in the incident, but with the number of Taser shocks.

1    Dr. Peter's testimony should be excluded in its entirety since nothing he offers meets

2 the standards of Fed. R. Evid. 702, and would aid the jury in deciding any of the complex

3 issues raised in this litigation.

4 V.    CONCLUSION

5    For the foregoing reasons, plaintiffs' motion to exclude certain opinions of TASER's

6 many experts, insofar as such opinions exceed the particular expert's field of expertise,

7 should be granted.

8 DATED:  March 31, 2008

9                                                Respectfully submitted,

10                                               THE LAW OFFICES OF JOHN BURTON
                                                 WILLIAMSON & KRAUSS
11

12

13                                               BY:  /s/ PETER M. WILLIAMSON
                                                      Attorneys for Plaintiffs
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28